**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MIKE SHAFER, DAVID KEATING and WILLIAM JEFFREY IGOE, on Behalf of Themselves and All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>     v.<br><br>GLOBAL PAYMENTS, INC.; ACTIVE NETWORK, LLC; JEFF SLOAN; CAMERON BREADY; PAUL TODD; JOSH WHIPPLE; and ANDREA FACINI,<br><br>                Defendants. | No. 1:23-cv-00577-LMM |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   BACKGROUND .....................................................................................2

    A.    Active Provides Race and Event Registration Services, and
        Misleads Consumers Into Signing Up for "Active Advantage." ..........2

    B.    GPN Acquires Active Despite Its History
        of Misleading Consumers...................................................................4

    C.    The CFPB Files Its Complaints, GPN Walks Back Its Assurances of
        Legal Compliance, and Defendant Sloan Abruptly Steps Down..........5

III.  ARGUMENT...........................................................................................6

    A.    The AC Alleges That Defendants' Statements Were
        Materially False and Misleading. .......................................................6

        1.    Defendants Falsely Stated That GPN Was In Compliance
            With Legal and Regulatory Requirements..................................7

        2.    Defendants' Risk Factor Statements Are Actionable. ...............8

        3.    Defendants' Earnings Call Statements About Active's
            Performance Are Actionable....................................................11

        4.    The Misstatements on Active's Website Are Actionable.........15

        5.    Defendants' Violated SEC Items 303 and 105. .......................17

        6.    Defendants Are Liable for Statements They Controlled. .........18

    B.    The AC's Allegations Establish a Strong Inference of Scienter.........20

        1.    Consumer and Customer Complaints About Active
            Advantage Establish a Strong Inference of Scienter. ...............21

        2.    Active Advantage Cancellations, Refunds, and Complaints
            Were Tracked and Reported to Defendants.............................23

        3.    The Pre-Class Period Government and Class Action
            Lawsuits Put Defendants on Notice.......................................24

4.     The CFPB Investigation, and the Facts it Uncovered, Contributes to Scienter. ...........................................24

5.     Defendants Sloan and Todd Were Motivated To Portray the Acquisition of Active as a Success. ....................................25

C.    The AC Sufficiently Alleges Loss Causation. ....................................26

D.    Plaintiffs Sufficiently Allege A § 20(a) Claim. ..................................30

IV.   CONCLUSION.............................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...............................................................................13

*Brendon v. Allegiant Travel Co.*,
  412 F. Supp. 3d 1244 (D. Nev. 2019)....................................................29

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) .............................................9, 13, 18

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ....................................................................8

*City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing
  Servs., Inc.*, 2012 WL 1080953 (M.D. Fla. Mar. 30, 2012). .............19

*City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*,
  2018 WL 4293143 (N.D. Ga. May 15, 2018)....................................12

*D.E. & J Ltd. P'ship v. Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003) .............................................29

*Druskin v. Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) ......................................15, 22

*Duncan v. Rushmore Loan Mgmt. Servs., LLC*,
  2021 WL 8774248 (M.D. Fla. Sept. 30, 2021)...................................30

*Eastwood Enters., LLC v. Farha*,
  2009 WL 3157668 (M.D. Fla. Sept. 28, 2009)...................................25

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) .......................................7, 8, 12, 26

*Firemen's Ret. Sys. of St. Louis v. Telos Corp.*,
  2023 WL 1512207 (E.D. Va. Feb. 1, 2023) ......................................18

*Galeston v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................23

iii

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ...............................................................6

*Golub v. Gigamon Inc.*,
  994 F.3d 1102 (9th Cir. 2021) ...............................................................10

*Grae v. Corr. Corp. of Am.*,
  2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021) ..................................29

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)................................................................................28

*Howard v. Arconic Inc*.
  395 F. Supp. 3d 516, 539 (W.D. Pa. 2019) .........................................16

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  625 F. Supp. 2d 1267 (S.D. Fla. 2008) ................................................24

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005)......................................................29

*In re Braskem S.A. Sec. Litig.*
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) ....................................................8

*In re Buca Inc. Sec. Litig.*
  2006 WL 3030886 (D. Minn. Oct. 16, 2006)......................................29

*In re Coca-Cola Enterprises Inc. Sec. Litig.*
  510 F. Supp. 2d 1187 (N.D. Ga. 2007).................................................14

*In re Ebix, Inc. Sec. Litig.*,
  898 F. Supp. 2d 1325 (N.D. Ga. 2012).................................................26

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019).................................................26

*In re Facebook, Inc. Sec. Litig.*,
  405 F. Supp. 3d 809 (N.D. Cal. 2019)...............................................8, 15

*In re Flowers Foods, Inc. Sec. Litig.*,
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)............................*passim*

iv

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018)....................................................21

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ....................................12

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
2016 WL 10592320 (S.D. Fla. June 6, 2016)..............................20, 29

*In re HomeBanc Corp. Sec. Litig.*
706 F. Supp. 2d 1336 (N.D. Ga. 2010)..............................................23

*In re Honeywell Int'l, Inc. Sec. Litig.*,
182 F. Supp. 2d 414 (D.N.J. 2002)....................................................26

*In re LifeLock, Inc. Sec. Litig.*,
690 F. App'x 947 (9th Cir. 2017)......................................................16

*In re Miller Indus., Inc. Sec. Litig.*,
12 F. Supp. 2d 1323 (N.D. Ga. 1998)..................................................8

*In re MiMedx Grp., Inc. Sec. Litig.*,
2021 WL 7210372 (N.D. Ga. Mar. 25, 2021), *motion for relief
from judgment denied*, 2022 WL 619702 (N.D. Ga. Jan. 27, 2022),
*and aff'd in part, vacated in part sub nom. MacPhee v. MiMedx
Grp., Inc.*, 73 F.4th 1220 (11th Cir. 2023)..................................27, 28

*In re Mirant Corp. Sec. Litig.*,
2009 WL 48188 (N.D. Ga. Jan. 7, 2009)............................................12

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*
423 F. Supp.2d 364 (S.D.N.Y. 2006) ................................................13

*In re Tupperware Brands Corp. Sec. Litig.*,
2023 WL 5091802 (11th Cir. Aug. 8, 2023) ....................................21

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab.
Litig.*, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ..............................15

*In re Witness Sys., Inc. Sec. Litig.*,
2008 WL 9020540 (N.D. Ga. Mar. 31, 2008), *aff'd, Rosenberg v.
Gould*, 554 F.3d 962 (11th Cir. 2009) ..............................................24

*In re XP Inc. Sec. Litig.*
  524 F. Supp. 3d 23 (E.D.N.Y. 2021) ...................................................................8

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)..............................................................................19, 29

