IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MIKE SHAFER et al., *on behalf of themselves and all others similarly situated,* | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 1:23-cv-00577-LMM |
| GLOBAL PAYMENTS, INC. et al., | : | |
| Defendants. | : | |

**ORDER**

This case comes before the Court on Defendants' Motion to Dismiss [49]. After due consideration, the Court enters the following Order.

## I. BACKGROUND

This is a putative class action seeking damages under the Securities and Exchange Act of 1934. Plaintiffs have common stock in Defendant Global Payments, Inc. ("Global" or "GPN"), which is the parent company of Defendant Active Network LLC ("Active"). The individual Defendants are several officers in GPN and Active's businesses. Put simply, Plaintiffs allege that Defendants falsely stated that they were in compliance with all applicable laws despite knowledge of an illegal subscription system that Defendant Active operated.

Defendant Active operates online event registration and payment services for camps and athletic events like road races. Dkt. No. [39] ¶ 50. Active also

maintains an "Active Advantage" membership service, which consumers can join for an annual fee. Id. ¶ 52. In return, Active Advantage members receive discounts on various consumer products and services, such as wine tastings, sports apparel, and travel. Id.

Plaintiffs claim that Defendant Active deceived consumers into subscribing for Active Advantage memberships by placing a highlighted "accept" button on webpages related to the event or camp that the consumer wanted to participate in. Id. ¶¶ 53–55. According to Plaintiffs, Defendant Active's system leads consumers to mistakenly believe that they are agreeing to liability waivers or accepting charges related to an event, when in fact they are enrolling in a trial membership. Id. ¶ 55. The trial membership automatically converts to a paid subscription if it is not cancelled within 30 days and charges customers an annual fee of $89.95. Id. Between 2013 and 2016, many state and local officials initiated consumer protection actions against Defendant Active. Id. ¶¶ 58–61. Additionally, many consumers and event organizers publicly complained about the Active Advantage program. Id. ¶¶ 62–64.

Defendant Global acquired Defendant Active in 2017. Id. ¶ 65. At the time of the acquisition, Defendant Global touted Defendant Active's potential for growth and high revenues. Id. ¶¶ 66–74. Defendant Active allegedly continued deceptive practices under Defendant Global's ownership. Id. ¶¶ 75–80. Nonetheless, in its SEC Form 10-K annual reports for 2020 and 2021, Defendant Global represented to investors that it was "currently in compliance with existing

legal and regulatory requirements." Id. ¶ 82. In October 2022, the Consumer Financial Protection Bureau ("CFPB") sued Defendant Active, alleging that Defendants' continued operation of the Active Advantage program violated federal law. Id. ¶¶ 84–85. After this filing, Defendant Global's 2022 10-K report stated, "We are currently in compliance *in all material respects* with applicable existing legal and regulatory requirements and do not expect that maintaining compliance with these regulations will have a material adverse effect on our capital expenditures, earnings or competitive and financial positions." Id. ¶ 83. Plaintiffs contend that these legal compliance statements were materially false and misleading because Defendants knew that the Active Advantage program was unlawful and failed to disclose that fact.

Plaintiffs also allege that Defendants made materially false statements during calls with analysts and investors. Specifically, Plaintiffs claim that Defendants Bready and Sloan touted Active's growth by stating that Active had "good booking trends" and "really good performance," despite some negative business impacts from COVID-19. Id. ¶¶ 105–15. Defendants discussed these gains for Active without any mention of Active Advantage or the unlawful subscription structure.

Last, Plaintiffs allege that Defendant Active's website contains materially false statements or omissions such as "ACTIVE's race registration and technology help elevate the participant experience so that your event stands out from the crowd" and "ACTIVE makes registrations, payment processing, program

management and more, easy." Id. ¶¶ 116–26. The website also states that Active's team handles chargebacks for customers and has successfully disputed 50–80% of chargebacks. Id. ¶¶ 125–26.

Plaintiffs purchased or acquired stock in Defendant Global between October 2019 and October 2022. Id. ¶ 1. Plaintiffs allege that Defendants made materially false and misleading statements in their public filings, during calls with analysts, and on Defendant Active's website. As a result of these statements, Plaintiffs claim that they suffered economic loss because they purchased Defendant Global's common stock at artificially inflated prices while Defendants were concealing their unlawful conduct. Id. ¶ 127. Plaintiffs bring two counts, seeking damages under Section 10(b) of the Exchange Act and Rule 10b-5 in Count One, and Section 20(a) of the Exchange Act in Count Two. Id. ¶¶ 153–67. Defendants move to dismiss both claims. Dkt. No. [49].

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id. (citing Twombly, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006)). However, this principle does not apply to legal conclusions set forth in the complaint. Iqbal, 556 U.S. at 678.

Because Plaintiffs' Complaint alleges a securities fraud claim under Rule 10b-5, Plaintiffs must satisfy not only the typical Rule 8 pleading requirements but also the "heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995." Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1317–18 (11th Cir. 2019). "Failure to meet any of the three standards will result in a complaint's dismissal." Id. at 1318. To properly allege fraud under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act

("PSLRA"), Plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also allege facts supporting a "strong inference of scienter" for each Defendant with respect to each alleged violation. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008).

## III. DISCUSSION

Defendants move to dismiss each of Plaintiffs' claims against them. Dkt. No. [49]. To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must plead: (1) a material misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.[1] Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). Defendants argue that Plaintiffs have failed to adequately plead the first, second, and sixth elements of this claim. Dkt. No. [49]. Plaintiffs respond that they have pled sufficient facts for each of these elements. Dkt. No. [52]. The Court addresses the parties' arguments in turn.