*Kang v. PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022).................................................................8

*Laperriere v. Vesta Ins. Grp., Inc.*,
  526 F.3d 715 (11th Cir. 2008) .......................................................................30

*Leykin v. AT&T Corp.*,
  423 F. Supp. 2d 229 (S.D.N.Y. 2006),
  *aff'd*, 216 F. App'x 14 (2d Cir. 2007)...............................................................30

*Luczak v. Nat'l Beverage Corp.*,
  812 F. App'x 915 (11th Cir. 2020) (per curiam) ...............................................13

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  No. 22-1165 (Sup. Ct. May 30, 2023), Doc. 4 ..................................................18

*Masters v. GlaxoSmithKline*,
  271 F. App'x 46 (2d Cir. 2008) .......................................................................30

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)........................................................................................13

*Meyer v. Greene*
  710 F.3d 1189 (11th Cir. 2013) ......................................................................27

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) .....................................................................10, 27

*Miyahira v. Vitacost.com, Inc.*
  2012 WL 12895513 (S.D. Fla. June 28, 2012),
  *aff'd,* 715 F.3d 1257 (11th Cir. 2013)..............................................................15

*Mizzaro v. Home Depot, Inc.*
  544 F.3d 1230 (11th Cir. 2008) ..................................................................22, 26

*Mogensen v. Body Cent. Corp.*
  15 F. Supp. 3d 1191 (M.D. Fla. 2014).............................................................22

vi

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
2018 WL 1558577 (N.D. Ga. Mar. 29, 2018), *clarified*, 2018 WL
1702675 (N.D. Ga. Apr. 6, 2018) ....................................................................20

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ....................................................................28

*Nolte v. Capital One Fin. Corp.*,
390 F.3d 311 (4th Cir. 2004) ....................................................................10, 11

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ............................................................................7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund*, 575 U.S. 175 (2015) ....................................................................9, 10, 11

*Otogenetics, Corp. v. Omega Biosciences, Inc.*,
2018 WL 11243794 (N.D. Ga. Aug. 29, 2018) ..............................................30

*Plain Bay Sales, LLC v. Gallaher*,
2019 WL 1782761 (S.D. Fla. Apr. 24, 2019) ................................................30

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ................................................12

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*
645 F. Supp. 2d 210 (S.D.N.Y. 2009) ............................................................29

*Primavera Inv's v. Liquidmetal Techs., Inc.*,
403 F. Supp. 2d 1151 (M.D. Fla. 2005)....................................................19, 22

*Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021)...........................................................26

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F. 4th 232 (4th Cir. 2023) .........................................................................24

*SEC v. Gruder*,
2010 WL 11500092 (N.D. Ga. Feb. 11, 2010) ..............................................15

*SEC v. Tex. Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) ...........................................................................16

vii

*Stein v. Aaron's, Inc.*,
  2022 WL 4588410 (N.D. Ga. Sept. 29, 2022)................................................22, 25

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..............................................................15

*Sturm v. Marriott Marquis Corp.*
  85 F. Supp. 2d 1356 (N.D. Ga. 2000)..................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...........................................................................................20

*Theodore v. Purecycle Techs., Inc.*,
  2022 WL 20157415 (M.D. Fla. Aug. 4, 2022)..............................................19, 26

*Theodore v. Purecycle Techs., Inc.*,
  2023 WL 4035880 (M.D. Fla. June 15, 2023) ...................................................25

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015)........................................................20, 27

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  2014 WL 11961964 (S.D. Fla. Dec. 23, 2014)...................................................20

*Veal v. LendingClub Corp.*
  423 F. Supp. 3d 785 (N.D. Cal. 2019)............................................................8, 9

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017)....................................................15

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)....................................................................................10, 11

*Williams v. Globus Med. Inc.*,
  869 F.3d 235 (3d Cir. 2017) ...............................................................................8

**Statutes**

17 C.F.R. § 240.10b-5 .................................................................................................1

Consumer Financial Protection Act of 2010...............................................................6

Electronic Fund Transfer Act of 1978 .......................................................................6

PSLRA ..................................................................................................26

Securities Exchange Act of 1934 .............................................................1

Co-Lead Plaintiffs Mike Shafer, David Keating, and William Jeffrey Igoe (together, "Plaintiffs"), respectfully submit this brief in opposition to Defendants' motion to dismiss the Amended Class Action Complaint (Doc. 49) ("MTD").[1]

## I.    INTRODUCTION

"*We are currently in compliance with existing legal and regulatory requirements.*" That is what Defendants told investors. It was false. This securities fraud class action, which arises under the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, seeks damages caused by Defendants' false and misleading statements and omissions related to a long-running consumer deception scheme—which Defendants do not deny—at Active Network, LLC ("Active"), in the Merchant Solutions segment of Global Payments, Inc. ("GPN"). During the Class Period, Defendants stated that GPN was "currently in compliance with existing legal and regulatory requirements," covering up Active's intentionally deceptive methods to trick millions of consumers into paying subscription fees. Defendants touted "bookings trends" as the basis of Active's performance, and Active's "seamless" registration process as "created specifically to meet [event organizers'] needs." In truth, Active's performance was girded by hundreds of millions of dollars in fees ($300 million since 2011) paid by

---

[1] All "¶__" references are to the Amended Complaint ("AC") [Doc. 39] unless noted otherwise. All capitalized terms have the same meaning as in the AC.

1

consumers deceived by a process designed to benefit Active at the expense of consumers and Active's clients.

Not until the Consumer Financial Protection Bureau ("CFPB") took notice, conducted an investigation (kept secret by Defendants) that obtained Active's internal documents and sworn testimony, and filed a complaint in federal court on October 18, 2022, did investors begin to learn the truth and extent of Active's scheme. GPN retracted its assurances of compliance, and its CEO, Defendant Sloan—who spearheaded GPN's acquisition of Active—unexpectedly stepped down. The stock fell to $103.00 per share, a 10% decline from its opening price before the CFPB Complaint was filed, injuring the proposed Class.

## II.    BACKGROUND

### A.    Active Provides Race and Event Registration Services, and Misleads Consumers Into Signing Up for "Active Advantage."

Active offers online event registration and payment services, primarily for camps and athletic events. ¶50. Organizers of camps and events can retain Active rather than build and maintain their own payment and registration infrastructure. *Id*. When a consumer signs up for such a camp or event, the organizer's website directs them to an Active website to complete registration. *Id*. Active processes the consumer's registration information and payment data, transmits it through a payments system, and keeps a portion of the payment. *Id*.

For most of its customers, Active included in the process an "inserted offer" for enrollment in a "discount membership club" known as "Active Advantage." ¶¶11, 52. For an annual fee, Active Advantage members can redeem discounts for processing fees, wine tastings, sports apparel, travel, and race registrations. ¶52.