### A. Material Misrepresentation or Omission

First, Defendants argue that Plaintiffs have failed to allege a material misrepresentation or omission—the first element of their Section 10(b) claim. Dkt. No. [49-1] at 14–25. Specifically, Defendants contend that: (1) failure to

[1] Plaintiffs' Section 20(a) claim is a derivative claim, so it only succeeds if Plaintiffs plead a Section 10(b) violation. Additionally, the Court notes that Count One is based on Section 10(b) of the Exchange Act and Rule 10b-5, promulgated under Section 10(b). For clarity, the Court generally refers to Count One simply as Plaintiffs' "Section 10(b) claim."

disclose unproven allegations does not support a fraud claim, (2) the analyst call statements were not false, (3) statements on Defendant Active's website are not actionable, and (4) compliance statements in Defendants' SEC filings did not mislead investors. Plaintiffs respond that all these statements constitute material fraudulent misrepresentations. Dkt. No. [52] at 16–30.

Before turning the merits of the parties' arguments, the Court must acknowledge the heightened pleading requirements for this element. In a securities fraud case of this nature, Plaintiffs face a "triple-layered" pleading standard to show a material misrepresentation or omission. Ocwen, 934 F.3d at 1317. First, Plaintiffs must satisfy typical Rule 8 standards. Second, Plaintiffs must also satisfy Rule 9(b), which requires securities fraud plaintiffs to specifically allege four elements: "(1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." Id. at 1318. And third, Plaintiffs must satisfy the PSLRA, which "requires a complaint to 'specify each statement alleged to have been misleading' and 'the reason or reasons why the statement is misleading.'" Id. (quoting 15 U.S.C. § 78u-4(b)(1)(B)).

As to the merits, under Section 10(b), a misrepresentation or omission is material if there was a "substantial likelihood" that a reasonable investor would have viewed that misrepresentation or omission as "significantly altering the total

mix of information available" at the time. Id. at 1317 (cleaned up). Further, unless there is a duty to disclose, an omission is only material if it renders information that the issuer has disclosed misleading. Id. Materiality is a mixed question of law and fact that "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him." Id. at 1320 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)). "Accordingly, when considering a motion to dismiss a securities-fraud action, a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Id. (citation omitted).

Plaintiffs allege that Defendants made material misrepresentations and omissions in three separate categories: (1) statements in annual reports filed with the SEC, (2) statements on Defendant Active's website, and (3) statements during calls with analysts. Defendants argue that none of these statements are actionable. The Court analyzes each category in turn.

***1. SEC Filings***

Plaintiffs claim that Defendants made material misrepresentations in their annual reports in their SEC Form 10-K for 2020 and 2021. In those reports, Defendants stated that they were "currently in compliance with existing legal and regulatory requirements." Dkt. No. [39] ¶¶ 96, 100. Defendants argue that those statements are insufficient to support a Section 10(b) claim for three reasons: (1)

general statements about legal compliance are not material, (2) Plaintiffs have not shown that Defendant Active was violating federal and state consumer protection laws at the time the statements were made, and (3) the statements are inactionable opinions. Dkt. No. [49-1] at 21–25. The Court disagrees with all three points.

First, Defendants argue that courts regularly hold that general statements about legal compliance are not material and thus not actionable as a matter of law. But Defendants do not point to any binding law to support that contention, and the Court is not persuaded that Plaintiffs' claims should be dismissed on those grounds alone. Although Defendants' compliance statements are broad in nature, the Court cannot say that they were so general or insignificant that they would be "obviously unimportant to a reasonable investor." Ocwen, 934 F.3d at 1320. A reasonable investor could have taken Defendants' claims regarding legal compliance seriously, such that they affected her decision-making.

Second, Defendants argue that Plaintiffs fail to plead particular facts to support their conclusory assertion that "Active was violating federal and state consumer protection laws" when Global filed its 10-K statement. Dkt. No. [49-1] at 22. According to Defendants, "Plaintiffs' central theory is that Defendants defrauded investors by failing to publicly confess to the unadjudicated claims alleged in the CFPB's complaint *before those claims were even asserted*." Id. at 14. This is an oversimplification. Although Plaintiffs do point to the 2022 CFPB complaint to support their contention that Active's conduct was illegal, it is not

their only allegation about Defendants' illegal activity. For example, Plaintiffs list several state-level legal proceedings about Active Advantage, dating back to 2013. Plaintiffs also point to a consumer class action against Active, hundreds of consumer complaints to the Better Business Bureau, and FTC guidance on the issue, among other facts. These allegations are sufficient to support Plaintiffs' allegation that the Active Advantage subscription system was illegal.

Third, Defendants argue that the 10-K statements conveyed beliefs or opinions about Defendant Global's compliance, not actionable facts. Defendants point to other statements in the 10-K reports that discuss risk factors and acknowledge that Global could face liability "to the extent" that it was in violation of laws, rules, or regulations—especially given "rapidly evolving social expectations of corporate fairness." Id. at 21–22. The reports also acknowledge that failure to comply with applicable laws could damage Global's business or reputation. Id. According to Defendants, these disclaimers reveal that the statement "We are currently in compliance with existing legal and regulatory requirements," was only an opinion.[2]

In Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 575 U.S. 175 (2015), the Supreme Court distinguished between facts and opinions in the securities fraud context. The Court explained, "[A]

[2] Defendants provide an outdated standard for actionable opinions. Dkt. No. [49-1] at 24 (citing Nolte v. Cap. One Fin. Corp., 390 F.3d 311, 315 (4th Cir. 2004)). The Court applies the current standard, as articulated by the Supreme Court.

statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." Omnicare, 575 U.S. at 183. In Omnicare, the alleged misrepresentations were "pure statements of opinion" because the defendant stated "we believe we are obeying the law." Id. at 186.