The registration process and inserted offer is designed to trick consumers into unknowingly signing up for, and remaining in, Active Advantage. Before and during the Class Period, Active used two deceptive methods known to violate consumer protection laws and regulations: (1) "dark patterns" and (2) "negative options." ¶53; *see also* ¶¶54-57. Active intentionally included dark patterns in its registration process. ¶75. Further, Active automatically renewed memberships absent an explicit rejection, though consumers were unaware they had enrolled in the first place. ¶13.

This exposed Active to liability, both before and after GPN acquired Active. In 2013, Active settled with the Iowa attorney general, agreeing to (i) comply with Iowa's consumer fraud law, or (ii) stop enrolling Iowans in Active Advantage. ¶58. Active chose the latter. *Id.* In 2014, Active settled with the Vermont attorney general, and stopped offering Active Advantage in that state. ¶59. In 2016, it settled with three California counties, agreeing to pay restitution to 100,000 consumers and $2.7 million in civil penalties. ¶60. In 2017, Active settled a consumer class action in California and paid full refunds to class members. ¶61.

Active was the subject of constant consumer complaints. A 2016 article reported that 410 complaints had been submitted to the Better Business Bureau ("BBB"), all of which were forwarded to Active. ¶63.

**B.    GPN Acquires Active Despite Its History of Misleading Consumers.**

Despite this, GPN acquired Active in 2017 for $1.2 billion. ¶65. Defendants Sloan and Bready—GPN's CEO and CFO at the time—touted the acquisition to investors, failing to mention Active's history of deceptive practices. ¶¶66-73.

Active's scheme continued unabated. In fact, after the acquisition, Active performed marketing tests to determine how to redesign its registration process to more effectively deceive consumers. ¶75. Consumer complaints continued to flood into the BBB and to Active. ¶76. In the last three years, the BBB received 890 complaints about Active; the vast majority were about hidden Active Advantage charges. ¶134. Active employees were tasked with responding to *all* of those complaints. ¶78(e)(vi). There was a dedicated complaints team, and marketing, social media, technical support, and registration employees also responded to customer complaints and refund requests. ¶¶38, 78(a)(i), 78(b)(ii), 78(c)(i).

Active Advantage refund requests were the company's "most hot button topic." ¶78(g)(iii). The deception was "common knowledge." ¶78(h)(ii). "This was not something where one or two of us knew about it. We all knew about it." ¶79(iv). Consumers complained to event organizers—Active's clients—which in

4

turn complained to Active. Some clients requested removal of the contractual provision permitting Active to include the Active Advantage inserted offer; Active refused at times because it threatened its revenue. ¶78(d)(ii), 79(i)-(ii). A senior account manager was sure that Active lost clients, which news reports support. ¶¶64, 78(d)(ii). At a quarterly town hall meeting attended by Active's executive leadership, one attendee asked: "why are we offering this if we're losing clients over it?" ¶78(d)(v). The reason: it was a "cash cow" for Active. ¶78(d)(iv).

GPN did not disclose any of this. Instead, Defendants assured investors that it was "in compliance with existing legal and regulatory requirements" (¶¶96, 100) and reported that Active's contribution to GPN's performance was based on bookings trends, referring to consumer registrations for events (¶¶105-14).

Active's website misleadingly touted Active's services as "created specifically to meet [the] needs" of event organizers, "elevat[ing] the participant experience." ¶¶117, 119. Furthermore, despite the excessive levels of credit card chargebacks Active received—four times "concerning" levels according to Active's own analysis—Active falsely claimed it "challenge[d] every chargeback received," and successfully disputed 50-80% of them. ¶¶77, 125-26.

### C.    The CFPB Files Its Complaints, GPN Walks Back Its Assurances of Legal Compliance, and Defendant Sloan Abruptly Steps Down

Regulators (again) took notice. The CFPB conducted an investigation of Active that included obtaining internal Active documents and communications and

securing testimony from Active leadership. ¶¶8, 138. On October 18, 2022, the CFPB filed a complaint in federal court, alleging that Active intentionally deceived consumers into signing up for free Active Advantage trials. ¶¶9-10. Active did not notify consumers when free trials would convert to paid or when memberships would renew. ¶10. Further, Active increased annual fees without statutorily required notice. *Id.* The CFPB alleges that Active violated the Consumer Financial Protection Act of 2010 ("CFPA"), the Electronic Fund Transfer Act of 1978 ("EFTA"), and Regulation E, and seeks injunctive and monetary relief, as well as civil monetary penalties and payment of the CFPB's costs. ¶¶10, 60.

From its opening price on October 18, 2022, GPN's stock fell over 2% by the close of October 19, 2022, and fell further when GPN retracted its assurances of compliance and when Defendant Sloan, who oversaw the Active acquisition, abruptly resigned. ¶¶129-31.

## III. ARGUMENT

### A. The AC Alleges That Defendants' Statements Were Materially False and Misleading.

The AC adequately pleads falsity because it specifies "the who, what, when[,] where, and how" of the alleged misstatements. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006). [2]

---

[2] Internal citations, internal quotations, and footnotes omitted and emphasis added unless noted otherwise.

**1.     Defendants Falsely Stated That GPN Was In Compliance With Legal and Regulatory Requirements.**

During the Class Period, Defendants explicitly stated that GPN was "currently in compliance with existing legal and regulatory requirements." ¶¶96, 100. This was false, as the CFPB alleged based on internal documents and testimony. Further, it was materially misleading because, "by voluntarily touting the subject to investors," Defendants undertook "a duty to disclose all material information relating to" such compliance. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *9 (M.D. Ga. Mar. 23, 2018); *see also FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011) ("A duty to speak the full truth arises when a defendant undertakes to say anything."); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023).

Defendants failed in this duty: they disclosed nothing about Active's deceptive scheme. After the CFPB Complaint was filed, Defendants revised GPN's disclosures to state that GPN was "in compliance *in all material respects* with . . . legal and regulatory requirements," implicitly conceding noncompliance, ¶130, and *they do not dispute that Active's deception occurred*. *Cf.* MTD at 16 (baldly and without citation stating that "Defendants deny [Active's violations] occurred").