Not so, here. Although the presence of "we believe" or "we think" is not necessary for a statement to be an opinion, it is significant.[3] See id. at 187 ("[A] reasonable person understands, and takes into account, the difference we have discussed above between a statement of fact and one of opinion. She recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content." (citation omitted)). Those words are lacking here, where Global instead simply asserted, "We are currently in compliance with existing legal and regulatory requirements." The risk factor warnings following that statement do not transform it into an opinion or belief about compliance. A reasonable investor could interpret that statement as fact.

Regardless, an opinion is also actionable if the statement "omits material facts" that "conflict with what a reasonable investor would take from the statement itself." Id. at 189. Because the 10-K statements do not make any reference to Active Advantage or the legal risks of that program, a reasonable

[3] Defendants cite several non-binding cases to contend that the compliance statements were subjective assessments, which makes them belief statements. Dkt. No. [53] at 11–12. The Court is not persuaded.

investor could be misled by Defendants' declarations of legal compliance. As the Supreme Court explained,

> [I]f the issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

Id. at 188–89.

Thus, even if the 10-K legal compliance statements are opinions, they are still actionable. Plaintiffs have adequately pled facts putting Defendants on notice of the unlawful Active Advantage scheme. Plaintiffs claim that Defendants knew the Active Advantage system was illegal based on legal proceedings against Active, federal agencies' guidance on the practices that Active used, applicable federal laws, and more. As a result, failing to include facts about Active Advantage and instead broadly asserting compliance is actionable here, even if it is an opinion.

In sum, Plaintiffs allege that Defendants stated they were in compliance with applicable laws and regulations despite well-documented enforcement actions, legal proceedings, and federal guidance indicating that the Active Advantage subscription scheme was unlawful. The Court accepts Plaintiffs' allegations at true at this stage—even on the heightened pleading standards. Based on the facts alleged, there is a substantial likelihood that a reasonable investor would have viewed Global's 10-K statements as significantly altering the

total mix of information available to her. Consequently, Plaintiffs have sufficiently pled that the 10-K statements were materially misleading.

### *2. Active's Website*

Plaintiffs' next category of alleged material misrepresentations is based on statements from Defendant Active's website. For example, Plaintiffs claim that Active's assertions that it "makes registrations easy" and seeks to meet consumer needs were false and misleading because the registration system was actually designed to trick customers into signing up for Active Advantage. Dkt. No. [39] ¶¶ 116–26. Defendants argue that these statements are not material misrepresentations because they are puffery and directed at customers rather than investors. Dkt. No. [49-1] at 19–21. The Court disagrees.

"Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism." Ocwen, 934 F.3d at 1318. Puffery is immaterial as a matter of law because puffery statements are "not those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle." Id. at 1320. But even if statements are puffery, they must be "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" in order for the Court to grant a Motion to Dismiss on those grounds. Id. (citation omitted).

Although some statements on Active's website may constitute puffery, the Court cannot say that they were "obviously unimportant" to a reasonable

investor. This is especially true given the website's post about chargebacks. Active's website provides:

> When it comes to chargebacks, think of it the same way. Instead of you having to personally deal with the issue, our team at ACTIVE handles it for you. In fact, as your partner, ACTIVE Network challenges *every* chargeback received. When a chargeback is initiated, ACTIVE steps in and has been successful in disputing between 50-80% of the chargebacks received. After winning the case, the chargeback is closed in ACTIVE's favor and funds are returned.

Dkt. No. [39] ¶ 125. Plaintiffs claim that this statement is false and misleading because it fails to mention (a) that a large number of these chargebacks arose from the deceptive Active Advantage subscription scheme and (b) that Active acceded to chargebacks instead of disputing them, so it did not successfully dispute 50–80% of them. Id. ¶ 126.

Defendants argue that Plaintiffs fail to plead any particular facts to support this assertion. Dkt. No. [49-1] at 19 n.4. In doing so, Defendants ignore Plaintiffs' allegations that Active's own chargeback analysis revealed concerning chargeback rates and awareness of widespread consumer complaints about Active Advantage charges, as well as allegations with former employee accounts about refund processes. Dkt. No. [39] ¶¶ 63, 77–78, 140. With these facts, the Court finds that Plaintiffs have sufficiently supported their assertion that the chargeback post was materially misleading.

When the other, broader statements from Active's website (e.g., "ACTIVE's race registration and technology help elevate the participant experience," and "Our wide range of solutions are created specifically to meet your needs and drive

up participation—meaning you save time and resources") are taken in context, the Court cannot find that they are inactionable puffery as a matter of law. Several of these statements relate to the deceptive Active Advantage subscription system, which Plaintiffs contend had significant impacts on Defendants' business. Thus, a reasonable investor could find these statements important in the total mix of information. See In re Equifax Sec. Litig., 357 F. Supp. 3d 1189, 1223–25 (N.D. Ga. 2019) (finding that general assertions about the defendant's commitment to cybersecurity were not puffery because "[e]ven if, in a vacuum, each of these statements seems like a meaningless, corporate vaguery, when taken together a reasonable investor would rely upon them to conclude that Equifax made cybersecurity a serious priority").