Defendants' contention that "[t]he federal securities laws do not require defendants to accuse themselves of wrongdoing" (MTD at 7 (quoting *Drucker v. Just for Feet Inc.*, 2000 WL 36733071, at *5 (N.D. Ala. Sept. 29, 2000)) is

7

irrelevant. Defendants affirmatively stated that GPN was in compliance with all laws and regulations, and thus had a duty to "speak the full truth" about that subject. *FindWhat*, 658 F.3d at 1299; *cf. In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1331 (N.D. Ga. 1998) ("Materiality alone is not sufficient to place a company under a duty of disclosure.").[3]

### 2.    Defendants' Risk Factor Statements Are Actionable.

Defendants' arguments about their risk factor statements (¶¶98, 102) fail per their own authorities. The AC *does* allege that Active's deception was affecting Active and GPN: customers complained, employees were diverted, clients complained and were lost. *Cf. In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 841 (N.D. Cal. 2019); *cf., also*, *Williams v. Globus Med. Inc.*, 869 F.3d 235, 241–43 (3d Cir. 2017).[4] *Veal v. LendingClub Corp.* fares no better; there, "[t]he

---

[3] Unlike in *In re XP Inc. Sec. Litig.*, Plaintiffs here can "point to express prior disclosure" claiming legal and regulatory compliance," and have alleged with particularity that the underlying conduct occurred and contributed to GPN's financial results. 524 F. Supp. 3d 23, 38 (E.D.N.Y. 2021). *In re Braskem S.A. Sec. Litig.* involved "inherently aspirational" statements. 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017). So did *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("explicitly aspirational"), and *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 899 n.2 (N.D. Cal. 2022) ("'aspirational' statements of compliance here did not 'reasonably suggest[] that there would be no violations'"). Here, Defendants explicitly represented there were "no violations."

[4] *Miller*'s holding that the simple disclosure of an antitrust investigation did not create a duty to disclose "potential but conjectural antitrust liability." 12 F. Supp. 2d at 1331. That is irrelevant here, where Defendants assured investors that GPN

two statements regarding GLBA compliance were issued on February 28, 2017 and February 22, 2018," so FTC allegations regarding "conduct that ended in 2016," did not establish falsity. 423 F. Supp. 3d 785, 809 (N.D. Cal. 2019). Moreover, Defendants' awareness of Active's scheme is adequately pled. *See* § III.B., *infra*.[5]

Defendants' statements were not framed as opinions or beliefs, like in *Ocwen*. 934 F.3d at 1323 (e.g., "[W]e believe that our competitive strengths. . . .").[6] The Supreme Court held that a reasonable investor "recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187 (2015)). Such words appear in Defendants' brief, but not in the misstatements themselves. The "context" of the misstatements confirms that they are actionable. For instance, Defendants' statement that "[w]e are currently in compliance with existing legal and regulatory requirements" appears on page 11 of the 2020 Form 10-K. Defendants' selectively quoted excerpts (MTD at 15) appear

was in full compliance with laws and regulations, and also made boilerplate risk factor warnings about enforcement for hypothetical noncompliance.

[5] To the extent *LendingClub* suggests that actual knowledge of falsity is required, it conflicts with binding Eleventh Circuit law holding that allegations establishing severe recklessness satisfy the scienter requirement (which is distinct from pleading that a statement was materially false or misleading). *See, e.g., Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317-18 (11th Cir. 2019).

[6] Defendants' citation to *Sturm v. Marriott Marquis Corp.* does not address liability for statements of opinion or belief; it concerns when a court may consider an extrinsic document on a 12(b)(6) motion without converting the motion to one for summary judgment. 85 F. Supp. 2d 1356, 1366 (N.D. Ga. 2000).

9

on page *20* of that 10-K, and warn about "*[c]hanges* to legal rules and regulations, or interpretation or enforcement thereof." But the AC pleads, and Defendants do not contest, that Active violated "legal rules and regulations" in place at the time of the misstatements. Defendants' omission of Active's scheme "is not cured by the additional statement that non-compliance" may have consequences. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

Even if Defendants' risk factor misstatements could be analyzed as statements of opinion or belief (and they cannot), they are actionable. "*Omnicare* identified three ways in which a statement of opinion may" be actionable. *Golub v. Gigamon Inc.*, 994 F.3d 1102, 1106 (9th Cir. 2021). Reasonable investors interpret "[w]e believe our conduct is lawful"—a statement of belief, rather than Defendants' misstatements—to "to rest on some meaningful legal inquiry." *Omnicare*, 575 U.S. at 188. The AC establishes that Defendants conducted no such inquiry as Active's conduct was unambiguously illegal.

Defendants' "opinion statement" argument misstates the legal standard. It is *not* necessary to allege the speaker's actual knowledge of falsity of a statement of opinion or belief, let alone the actual knowledge of falsity *and* subjective disbelief. MTD at 16. Defendants cite to *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004). *Nolte*, in turn, relied on *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 (1991), about which *Nolte* stated: "in order to plead that an opinion is a

10

false factual statement under *Virginia Bankshares*, the complaint must allege that the opinion expressed was different from the opinion actually held by the speaker." 390 F.3d at 315. This is no longer true: *Omnicare* held that a statement framed as an opinion may be actionable without allegations that the speaker subjectively disbelieved the statement, such as where a speaker "omits material facts about the issuer's inquiry into or knowledge concerning" the stated opinion or belief. *Omnicare*, 575 U.S. at 189. The AC alleges just that by alleging that Defendants omitted material facts regarding Active's deceptive and illegal practices.

### 3. Defendants' Earnings Call Statements About Active's Performance Are Actionable.

During the Class Period, Defendants attributed Active's performance to bookings trends without disclosing that performance was inflated by Active's deception. For instance, on December 7, 2021, in response to an analyst request for "an update specifically on a number of your verticals," explicitly including Active, Defendant Sloan stated that Active "has showed really good bookings trends and really good performance most recently." ¶109. Statements attributing Active's performance to "bookings growth" (¶¶105, 114) rather than the Company's deceptive registration process conveyed a materially false and misleading impression about the quality and sustainability of Active's revenues and "conveyed

to the public a false impression" of Active's performance. *FindWhat*, 658 F.3d at 1306.[7]

In contrast to Defendants' representations, Active's undisputed deception inflated Active's, and thus GPN's financials ("cash cow" generating at least $300 million since 2011), posed a risk to Active's customer relationships, and exposed Active and GPN to regulatory scrutiny including but not limited to the CFPB Complaint, and thus are actionable. *FindWhat*, 658 F.3d at 1306; *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *9 (S.D.N.Y. Apr. 14, 2020) (because defendants "cited their strategy as a source of their success, they were obligated to tell the whole truth[,]" including "short-run sales tactics"); *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *15 (E.D.N.Y. Sept. 27, 2019) (omission of "a material basis for the company's achievements" was actionable). Defendants chose to speak about the basis of Active's performance, and thus "had a duty to disclose the full truth." *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018).

---

[7] The AC's (and CFPB's) detailed allegations about Active's deception are distinct from "blanket characterization of business transactions as illegal" in *In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, at *18 (N.D. Ga. Jan. 7, 2009). And unlike the "company-wide" revenue statements in *FindWhat*, 658 F.3d at 1306, Defendants' misstatements about Active's performance were received in the context of their explicit assurances of legal compliance.