Defendants also argue that Active's website posts cannot support Plaintiffs' Section 10(b) claim because the posts were not made "in connection with" a security transaction. Dkt. No. [49-1] at 20–21. Defendants are correct that Plaintiffs must show that the alleged misrepresentations were made "in connection with" a security transaction, but Defendants are incorrect about what that element requires. Dura, 544 U.S. at 341.

Defendants contend that a statement must be "reasonably calculated to influence the investing public" to be considered "in connection with" a securities transaction. Dkt. No. [53] at 15. The only case applying Eleventh Circuit law that Defendants cite for that proposition does not demand such a narrow test. Instead, the court there explained that "in connection with" should be broadly

construed, and that "whenever assertions are made in a manner reasonably calculated to influence the investing public, the in connection with requirement is satisfied." SEC v. Davison, No. 8-20-cv-325, 2021 WL 3079689, at *4 (M.D. Fla. 2021) (cleaned up). Thus, while statements in investor-facing documents are undoubtedly made "in connection with" a transaction, statements from other sources can also satisfy this test.

Other courts have explained that the phrase "in connection with" demands a liberal construction. "In using this phrase, Congress intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon," and to purchase or sell securities "in connection therewith." Equifax, 357 F. Supp. 3d at 1250–51 (cleaned up). More simply, statements that manipulate the market "are connected to" stock trading, so public statements—online or otherwise—can fall into this category of actionable statements. Id.

Even so, Defendants argue that material statements are "typically published" in press releases, SEC filings, and other investing-facing documents. Dkt. No. [49-1] at 20. Even if material statements often take those forms, available information on a company website that hides a specific deceptive practice is not "so obviously unimportant to a reasonable investor" that it would not "mov[e] the investment-decision needle." Ocwen, 934 F.3d at 1320. A reasonable investor relies on public information about a business, including customer-facing information, and there is a substantial likelihood that the

statements on Active's website would influence a reasonable investor's decision-making, given the total mix of available information. Thus, the Court cannot say that posts on Active's website are immaterial as a matter of law at this stage.

### 3. *Calls with Analysts*

Next, Plaintiffs allege that Defendants Bready and Sloan touted Active's growth in several statements during calls with analysts, which were material misrepresentations. For example, Defendants stated that Active showed "good booking trends" and "really good performance," despite some negative business impacts from COVID-19. Dkt. No. [39] ¶¶ 105–15. According to Plaintiffs, these statements triggered a duty to disclose that Active's performance was based on Active Advantage's illegal subscription structure. Dkt. No. [52] at 22. Defendants argue that these statements are not material misrepresentations because (1) Plaintiffs have not shown that they are false, and (2) reporting undisputed earnings growth does not require disclosure of allegedly improper means supporting that growth. The Court agrees with Defendants.

In FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282 (11th Cir. 2011), the Eleventh Circuit analyzed a similar claim. There, the plaintiffs alleged that statements in a business's public conference call were materially misleading. On the call, a company executive stated that "revenue was increasing" and made comments about expected future growth without mentioning that the company's revenue stream was significantly bolstered by illegal conduct. FindWhat, 658 F.3d at 1304–05. The Eleventh Circuit determined that the executive's statement

was not misleading. The court reasoned, "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" Id. at 1305 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc)). Nonetheless, "[r]equiring that disclosures be complete and accurate does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." Id. (cleaned up). Thus, the court rejected the plaintiffs' theory:

> Under the Plaintiffs' preferred rule, company reports of revenue growth—no matter how factually accurate and no matter the level of generality—would be made at the company's peril, carrying a concomitant obligation to reveal a detailed picture of every aspect of the company's operations that could possibly bear on future revenue. This is not the rule.

Id. at 1306.

Plaintiff's theory here is similar. Plaintiffs do not dispute that Active's business was growing with increased bookings or that any of Defendants' claims during calls with analysts were factually untrue; they argue only that the claims were misleading because Defendants failed to mention the Active Advantage subscription system, which presumably accounted for some of this growth. Dkt. No. [52] at 20–25. Discussing Active's bookings at a high level did not trigger a duty to disclose concerns about the Active Advantage system, so Defendants' statements during calls with analysts were not misleading under the

circumstances. See FindWhat, 658 F.3d at 1306 (holding that accurate factual statements about past earnings do not create Section 10(b) liability).

Plaintiffs argue that their claims differ from the statements in FindWhat because "Defendants' misstatements about Active's performance were received in the context of their explicit assurances of legal compliance." Dkt. No. [52] at 22 n.7. But Plaintiffs' allegations do not support that argument. The statements to analysts were made during a quarterly earnings call, in response to questions about Active generally, and in discussions about COVID-19's impact on business. Dkt. No. [39] ¶¶ 105–15. Defendants did not have a duty to disclose additional facts about the Active Advantage subscription system in this context.[4]

In short, the Court finds that Plaintiffs have adequately pled the first element of their Section 10(b) claim—material misrepresentations and omissions—based on Defendants' statements about legal compliance in their Form 10-K reports and in pages on Active's website.[5] Plaintiffs' allegations about

---

[4] The parties also dispute whether statements about Active's growth were material to Global's business because Active accounts for only a small percentage of Global's total revenue. The Court need not address that argument because there was no actionable misrepresentation or omission in these statements.