Defendants' "puffery" defense is a strawman; they point to statements that are not alleged to be false. *Compare, e.g.*, MTD at 9 (arguing that statement "we feel really good about kind of where we are" is puffery (citing ¶110), *with* ¶110 (emphasizing preceding statement that Active's performance has "accelerated" due to "reopenings"). The statements deemed puffery in *Ocwen*, 934 F.3d at 1321 (e.g., feeling "good about the progress" made towards "national mortgage settlement compliance") do not resemble Defendants' assurances of compliance and omission of Active Advantage's deceptive scheme when discussing Active's performance.

Defendants' statements were material. Materiality is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). Materiality is a fact-specific determination, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013), and is typically "resolved by the factfinder." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020) (per curiam).[8] Defendants' statements are material for several reasons. The statements concerned widespread, illicit, and undisputed conduct at Active, which

---

[8] *In re Nokia Oyj (Nokia Corp.) Sec. Litig.* addressed "conclusory allegations" that (unspecified) "millions of dollars worth" of allegedly defective products were shipped to customers, which failed to render financial statements misleading. 423 F. Supp.2d 364, 408 (S.D.N.Y. 2006). Here, the AC alleges a specific amount of charges ($300 million) and challenges Defendants' statements about legal compliance and Active's performance, rather than reported revenues.

13

endangered Active's relationship with its largest clients and millions of consumers. Further, Active's legal and regulatory violations formed the basis of Active's performance. Active's scheme generated over $300 million in fees, which is material given that: (i) it constituted over half of the $600 million in cash that GPN paid to acquire Active; (ii) it was generated from millions of consumers and broadly implicated Active's client relationships. And, Active's deception generated material legal and regulatory exposure for Active and GPN. Active's deception has exposed it to injunctions, restitution and damages, and penalties of up to $1,000 *per violation*, not to exceed 1% of Active's assets. ¶85. Given that fees ranging from $59.95 to $89.95 added up to over $300 million, Active's exposure for penalties alone is material, in addition to restitution and other costs. After all, in 2016 Active agreed to pay $2.7 million in civil penalties—plus restitution to consumers—in a case brought by three *county-level* district attorneys. That a portion of the $300 million of Active Advantage membership fees were levied before GPN's acquisition of Active does not undermine materiality. Defendants do not claim that GPN is not liable for Active's pre-acquisition conduct, and the CFPB Complaint makes clear that Active's exposure is based on the hundreds of millions of dollars deceptively levied on consumers since July 2011.[9] Defendants'

---

[9] *In re Coca-Cola Enterprises Inc. Sec. Litig.* does not bear on this question. There, the plaintiffs' channel-stuffing allegations could not identify "at least one specific channel stuffing transaction," including the dollar amounts involved, 510 F. Supp.

14

formulaic standard ignores these qualitative factors establishing materiality. *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015) (materiality alleged for misstatements concerning business unit contributing 0.1% of revenues); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) ("When assessing materiality, courts must fully analyze 'all relevant considerations.'").[10]

### 4.    The Misstatements on Active's Website Are Actionable.

Defendants' misstatements disseminated on Active's website are actionable. First, the court "cannot say as a matter of law that a reasonable investor would not use" Active's website in making investment decisions; it would be a natural source for information about Active. *Facebook*, 405 F. Supp. 3d at 834. Indeed, it is precisely "a forum where it was likely seen by potential investors." *SEC v. Gruder*, 2010 WL 11500092, at *6 (N.D. Ga. Feb. 11, 2010) (statements in magazine advertisements and postcards sent to law enforcement agencies "was in connection with the sale of a security"); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *18 (N.D. Cal. Jan. 4, 2017)

---

2d 1187, 1196-98 (N.D. Ga. 2007), whereas here, Plaintiffs' allege the $300-million figure based on the CFPB's allegations made after obtaining discovery—including testimony—from Active.

[10] In *Miyahira v. Vitacost.com, Inc.*, revenue only shifted from one quarter to the next. 2012 WL 12895513, at *8 (S.D. Fla. June 28, 2012), *aff'd,* 715 F.3d 1257 (11th Cir. 2013). There was no alleged ongoing underlying illegality in *Miyahara* or *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1329 (S.D. Fla. 2004).

("[T]he Court cannot declare as a matter of law that a reasonable investor would not have considered the emissions stickers on Volkswagen vehicles to be material investing information.").[11]

Defendants' authorities do not control. In *In re LifeLock, Inc. Sec. Litig.*, the plaintiffs did not identify *where* misstatements (which did not address "throttling") appeared. 690 F. App'x 947, 954 (9th Cir. 2017). And *Howard v. Arconic Inc.*, which addressed brochures, acknowledged that securities liability may lie for ads not directed to investors. 395 F. Supp. 3d 516, 539 (W.D. Pa. 2019). Here, the misstatements were on Active's website and directly addressed Active Advantage.

Second, Defendants' website statements were materially false and misleading. Defendants touted Active's registration process, claiming that it: (i) was "created specifically to meet [event organizers'] needs and drive up participation;" (ii) "elevate[d] the participant experience;" and (iii) "maintain[ed] a seamless experience for your customers," (iv) for whom signing up to Active Advantage was a "breeze." ¶¶117, 119. These statements were false: the process was designed to meet Active's needs and degraded the experience of consumers. Further, Defendants "voluntarily tout[ed] the benefits of" Active's registration and

---

[11] Defendants' argument that Section 10(b) does not reach publicly disseminated material misstatements that a defendant directs to consumers is wrong, contravenes the purposes of the securities laws, and is not what the Second Circuit held in *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968).

16

payment process, and "their failure to disclose known material problems" with that process was materially misleading. *Flowers Foods*, 2018 WL 1558558, at *9.

As to the alleged misstatement that Active "challenges every chargeback received" and was "successful in disputing between 50-80% of the chargebacks," Defendants' footnoted (and thus waived) argument fails. The AC's allegations, far from conclusory, *are based on Active's own internal analyses* disclosed by the CFPB Complaint (¶¶77, 140), as well as Active's responses to BBB complaints (¶63) and former employee accounts (¶¶78(a)(iii)-(iv), 78(c)(i), 78(e)(v)). These allegations plausibly establish that Active did not "challenge[] every chargeback received" nor obtain "success[] in disputing between 50-80% of the chargebacks." Further, Defendants do not dispute that these statements were rendered false by the failure to disclose that Active's scheme caused abnormally high chargeback rates. *See* MTD at 11 n.4; *see also* ¶126. Defendants concede falsity on this ground.