[5] Defendants separately argue that Plaintiffs cannot plead a Section 10(b) claim predicated only on violations of SEC Regulation S-K Items 105 and 303. Dkt. No. [49-1] at 37–38. Plaintiffs plead violations of Items 105 and 303 to demonstrate that Defendants had a duty to disclose risks posed by the Active Advantage subscription system. Dkt. No. [39] ¶¶ 90–94. Items 105 and 303 could impose a legal duty on Defendants to disclose facts about Active Advantage in certain circumstances, but a Section 10(b) claim is also sufficient when an omission renders certain information misleading—even absent a legal duty to disclose. The Court finds that Plaintiffs have adequately pled material omissions in Count One,

statements during calls with analysts, however, are not sufficient to support their claims. The Court now turns to whether Plaintiffs have shown scienter relating to the actionable statements.

**B. Scienter**

Next, Defendants contend that Plaintiffs have failed to allege facts supporting the scienter requirement of a Section 10(b) claim. Dkt. No. [49-1] at 27–33. Plaintiffs respond that the totality of their allegations establishes a strong inference of scienter. Dkt. No. [52] at 30–36. The Court agrees with Plaintiffs.

The PSLRA heightened pleading also applies to scienter. The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each act or omission alleged. Ocwen, 934 F.3d at 1318 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The required state of mind is an intent to defraud or severe recklessness by Defendants. Id. "And a 'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Id. (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007)). The Court must consider Plaintiffs' Complaint in its entirety for the scienter analysis: "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

---

independently from the duties imposed by 105 and 303. Thus, the Court need not analyze any potential additional duties to disclose.

isolation, meets that standard." Tellabs, Inc., 551 U.S. at 322–23. Plaintiffs have satisfied this burden.

Defendants attack Plaintiffs' scienter allegations individually and fail to consider how all facts taken together give rise to a strong inference of scienter. "[T]he court's job is . . . to assess all the allegations holistically." Id. at 326. The scienter analysis "boils down to whether a reasonable person *would* infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount." Mizzaro, 544 F.3d at 1249.

Taking all of Plaintiffs' allegations together, there is at least a fifty-fifty chance that Defendants either knew about the Active Advantage subscription scheme or were severely reckless in not knowing about it. Plaintiffs make several allegations about consumer lawsuits against Active; state-level enforcement of consumer protection laws against Active; hundreds of consumer complaints to the Better Business Bureau regarding Active; on-point federal guidance about deceptive practices; accounts from former employees acknowledging issues with Active Advantage; due diligence during Global's acquisition of Active that would have revealed wrongdoing; on-going complaints after the acquisition; and Global's motivation to conceal Active's deceptive practices for its own profit. Looking at these allegations holistically, there is a compelling inference that Defendants either knew about Active Advantage's unlawful practice or were severely reckless in ignoring that information. Nonetheless, to determine whether

this inference is sufficient to support scienter, the Court must weigh it against competing inferences in Defendants' favor. Thus, although Defendants only consider Plaintiffs' allegations in isolation, the Court still addresses Defendants' seven arguments about scienter in turn.

First, Defendants argue that consumer lawsuits publicly disclosed before Global acquired Active, Active's settlements in prior lawsuits, and any illegal conduct before the class period began fail to create an inference of scienter. Defendants also argue that Plaintiffs cannot plead scienter by alleging that individual Defendants were motivated to conceal Active's deceptive practices because they wanted to acquire Active. While individually any of these points may fail, together—and alongside Plaintiffs' other allegations—they support a strong inference of scienter. It is reasonable to assume that Global would have known about Active's unlawful subscription scheme before the acquisition, or that it at least learned about it during due diligence.

Second, Defendants point to a former employee statement in Plaintiffs' Complaint. The employee said, "[w]hen GPN acquired Active, there was an effort to avoid misleading consumers." Dkt. No. [39] ¶ 78(d)(vi). Defendants contend that this statement raises a compelling inference that Defendants believed Active was being managed in compliance with legal requirements. Dkt. No. [49-1] at 27. The Court disagrees. If anything, this statement further supports the inference that Defendants at Global knew about issues with the Active Advantage system

that were misleading customers. There is also no indication that Global's "effort" resulted in eliminating the deceptive Active Advantage subscription page.

Third, Defendants argue that Active's website posting directions for disputing charges is inconsistent with the idea that Global wanted to boost revenue through consumer deception. But Plaintiffs allege that even with those instructions, there were significant roadblocks for consumers trying to cancel Active Advantage, supported by specific customer complaints. Thus, even if the website's instructions undercut an inference of scienter, they do not make a more compelling inference that Defendants did know about the unlawful subscription system. Like Global's effort to avoid misleading customers, the directions for disputing charges also indicate that Defendants were aware of consumers' issues with Active Advantage.

Fourth, Defendants argue that allegations claiming Defendants "must have known" that Active Advantage's system was unlawful are insufficient to show scienter under Eleventh Circuit precedent. But Defendants' own citation belies this point. In Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1250–51 (11th Cir. 2008), the Eleventh Circuit "indulge[d] at least some skepticism about allegations that hinge entirely on a theory that senior management 'must have known,' everything that was happening in a company as large as Home Depot." Thus, the Eleventh Circuit determined that a complaint "must at least allege *some* facts showing how knowledge of the fraud would or should have percolated up to senior management." Mizzaro, 544 F.3d at 1251. Plaintiffs have included such

facts here. For example, Plaintiffs allege that a former employee had monthly meetings with Defendants Facini and Bready, among other officials, in which they discussed Active's business. Dkt. No. [39] ¶ 78(i). Plaintiffs also point to quarterly meetings at Global with Defendant Sloan—attended by Defendants Bready, Todd, and Whipple—where Defendant Facini presented on Active's business. Id. Defendants argue that these meetings may have been outside the class period and that Defendants may not have discussed Active's deceptive conduct during them. But those inferences are no stronger than the inference that Defendants *did* discuss the Active Advantage subscription issues.