### 5.   Defendants' Violated SEC Items 303 and 105.

Item 303 required GPN to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 required GPN to disclose all "material factors" that made investing in GPN "speculative or risky." These SEC rules do "create an independent duty to

17

disclose." *Cf.* MTD at 29; *cf. Carvelli*, 934 F.3d at 1331 ("sweeping disclosure obligation").

The AC sufficiently alleges a 10b-5 claim based on Items 303 and 105: the omitted information required by those rules was material, and the AC alleges "the required degree of scienter and [is] pled with particularity." *Firemen's Ret. Sys. of St. Louis v. Telos Corp.*, 2023 WL 1512207, at *11 (E.D. Va. Feb. 1, 2023).[12] The AC alleges with particularly that Active's deceptive use of dark patterns and negative options constituted a "known trend[] or uncertaint[y]" and that, because it violated consumer fraud laws and regulations and thus was subject to enforcement, such practices were "reasonably likely to . . . materially impact" financial results and made an investment in GPN risky. ¶¶92, 94; *see also* §III.A.1-4, *supra*. The allegations also establish a strong inference of scienter. *See* §III.B, *supra*.

### 6.    Defendants Are Liable for Statements They Controlled.

Defendants Sloan, Bready, Todd, and Whipple were senior GPN executives during the Class Period and face § 10(b) liability for the statements of GPN.[13]

---

[12] The Supreme Court recently granted certiorari in a case presenting the question whether "a failure to make a disclosure required under Item 303 can support a private claim under Section 10(b), even in the absence of an otherwise-misleading statement." Petition for a Writ of Certiorari at i, *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, No. 22-1165 (Sup. Ct. May 30, 2023), Doc. 4.

[13] In addition to the misstatements listed in MTD section "Defendants Face No § 10(b) Liability For Statements They Did Not Make" (MTD at 30), the AC alleges that Defendants violated Items 303 and 105. ¶104.

Sloan and Todd certified the 2020 10-K and 2021 10-K and face liability for that reason alone. *City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing Servs., Inc.*, 2012 WL 1080953, at \*3 (M.D. Fla. Mar. 30, 2012). Defendants' position is that high-ranking executives are liable only if they signed filings containing misstatements. "However, the Eleventh Circuit has not created such a technical requirement to properly plead control over a SEC filing." *Theodore v. Purecycle Techs., Inc.*, 2022 WL 20157415, at \*8 n.8 (M.D. Fla. Aug. 4, 2022). The Individual GPN Defendants were high-ranking executives directly involved in the business of GPN, received regular reporting about Active and Active Advantage, and were involved in controlling the contents of the misstatements.

In addition, Defendants "made statements and were quoted in press releases and articles in their official capacities. They made such statements as agents of [GPN], which is distinguishable from *Janus*, where the statements were on behalf of a separate, independent entity." *St. Clair Shores*, 2012 WL 1080953, at \*3 (citing *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141-42 (2011)). Further, they had the opportunity to prevent the issuance of misleading statements. *Primavera Inv's v. Liquidmetal Techs., Inc.*, 403 F. Supp. 2d 1151, 1157 (M.D. Fla. 2005).

Defendant Facini was Active's President, oversaw its operations, and received regular reports about Active Advantage; he is liable for Active's

19

misstatements. ¶¶35, 78(l)(i), 137, 159. Further, Facini was responsible for reporting information to GPN (including directly to GPN's executive leadership) for inclusion in GPN's public filings, and thus was a "maker" of statements made by GPN. ¶¶35, 78(i)(ii)-(iv), 159; *see also Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1355 (S.D. Fla. 2015) ("*Thorpe II*"); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2014 WL 11961964, at *10 (S.D. Fla. Dec. 23, 2014) ("*Thorpe I*") (president of subsidiary liable for misstatements in parent company's SEC filings). "The Amended Complaint adequately alleges that [the Individual Defendants] had ultimate control over the alleged misstatements. [They] may challenge the factual accuracy of such control at summary judgment or trial." *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *8 (S.D. Fla. June 6, 2016)

### B. The AC's Allegations Establish a Strong Inference of Scienter.

A court must accept the AC's scienter allegations as true and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). The scienter analysis "boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance" that Defendants knew, or were severely reckless in not knowing, about the alleged fraud. *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *32 (N.D. Ga. Mar. 29, 2018), *clarified*, 2018 WL 1702675 (N.D. Ga. Apr. 6, 2018). Because the AC establishes scienter for individuals that made, "approve[d]," or "furnish[ed] information" for a

misstatement, GPN's corporate scienter is pled. *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *4 (11th Cir. Aug. 8, 2023).

### 1.    Consumer and Customer Complaints About Active Advantage Establish a Strong Inference of Scienter.

Public information and the FEs corroborate each other and contribute to a strong inference scienter. [14] Thousands of consumers reported—to Active, on (public) social media, and (again, publicly) to the BBB—that Active had deceived them into enrolling in Active Advantage. This was known throughout Active, many Active employees were tasked with responding to these complaints, Active created a webpage concerning these complaints, and received an inordinately high number of credit card chargebacks (more than three times the threshold deemed "alarming"). Active tracked customer complaints, cancellations, and credit card chargebacks relating to Active Advantage; this information was available to executives on SalesForce, and more serious consumer complaints were reported to management via "escalation forms." ¶¶78(c)(iii), 78(g)(ii). Moreover, the first page of Google results for "Active Network" gave Defendants cause to investigate. ¶135. These allegations contribute to scienter and distinguish Defendants'

---

[14] Defendants do not dispute that the AC "describe[s] 'the foundation or basis of the confidential witness[es'] knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.'" *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1352 (N.D. Ga. 2018). Pre-Class Period first-hand information is corroborated by FEs employed during the Class Period, and is "highly relevant to determining what [Defendants] knew or should have known during the Class Period." *Flowers Foods*, 2018 WL 1558558, at *15.

authorities.[15] *Primavera*, 403 F. Supp. 2d at 1157 (executives' scienter bolstered by access to information and opportunity to prevent misleading statements).