Fifth, Defendants contend that failure to plead any suspicious stock sales by individual Defendants constitutes "an omission that weighs against inferring scienter." Dkt. No. [49-1] at 31 (quoting Mizzaro, 544 F.3d at 1253). While the Mizzaro court did indicate that the timing of stock trades may be relevant to scienter, the lack of such trades is not dispositive to scienter here. In fact, the Mizzaro court explicitly rejected this idea: "We emphasize that suspicious stock sales are not *necessary* to create a strong inference of scienter. Instead, the presence or absence of such allegations must be assessed in light of all of the allegations found in the complaint." Mizzaro, 544 F.3d at 1253 n.3 (citation omitted).

Sixth, Defendants contend that the fact that Active was responsible for at most 1% of Global's revenue during the class period undercuts an inference of scienter. Defendants rely on Mizzaro again for this point. Although the Mizzaro

court did find that the amount of fraud was speculative and limited to under 2% of Home Depot's total sales, the court also discussed how the "type of fraud alleged would be difficult for senior management to detect." Id. at 1251–52. Here, the alleged deceptive practices were well-documented both within and outside of Active, creating a strong inference in favor of scienter. Additionally, the fact that Global sought to improve Active's practices to "avoid misleading consumers" indicates that Active Advantage was a priority for Global executives. Dkt. No. [39] ¶ 78(d)(vi).

Finally, Defendants argue that Plaintiffs cannot lean on the CFPB complaint for scienter because that complaint did not identify individual Defendants. Defendants cite Stein v. Aaron's Inc., No. 1:2-cv-02030-JPB, 2022 WL 4588410 (N.D. Ga. Sept. 29, 2022) for support. There, the court noted that an FTC complaint "stop[ped] short of alleging that any of the Individual Defendants" knew the disclosures were illegal, so the complaint had limited relevance to scienter. Aaron's, 2022 WL 4588410, at *8. Significantly, the Aaron's court also noted that the plaintiff failed to show that knowledge of consumer complaints had reached the individual defendants. Id. As discussed above, Plaintiffs have included such facts here. Defendants also argue that the CFPB investigation cannot support scienter because Plaintiffs fail to plead when precisely the investigation revealed that Active Advantage's subscription scheme was unlawful and how the investigation showed individual Defendants' state of mind. While the CFPB complaint or investigation alone may not be sufficient to

create an inference of scienter, when considered alongside the other allegations discussed, it provides further support for such an inference.

Taking all of Plaintiffs' allegations together, they create a strong inference that the individual Defendants knew about the Active Advantage scheme or were at least severely reckless in not knowing about it. To find a strong inference of scienter at least as compelling as any opposing inference, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. With such widespread information about consumer complaints, legal actions against Active, and internal meetings about Active—alongside Plaintiffs' other allegations—there is a strong inference that Defendants knew about Active's unlawful conduct.

While there are certainly other valid inferences that Defendants believed Active was in compliance with applicable laws, they are not more compelling than the inference that Defendants knew about the unlawful conduct. It is possible that Defendants were not aware of the Active Advantage scheme because several legal proceedings occurred before Global acquired Active. It is also possible that others in the company knew about issues with Active Advantage, but the knowledge never reached Defendants. But to make these inferences that Defendants had no knowledge of Active Advantage's scheme, one must ignore significant information about Defendants' own business. For example, one must

assume that Global did not conduct adequate due diligence in acquiring Active. One must also assume that Global did not consider Active material to its business, despite evidence of regular meetings about Active, statements from Defendants about Active's growth, and Global's explicit desire to limit customer deception after acquiring Active. Thus, although there are plausible inferences in support of Defendants, they are not more compelling than the inference that Defendants knew about Active Advantage's unlawful practices. Accordingly, Plaintiffs have met their heightened pleading burden for scienter.

### C. Loss Causation

Last, Defendants argue that Plaintiffs have not sufficiently alleged loss causation because neither the CFPB complaint nor CEO Jeff Sloan's departure from Global is a sufficient corrective disclosure.[6] Dkt. No. [49-1] at 33–37. Plaintiffs respond that they have established the causal connection between Defendants' misrepresentations, later corrections, and a decline in GPN stock value. Dkt. No. [52] at 36–40. The Court agrees with Plaintiffs as to the CFPB complaint and with Defendants as to Sloan's departure.

---

[6] In a footnote in their Reply, Defendants raise a different loss causation argument for the first time. Dkt. No. [53] at 16 n.6. They assert that Plaintiffs have not pointed to a public disclosure correcting the misleading statements about chargebacks on Active's website, without any further explanation or analysis. Because Defendants did not raise this argument in their Motion, the Court does not address it further here.

Unlike the other two elements that Defendants challenge, the Eleventh Circuit has not adopted a heightened pleading standard for loss causation.[7] Accordingly, the Court considers Plaintiffs' loss causation allegations under the typical Rule 8 standard. To establish loss causation, "[t]he plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses." FindWhat, 658 F.3d at 1309. "However, the plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause' of his injury; he need only show that the defendant's act was a 'substantial' or 'significant contributing cause.'" Id. (quoting Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997)).

Plaintiffs' loss causation allegations are based on a "fraud on the market" theory. The idea behind this theory is that the market absorbs both accurate and false information, so public dissemination of a falsehood can artificially inflate stock prices. Id. at 1310. "So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock." Id. "If and when the misinformation is finally corrected by the release of truthful information (often called a 'corrective disclosure'), the market will recalibrate the stock price to

[7] Defendants urge the Court to adopt a new rule in line with other circuit courts, Dkt. No. [49-1] at 34 n.8, but the Court is bound by the law of Eleventh Circuit. Without Eleventh Circuit or Supreme Court precedent on this issue, the Court declines to adopt such a rule.

account for this change in information, eliminating whatever artificial value it had attributed to the price." Id.