In addition, consumer complaints threatened Active's customer relationships: Active received complaints from its event organizer clients about the Active Advantage inserted offer and even lost clients because of it. At a quarterly town hall meeting, which Active's executive leadership attended, a senior account manager posed the question: "why are we offering this if we're losing clients over it?" ¶78(d)(v). Clients demanded to amend their contracts to prevent Active from inserting the Active Advantage offer (¶78(d)(iii)), and the most plausible inference is that this was known to GPN's legal team, which was so hands-on that it reviewed every single press release proposed by Active (¶138). Further, the most

---

[15] The plaintiffs in *Stein v. Aaron's, Inc.*, 2022 WL 4588410 (N.D. Ga. Sept. 29, 2022), did not allege the manner in which the relevant program (here, Active Advantage) was tracked and reported to management, nor did they allege that public information gave the defendants cause to investigate the subject of their misstatements. Unlike *Mizzaro v. Home Depot, Inc.*, the fraud in this case was not "very difficult for senior management to detect." 544 F.3d 1230, 1251 (11th Cir. 2008). In *Druskin v. Answerthink, Inc.*, the allegations did not "establish that any revenue was uncollectible at the time it was booked," let alone that the defendants were aware of such uncollectibility at the time of their statements. 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004). Here, metrics relating to Active's undisputed deceptive scheme were systematically tracked and reported. And *Mogensen v. Body Cent. Corp.*, had no allegations that a scheme publicly known at the time of an acquisition continued during the Class Period and gave Defendants cause to investigate. 15 F. Supp. 3d 1191 (M.D. Fla. 2014)

plausible inference is that that same legal team was itself involved in preparing and approving Defendants' alleged misstatements concerning legal compliance.[16]

### 2. Active Advantage Cancellations, Refunds, and Complaints Were Tracked and Reported to Defendants.

Active actively tracked customer complaints, cancellations, and refunds with respect to Active Advantage, and Active regularly—weekly and monthly—reported to GPN leadership, including Defendants. Weekly meetings addressed Active Advantage complaints, refunds, cancellations, and chargebacks, which were also tracked in quarterly reports and available to executives in SalesForce. ¶¶78(a)(v), 78(a)(vi), 78(g)(ii). Defendant Facini had weekly and monthly meetings with GPN's President of Vertical Markets Software Solutions, and gave quarterly presentations to GPN's leadership team, including Defendants Bready, Todd, and Whipple. Here, though "Defendants claim that the FEs cannot speak to the Individual [GPN] Defendants' knowledge," the FE accounts of establish that the Individual GPN Defendants participated in numerous meetings addressing Active's performance and risks, which necessarily included Active Advantage. *Galeston v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018).

---

[16] The AC alleges specific facts establishing falsity and scienter, unlike the allegation in *In re HomeBanc Corp. Sec. Litig.* that defaults were "out of control." 706 F. Supp. 2d 1336, 1350 (N.D. Ga. 2010) (no "factual metrics establishing that 'fact'").

### 3. The Pre-Class Period Government and Class Action Lawsuits Put Defendants on Notice.

Under Defendants Todd and Sloan's leadership, GPN agreed to acquire Active only six months after Active's settlement of a consumer class action arising from the same conduct as the CFPB Complaint. ¶61. Furthermore, Active was subject to two consent orders at that time. ¶¶58-59. Identifying significant legal proceedings, such as government enforcement actions (¶¶58-60) and class action proceedings (¶61), is a critical and straightforward piece of acquisition due diligence. Whether due diligence involved disclosure of "large" contracts, as in *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F. 4th 232, 242 (4th Cir. 2023), is inapposite, and the public nature of the pre-Class Period lawsuits against Active further distinguishes this case. This contributes to scienter.[17]

### 4. The CFPB Investigation, and the Facts it Uncovered, Contributes to Scienter.

Scienter is bolstered by the CFPB's allegations, *inter alia*, that (1) a senior Active manager internally described Active Advantage as "pure profit" (¶139); (2) Active conducted marketing tests to determine how to more effectively deceive

---

[17] Further, Plaintiffs' allegations do not arise from impropriety prior to the Class Period, as in *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1290 (S.D. Fla. 2008) (one pre-class period loan did not establish that lax underwriting occurred during class period), and *In re Witness Sys., Inc. Sec. Litig.*, 2008 WL 9020540, at *7 (N.D. Ga. Mar. 31, 2008) (improper accounting 2-3 years before class period alleged to render class period statements actionable), *aff'd*, *Rosenberg v. Gould*, 554 F.3d 962 (11th Cir. 2009). Here, Active's scheme indisputably continued during the Class Period.

consumers (¶¶75, 140); (3) Active itself found that *72% of Active Advantage members who enrolled through the inserted offer and requested cancellation in 2019 were "unaware" of their membership (¶140); and (4) Active Advantage benefits used by consumers was only 2.8% of fees paid (¶15) (which Active knew hence the "cash cow" description (¶78(d)(iv))). These facts contribute to scienter, as does the government investigation itself. *Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *7 (M.D. Fla. June 15, 2023).

Further, the CFPB obtained internal documents and testimony before suing. The most plausible inference is that Defendants were aware of the investigation—and thus had a compelling reason to look into Active's deceptive practices—at least as early as May and August 2022, when Defendants touted Active's performance as the result of bookings growth without disclosures concerning Active Advantage. ¶¶110-13. The CFPB's investigation and lawsuit corroborates the FE accounts and adds to the strong inference of scienter. *Eastwood Enters., LLC v. Farha*, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) ("[G]overnment investigations are relevant and provide notice of possible fraud."); *Flowers Foods*, 2018 WL 1558558, at *17-18.

### 5. Defendants Sloan and Todd Were Motivated To Portray the Acquisition of Active as a Success.

Rather than "general allegations of motive, such as maintaining reputation and stock price," *Aaron's*, 2022 WL 4588410, at *10, or "meet[ing] . . . revenue

expectations," *FindWhat*, 658 F.3d at 1303, Plaintiffs allege that Defendants Sloan and Todd were motivated not to disclose Active's deceptive practices because they, specifically, were responsible for GPN's acquisition of Active. ¶¶66-69, 142. This "motive to make the merger appear to be a success" contributes to scienter. *In re Honeywell Int'l, Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 427 (D.N.J. 2002). "[S]uspicious stock sales are not necessary to create a strong inference of scienter." *Mizzaro*, 544 F.3d at 1253 n.3.

## C.    The AC Sufficiently Alleges Loss Causation.

The AC establishes "a causal connection between the misrepresentation and the investment's subsequent decline in value." *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1305 (N.D. Ga. 2021). "[A] corrective disclosure a corrective disclosure can come from any source, and can take any form from which the market would absorb the information and accordingly react." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1249 (N.D. Ga. 2019) (citing *FindWhat*, 658 F.3d at 1312 n.28). Plaintiffs are not required to establish that the defendant's fraud was the "sole and exclusive cause" of the injury at this stage. *See FindWhat*, 658 F.3d at 1309. "Loss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA." *Mohawk Indus.*, 564 F. Supp. 3d at 1305; *see also Purecycle Techs.*, 2022 WL 20157415, at *16; *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1347 (N.D. Ga. 2012).