To show loss causation on this theory, Plaintiffs must connect their inflated share price and later economic loss. Plaintiffs can do so circumstantially by " (1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud)"; "(2) showing that the stock price dropped soon after the corrective disclosure"; and "(3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price drop." Id. at 1311–12. Defendants argue that Plaintiffs have failed to satisfy the first two prongs of this test.

First, Defendants boldly assert that it is well-settled in the Eleventh Circuit that an announcement about a regulatory investigation or lawsuit, like the CFPB complaint, is not a corrective action. Dkt. No. [49-1] at 34. This statement mischaracterizes the Eleventh Circuit cases that Defendants rely on. First, in Meyer v. Greene, 710 F.3d 1189, 1201 (11th Cir. 2013), the court determined that "commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure" because an investigation shows only "added *risk* of future corrective action"; it does not show that a company's previous

statements were false.[8] Notably, the Meyer court did not address whether a lawsuit—especially a CFPB complaint representing the culmination of an agency investigation—could be a corrective disclosure. Next, in MacPhee v. MiMedx Group, Inc., 73 F.4th 1220, 1247 (11th Cir. 2023), the court declined to decide whether announcement of an investigation or commencement of a whistleblower lawsuit could qualify as a corrective disclosure because the investor had sold all of its stock in the defendant company before those events. Thus, it is far from "well-settled" that the CFPB complaint here cannot suffice as a corrective action.[9] Instead, "a corrective disclosure can come from any source, and can take any form from which the market would absorb the information and accordingly react." Equifax, 357 F. Supp. 3d at 1249. At this stage, Plaintiffs have sufficiently pled that the CFPB complaint was a corrective action: they claim that the complaint was publicly announced and that GPN stock prices fell in response to

[8] The Meyer court also indicated in a footnote that under other circumstances an SEC investigation could qualify as a partial corrective disclosure, further undercutting Defendants' assertion that an investigation or suit cannot constitute a corrective disclosure *per se*. Meyer, 710 F.3d at 1201 n.13.

[9] Defendants also point to Sapssov v. Health Management Associates, Inc., 22 F. Supp. 3d 1210, 1231 (M.D. Fla. 2012), aff'd, 608 F. App'x 855 (11th Cir. 2015), for this argument in their Reply. Dkt. No. [53] at 23. In Sapssov, the court determined that filing a civil complaint did not reveal falsity because it does not establish liability. While the Court of course agrees that initiating a lawsuit does not equate to a finding of liability, the Court still finds that Plaintiffs' allegations about the CFPB complaint suffice to show loss causation at this stage, on the facts of this case.

the news. Taking these allegations as true, Plaintiffs have satisfied Rule 8's pleading requirements for loss causation.

Second, Defendants argue that Plaintiffs have failed to show that GPN's stock price fell after the corrective disclosure. But Plaintiffs allege that the market learned of the CFPB complaint during the trading day on October 18, 2022. Dkt. No. [39] ¶ 129. Plaintiffs then state that GPN's stock declined from its opening price of $115.00 that day to $113.67 by closing (a 1.17% decline), in response to news about the CFPB complaint. Id. Plaintiffs also allege that GPN's stock price declined by another dollar the following day (a .88% decline).[10] Id. At this stage, Plaintiffs' allegations are sufficient because, taken as true, they show that GPN's stock price fell after the corrective disclosure.

Nonetheless, Defendants contend that Plaintiffs were not specific enough. According to Defendants, Plaintiffs must show the exact time that CFPB news hit the market, and the price must have fallen *immediately*. Dkt. No. [49-1] at 35. Defendants also state that GPN's stock price temporarily rose after a Bloomberg Law post about the CFPB complaint was released during the afternoon of October 18, 2022—facts that Defendants urge the Court to take judicial notice of, based on

[10] Defendants state that a .88% drop is not significant. The cases that Defendants cite for support do not provide that this percentage drop makes Plaintiffs' allegations insufficient as a matter of law. See Dura, 544 U.S. at 347; In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561 (D. Md. 2005); D.E. & J Ltd. P'ship v. Conaway, 284 F. Supp. 2d 719 (E.D. Mich. 2003). In each of those cases, the Court considered more than the mere percentage drop in assessing loss causation.

two unreported district court cases. Id. These additional facts from Defendants do not defeat Plaintiffs' well-pled allegations at this stage. The Supreme Court has acknowledged that "market efficiency is a matter of degree" and has not adopted "any particular theory of how quickly and completely publicly available information is reflected in market price." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 272 (2014) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 248 n.28 (1988)). Thus, the Court does not engage with Defendants' facts about the timing of GPN stock price changes down to the minute at this stage of the litigation. Plaintiffs' allegations satisfy the Rule 8 pleading standards for this element.