26

The false and misleading nature of Defendants' statements was partially revealed by the October 18, 2022 CFPB Complaint, which set forth detailed, previously non-public facts. These facts "revealed a truth to the market" concerning Active's deception and the resulting financials. *Thorpe II*, 111 F. Supp. 3d at 1382. Defendants' reliance on *Meyer v. Greene* is misplaced: there, the Eleventh Circuit held that "[t]he *announcement* of an investigation reveals just that—an investigation—and nothing more." 710 F.3d 1189, 1201 (11th Cir. 2013). Here, Defendants *concealed* the CFPB's investigation as they produced documents and provided testimony; the CFPB Complaint was the *outcome* of the investigation and included detailed facts based on internal documents and testimony, unlike in *Meyer*. *MacPhee* also addressed announcements, rather than findings, of investigations, and the filing of a whistleblower lawsuit could not establish loss causation because the plaintiff in that case "sold its MiMedx stock prior to [the filing of the whistleblower complaint on] December 15, 2016, and then repurchased MiMedx stock following the announcement of the lawsuit." *In re MiMedx Grp., Inc. Sec. Litig.*, 2021 WL 7210372, at *4 n.5 (N.D. Ga. Mar. 25, 2021), *motion for relief from judgment denied*, 2022 WL 619702 (N.D. Ga. Jan. 27, 2022), *and aff'd in part, vacated in part sub nom. MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220 (11th Cir. 2023).

Furthermore, Defendants effectively confirmed the CFPB's allegations in GPN's next Form 10-K, filed on February 17, 2023. ¶130. The stock price declined 0.89%. *Id.* Their concession confirms that loss causation is sufficiently pled.

After the CFPB Complaint was filed, GPN's closing stock price on October 18, 2022 was $113.67, and fell another dollar to close at $112.67 on October 19, a more than 2% decline from its opening price on October 18. Defendants introduce documents to indicate the moment a CFPB statement and press release were added to a news database, but Defendants offer no facts establishing when investors learned of the information, which is the key question, especially because the CFPB complaint was against Active rather than against GPN, and thus may have been less rapidly assimilated into GPN's stock price.

Defendants' argument that stock prices must immediately react ignores Supreme Court guidance that market efficiency is not a "binary," and that "[t]he markets for some securities are more efficient than the markets for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 271 (2014); *see also Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 391 (N.D. Ga. 2019) ("[T]he Supreme Court in *Halliburton II* reiterated that it would not 'enter the fray' of academic debates about the speed at which information is

28

impounded into a stock price.'"); *Grae v. Corr. Corp. of Am.*, 2021 WL 1100799, at \*23 (M.D. Tenn. Mar. 23, 2021) (court need not "choose between either rejecting the idea of efficient capital markets outright or ascribing to the markets a nearly mystical ability to immediately assimilate even the most obscurely reported information").[18]

Defendants do not provide another explanation for the October 18 and 19 price declines. *See generally* MTD § III.[19] Their other loss causation arguments also fail. Defendant Sloan's unexpected resignation is plausibly connected to the alleged fraud. *Flowers Foods*, 2018 WL 1558558, at \*19. In *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, a stock price reaction was found to be more plausibly explained by another announcement made the same day, which Defendants do not contend occurred here. 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009). And in *In re Buca Inc. Sec. Litig.*, the share price declined drastically before the *first* alleged corrective disclosure, which was an executive resignation, and the Court did not address a materialization-of-the-risk theory of loss causation. 2006

---

[18] In *Home Loan Servicing*, the stock rose in price and did not decline following a restatement *which was not even alleged to be a corrective disclosure*. 2016 WL 10592320, at \*5. Here, GPN's stock price declined after the CFPB Complaint.

[19] Courts find loss causation for price declines of similar magnitude. *See, e.g.*, *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (2% decline). Defendants' cases address whether non-fraud factors more plausibly caused stock drops. *See In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005); *see also D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003) ("intervening events" more plausibly explained stock price declines). Here, the AC does not suggest other "intervening events."

WL 3030886, at *9 (D. Minn. Oct. 16, 2006). Here, Sloan's resignation *followed* revelations about Active Advantage and plausibly constituted a materialization of the risk misrepresented by Defendants and a corrective disclosure of their fraud.[20]

### D.    PLAINTIFFS SUFFICIENTLY ALLEGE A § 20(A) CLAIM.

The AC adequately pleads a § 20(a) liability. Defendants' only § 20(a) argument was buried in a footnote and thus waived. *See, e.g.*, *Duncan v. Rushmore Loan Mgmt. Servs., LLC*, 2021 WL 8774248, at *5 (M.D. Fla. Sept. 30, 2021); *Otogenetics, Corp. v. Omega Biosciences, Inc.*, 2018 WL 11243794, at *5 (N.D. Ga. Aug. 29, 2018); *Plain Bay Sales, LLC v. Gallaher*, 2019 WL 1782761, at *6 (S.D. Fla. Apr. 24, 2019). Further, the AC establishes that Whipple could exercise "some indirect means of discipline or influence." *See Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 724 n.18 (11th Cir. 2008). Defendants do not contest the Individual GPN Defendants' control over GPN, so Plaintiffs' § 20(a) claim against them succeeds with the § 10(b) claim against GPN.

### IV.    CONCLUSION

For the reasons described herein, Defendants' motion should be denied.

---

[20] The cited propositions from *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008). and *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243–44 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007), do not analyze statutory language and do not control.

Dated: October 16, 2023                    **POMERANTZ LLP**


_/s/ Jonathan D. Park_

Jeremy A. Lieberman
(Admitted _Pro Hac Vice_)
Jonathan D. Park
(Admitted _Pro Hac Vice_)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jpark@pomlaw.com

_Counsel for William Jeffrey Igoe and
Co-Lead Counsel for the Class_

**EVANGELISTA WORLEY, LLC**
James M. Evangelista
500 Sugar Mill Road, Suite 245A
Atlanta, GA 30350
Telephone: (404) 205-8400
jim@ewlawllc.com

_Counsel for William Jeffrey Igoe and
Liaison Counsel for the Class_

**LOWEY DANNENBERG, P.C.**
Vincent Briganti
vbriganti@lowey.com
(Admitted _Pro Hac Vice_)
Andrea Farah
afarah@lowey.com
(Admitted _Pro Hac Vice_)
Alesandra Greco
agreco@lowey.com
(Admitted _Pro Hac Vice_)
44 South Broadway, Suite 1100

31

White Plains, New York 10601
Telephone: 914/997-0500

*Counsel for Mike Shafer and David Keating and Co-Lead Counsel for the Class*

## **LOCAL RULE 7.1(D) CERTIFICATION**

By signature below, counsel certifies that the foregoing document was

prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1.

*/s/ Jonathan D. Park*
JONATHAN D. PARK

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2023, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

/s/ Jonathan D. Park
JONATHAN D. PARK

34