Finally, Defendants argue that Global's CEO's (Defendant Sloan) announcement that he would step down was not a corrective disclosure. A corrective disclosure is "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." FindWhat, 658 F.3d at 1311. Plaintiffs claim that analysts described the news of Sloan's departure as "surprising and confusing," but Plaintiffs do not connect his departure to any release of information about the Active Advantage scheme. Dkt. No. [39] ¶ 131. Instead, Plaintiffs merely state, "[i]n response to this news, the concealed regulatory risks relating to Active's deceptive business practices materialized." Id. Even on the Rule 8 pleading standard, this allegation is not sufficient to show a corrective disclosure for loss causation. Plaintiffs do not point to any facts about Sloan's departure that include public disclosures

about Active Advantage. A CEO leaving a large corporation naturally affects stock prices, but an executive's departure alone does not reveal wrongdoing by a subsidiary. Thus, Plaintiffs cannot rely on their allegations about Sloan's departure for loss causation and are limited only to their allegations about the CFPB complaint filed in October 2022 for this element.

In conclusion, Plaintiffs have adequately pled their Section 10(b) and Rule 10b-5—and consequently their Section 20(a)—claims. However, Plaintiffs' claims are narrowed: Plaintiffs cannot rely on alleged misrepresentations in Defendants' calls with analysts, and they cannot rely on Defendant Sloan's departure from Global as a corrective disclosure for loss causation. The remainder of Plaintiffs' allegations are sufficient to proceed.

**D. Individual Defendants**

Separately from their arguments about the Section 10(b) elements, Defendants seek dismissal of two individual Defendants. Defendants contend that Plaintiffs fail to state claims against Defendants Whipple and Facini under Section 10(b) and Rule 10b-5 because Plaintiffs do not allege that either of them "made" any of the challenged statements. Dkt. No. [49-1] at 38. Defendants are correct that to impose liability, Plaintiffs must plead facts showing that the individual Defendants "made" these statements. In Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011), the Supreme Court held, "For purposes of Rule 10b-5, the maker of a statement is the person or entity with

ultimate authority over the statement, including its content and whether and how to communicate it."

Plaintiffs argue that Defendant Whipple, along with the other individual Defendants who were Global executives, had control over Global's misstatements, sufficient for him to be considered a "maker" of the statements at issue. Dkt. No. [52] at 28–29. And Plaintiffs argue that the same is true for Defendant Facini, who was responsible for Active's misstatements. Id. at 29–30. Defendants respond that Plaintiffs cannot plead control or authority based solely on a defendant's position and must instead include specific allegations linking individual Defendants to each false or misleading statement. Dkt. No. [53] at 25–26. While the individual Defendants' positions alone do not suffice for them to be considered "makers" of the statements at issue, "a plaintiff is not required to plead that the defendant directly issued the allegedly misleading statement. Rather, the plaintiff must plead sufficient facts to support an inference that the defendant had the power and authority to control the content and issuance of the statement." SEC v. Complete Bus. Sols. Grp., Inc., 538 F. Supp. 3d 1309, 1338 (S.D. Fla. 2021) (cleaned up).

Here, the Court finds that Plaintiffs' allegations are sufficiently pled at this stage. Plaintiffs claim that all individual Defendants had ultimate control over the misstatements at issue by virtue of not only their titles as officers of the company but also their access to certain information, participation in relevant events, and specific job functions. Thus, Plaintiffs have pled ultimate control for all individual

Defendants, and Defendants can challenge the factual accuracy of these allegations at a later stage in the litigation, with reference to the limited set of statements that the Court has deemed actionable in this Order.

Finally, Defendants argue that Plaintiffs' Section 20(a) claims against Defendants Whipple and Facini fail because Plaintiffs have not shown that they are "control" persons at Global. Dkt. No. [49-1] at 38 n.14. "To show control person liability under Section 20(a), a plaintiff must allege that: (1) the company violated § 10(b); (2) the defendant had the power to control the general affairs of the company; and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation." Equifax, 357 F. Supp. 3d at 1251–52 (quoting In re Spectrum Brands, Inc. Sec. Litig., 461 F.Supp.2d 1297, 1307 (N.D. Ga. 2006)); Laperriere v. Vesta Ins. Grp., Inc., 526 F.3d 715, 723 (11th Cir. 2008) (citing Brown v. Enstar Grp., Inc., 84 F.3d 393, 396 (11th Cir. 1996)). Defendants do not make any specific arguments about how Plaintiffs have failed to satisfy these requirements; instead, they simply state in a footnote, "Plaintiffs also fail to adequately plead that Whipple and Facini are 'control' persons of Global Payments under §20(a)." Dkt. No. [49-1] at 38 n.14. The Court finds that Plaintiffs have adequately pled Section 10(b) violations and made sufficient allegations about all individual Defendants' control over both general affairs and specific policies, as required for Section 20(a).[11] Plaintiffs include specific facts

---

[11] In their Reply, Defendants contend that Plaintiffs "tacitly concede" failure to plead that Defendant Facini had Section 20(a) control, with no explanation. Dkt.

about Defendants' responsibilities and conduct throughout their Complaint, and Defendants have not adequately challenged those allegations here. Thus, the Court will not dismiss Plaintiffs' Section 20(a) claims against any individual Defendants at this stage of the litigation.

## IV. CONCLUSION

In accordance with the foregoing, Defendants' Motion to Dismiss [49] is **GRANTED in part and DENIED in part**. Defendants' Motion is **GRANTED** as to Plaintiffs' claims based on alleged misrepresentations in Defendants' calls with analysts and Plaintiffs' allegations of loss causation based on Defendant Sloan's departure from Global. Defendants' Motion is otherwise **DENIED**.

**IT IS SO ORDERED** this 29th day of March, 2024.

**Leigh Martin May**
**United States District Judge**

No. [53] at 26. The Court presumes this argument relates to Plaintiffs only mentioning Defendant Whipple by name in their response to Defendants' 20(a) argument, but the Court does not agree that this constitutes a concession warranting dismissal.