# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| MIKE SHAFER, DAVID KEATING and WILLIAM JEFFREY IGOE, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GLOBAL PAYMENTS, INC.; ACTIVE NETWORK, LLC; JEFF SLOAN; CAMERON BREADY; PAUL TODD; JOSH WHIPPLE; and ANDREA FACINI, <br><br> Defendants. | No. 1:23-cv-00577-LMM <br><br> ANSWER TO AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |

## DEFENDANTS' ANSWER AND DEFENSES TO THE AMENDED CLASS ACTION COMPLAINT

Defendants Global Payments Inc. ("Global Payments," the "Company" or "GPN"), Active Network, LLC ("Active"), Jeff Sloan, Cameron Bready, Paul Todd, Josh Whipple, and Andrea Facini (the "Individual Defendants," and together with Global Payments and Active, "Defendants") hereby answer Plaintiffs' Amended Class Action Complaint for Violation of Federal Securities Laws (Dkt. 39) (the "Complaint").

At the outset, Defendants note that Plaintiffs' Complaint is far from the "short and plain statement" required by Federal Rule of Civil Procedure 8(a)(2). To the contrary, the Complaint spans 81 pages and 167 paragraphs, some of which include extensive subparts.  Moreover, the Court's Order dated March 29, 2024 (Dkt. 55) dismissed all claims pled in the Complaint based on alleged misrepresentations in Defendants' calls with analysts (Complaint ¶¶ 105–115) and further held that Plaintiffs "cannot rely on their allegations about Sloan's departure for loss causation and are limited only to their allegations about the CFPB complaint filed in October 2022 for this element."  Dkt. 55 at 33.  Defendants nonetheless respond to all paragraphs of the Complaint. In doing so, Defendants do not concede that the dismissed claims and related allegations remain at issue in this case; nor do Defendants concede that any of the Complaint's allegations are proper bases of liability or subject of or bases for discovery.

In addition, Defendants note that the Complaint contains allegations purporting to characterize or partially quote statements made by media, stock analysts, consumers, regulators, former employees, and other persons who are not parties to this lawsuit. In accordance with Rule 8(b)(5), Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiffs have completely and accurately reflected the contents of such statements or the various documents to which these allegations refer or in which the referenced statements are contained. Defendants therefore refer to each such document for a statement of its complete contents and deny such allegations to the extent that they mischaracterize, misquote or are contradicted by the cited document. Likewise, in accordance with Rule 8(b)(5), where Plaintiffs have made allegations as to the actions of the marketplace, Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations because Defendants cannot, in their Answer to the Complaint, aver to the mindset or conduct of third parties such as analysts, investors or market participants.

Pursuant to Rule 8(b)(3), unless expressly admitted below, all contents of the Complaint, including the allegations in the enumerated paragraphs and subparagraphs, headings, titles, charts, graphs, footnotes, preamble, Table of Contents, Prayer for Relief and Jury Demand are expressly denied. If an allegation

is directed towards a specific Defendant, and that Defendant admits such allegation as to himself or herself, then such an admission is only as to that Defendant, and is expressly denied as to the other Defendants. The Complaint contains unnumbered paragraphs and/or statements that Defendants are not required to admit or deny. If a response is required, then Defendants deny all such unnumbered paragraphs and/or statements.

Defendants answer the Complaint's separately numbered paragraphs as follows:

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired GPN's common stock during the period October 31, 2019 through and including October 18, 2022 (the "Class Period"), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (the "Class").[1]

**ANSWER:**

Admit that Plaintiffs purport to bring this action seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (as amended by the Private Securities Litigation Reform Act of 1995) and SEC Rule 10b-5, on behalf of

---

[1] Excluded from the Class are Defendants, the present and former officers and directors of GPN; and/or Active, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any of the excluded parties have or had a controlling interest.

all persons and entities that purchased Global Payments' common stock between October 31, 2019 through and including October 18, 2022 (the "Class Period") and were allegedly damaged thereby. Deny that Plaintiffs' claims have any merit and deny that the putative class (the "Class") should be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure. Deny the remaining allegations in this paragraph.

2.      GPN is a Georgia corporation headquartered in Atlanta, Georgia. GPN is a payments technology company that delivers software and services to merchants and financial institutions in the United States and abroad. GPN acquired Active as a wholly owned subsidiary in 2017. Then and now, Active provided third-party registration and payment processing services to organizers of events such as summer camps and athletic competitions. When an individual wishes to register and pay for a camp or event for which the organizer has contracted with Active, the individual is directed to an Active website, where the individual enters their registration and payment information. Pursuant to its agreements with the event organizers, which are its clients, Active retains a portion of the payments it collects and transmits to the organizers.

**ANSWER:**

Admit the allegations in this paragraph except to the extent the allegations are intended to constitute a complete description of Global Payments' or Active's business, in which case the allegations are denied as incomplete.

3.      Active, however, designed its payment and registration workflow to trick consumers into signing up for membership in an "Active Advantage" discount membership program. Members of Active Advantage can receive discounts when registering for certain events through Active, on athletic apparel, and so forth. Because of Active's deceptive practices, however, consumers often are unaware that they have been enrolled as Active Advantage members, and most do not redeem the

offers available to them. Rather, after learning that they have been charged an annual fee for a program they never intended to sign up for, they complain to Active and seek a refund. Active often gives only partial refunds, prorated to reflect the amount of time the consumer was (unknowingly) a member of the program. These practices brought in hundreds of millions of dollars—and thousands of customer complaints—over the years.

**ANSWER:**

Admit that Active Advantage is a membership program offered by Active that provides discounts to members. Deny the remaining allegations in this paragraph.

4.     GPN acquired Active shortly after Active had resolved the last in a series of legal proceedings and investigations—brought by municipal and state attorneys, as well as private plaintiffs—concerning these deceptive and unlawful practices.

**ANSWER:**

Admit that Active resolved certain legal proceedings and investigations brought by government attorneys and private plaintiffs prior to being acquired by Global Payments. Deny the remaining allegations in this paragraph.

5.     Despite the extensive litigation concerning Active's deceptive practices, GPN did not disclose these issues to its investors at the time it acquired Active. In fact, GPN never mentioned to investors that a material portion of Active's revenue depended on tricking consumers, in violation of federal and state consumer protection laws and regulations.

**ANSWER:**

Deny the allegations in this paragraph, except refer to Global Payments' SEC filings, press releases, and other public statements discussing the acquisition of Active for their contents.

6.     Instead, GPN attributed Active's performance to its "innovative" software offerings and the fragmentation of the registration and payment processing market for events and competitions. During the Class Period, GPN touted Active's growth, which it claimed arose from increased event bookings, while omitting any mention of Active Advantage. Indeed, GPN purposefully modified the disclosures in its Forms 10-K to boldly assure investors that it was "currently in compliance with existing legal and regulatory requirements."

**ANSWER:**

Deny the allegations in this paragraph, except refer to Global Payments' SEC Forms 10-K and public statements regarding Active's performance and growth for their contents.

7.     Despite the prior lawsuits and regulatory investigations, and contrary to GPN's assurances to investors, Active had not ended its deceptive trade practices. As they had before the acquisition by GPN, consumer complaints about surprise Active Advantage charges—as well as high rates of credit charge chargebacks— rolled in continuously. Consumers complained directly to Active via telephone, email, and social media, and to third party consumer protection and rating websites such as the Better Business Bureau, Yelp, and ComplaintsBoard. In addition to fielding the complaints it received directly, Active responded to hundreds of complaints made in these third-party forums. Active refunded thousands of customers who were tricked by its deceptively designed webpages.

**ANSWER:**

Deny the allegations in this paragraph, except admit that Active received, became aware of, and responded to complaints concerning the Active Advantage program and that Active has issued refunds of certain charges to some individuals who enrolled in Active Advantage.

8.     The Consumer Financial Protection Bureau ("CFPB"), a Federal agency created in 2011 pursuant to the Dodd-Frank Wall Street Reform and

Consumer Protection Act of 2010 ("Dodd-Frank"), took notice. Unbeknownst to investors, the CFPB began an investigation, obtaining internal GPN and Active documents and testimony from GPN and Active employees. GPN did not inform investors of the ongoing investigation.

**ANSWER:**

Admit that the Consumer Financial Protection Bureau ("CFPB") is a federal agency created in 2011 pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"). Admit that the CFPB conducted an investigation relating to Active through which the CFPB obtained certain documents from Global Payments and Active and testimony from certain Global Payments and Active employees. Admit that Global Payments did not specifically describe the investigation in filings made with the SEC prior to the CFPB's initiation of a lawsuit against Active on October 18, 2022 but deny any suggestion that Global Payments was required to do so. Deny the remaining allegations in this paragraph.

9.    On October 18, 2022, the CFPB filed a complaint against Active in the United States District Court for the Eastern District of Texas (the "CFPB Complaint").[2]

**ANSWER:**

Admitted.

---

[2] That action is styled *Consumer Financial Protection Bureau v. Active Network, LLC*, No. 4:22-cv-00898-ALM (E.D. Tex.). The CFPB filed an amended complaint that same day that changed only the attorney signature block. As used herein, the term "CFPB Complaint" refers to both the original and the amended complaint filed by the CFPB.

10.	The CFPB Complaint alleges that Active intentionally created deceptive web pages to trick consumers into signing up for free trial memberships in Active Advantage, which then automatically converted into paid memberships that renewed each year unless cancelled. Active did not notify consumers when the free trial membership would convert to a paid membership or when the membership would renew. Furthermore, Active increased the annual fee for Active Advantage memberships without statutorily required notice. The CFPB complaint alleges that Active's practices violated the Consumer Financial Protection Act of 2010 ("CFPA"), the Electronic Fund Transfer Act of 1978 ("EFTA"), and Regulation E, 12 C.F.R. § 1005.10(d).

**ANSWER:**

Deny the allegations in this paragraph, except refer to the CFPB Complaint for its allegations.

11.	More specifically, the CFPB alleged that consumers registering for an event that employs Active's registration software are transferred to Active's webpages to provide their registration and payment information. After providing their registration and payment information, consumers are presented with the Active Advantage "inserted offer" page (so called because the offer is inserted into the payment and registration process for another service). Consumers are required to click one of two buttons at the bottom of the inserted offer page to complete their event registration and payment. The two buttons usually consist of a bright blue highlighted box titled "Accept" and a gray unhighlighted box titled "No thanks." Above these buttons is an advertisement for the Active Advantage discount club and then a box showing the consumer's address and billing information. Consumers are asked to confirm their email address and billing data and check a box to agree to Active's terms before clicking either the "Accept" or "No Thanks" button. These response buttons are commonly referred to as a "call to action button." A significant number of consumers click the highlighted "Accept" button and mistakenly enroll in Active's discount club. If these consumers do not cancel the membership that they mistakenly enrolled in by the end of the trial period, Active begins automatically withdrawing the annual fee from their accounts or billing their accounts for the annual fee.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the CFPB Complaint for its allegations.

12.     This conduct employs two practices that are known to mislead consumers:  "dark patterns" and "negative options." The CFPB has defined dark patterns as "design features used to deceive, steer, or manipulate users into behavior that is profitable for a company, but often harmful to users or contrary to their intent." Dark patterns are employed intentionally:  as discussed further below, Active conducted consumer testing to identify design elements most likely to result in consumers unknowingly signing up for Active Advantage. As a recent consumer review published on the Better Business Bureau ("BBB") website described it: "[t]otal scam - they trick you into a membership by having the 'join' box already ticked. This should be an illegal practice."

**ANSWER:**

Admit that the text set forth in quotation marks in the second sentence of this paragraph appears in the document cited at footnote 4 of the Complaint. Lack knowledge or information sufficient to form a belief as to the truth of allegations that the "consumer review" allegedly published on the Better Business Bureau website included the text set forth in quotation marks in the last two sentences of this paragraph. Deny the remaining allegations in this paragraph.

13.     According to a 2009 report from the Federal Trade Commission ("FTC"), the FTC (which like the CFPB enforces Federal consumer protection law) "uses the phrase 'negative option marketing' broadly to refer to a category of commercial transactions in which sellers interpret a customer's failure to take an affirmative action, either to reject an offer or cancel an agreement, as assent to be charged for goods or services." Here, "free trials" for Active Advantage convert into paid memberships unless the consumer earlier contacts Active to cancel the

membership. However, as Active knows, consumers are generally unaware that they have signed up for the program, and Active does not clearly warn them when their membership will incur an annual fee or confirm when the fee is charged.

**ANSWER:**

Admit that the Federal Trade Commission ("FTC") and the CFPB oversee and enforce certain consumer protection laws. Admit that enrollment in the Active Advantage program is free during an initial trial period, during which enrollees may elect to cancel their enrollment. Admit that enrollees who do not cancel enrollment during the trial period are charged an annual membership fee. Deny the remaining allegations in this paragraph, except refer to the referenced FTC report for its contents.

14.     Nearly all Active Advantage memberships (93%) begin with this "inserted offer," rather than consumers signing up on Active's website independent from registering for an event, camp, or so forth. The CFPB Complaint revealed that since July 2011, Active has generated over $300 million in fees from approximately three million consumers using these unlawful tactics.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the CFPB Complaint for its allegations.

15.     Between July 21, 2011 and early 2020, members who enrolled in Active Advantage via an inserted offer redeemed only $8.4 million in Active Advantage benefits compared to the $300 million in membership fees that Active collected from these members, meaning that the value of Active Advantage benefits used by consumers is only 2.8% of the fees consumers paid. This remarkably low ratio is strong evidence that Active Advantage members are unaware of their membership,

and thus that they signed up unknowingly. In an internal email, a senior manager of Active described the Active Advantage discount club as providing "pure profit."

**ANSWER:**

Deny the allegations in this paragraph except refer to the email referenced in the last sentence of this paragraph for its contents.

16. The CFPB Complaint seeks (1) to permanently enjoin Active from committing future violations of the CFPA, EFTA, and Regulation E, (2) monetary relief for consumers, including rescission, refunds, and damages, (3) civil monetary penalties, and (4) payment of the CFPB's costs to prosecute the action.

**ANSWER:**

Admit that this paragraph purports to summarize or characterize the Demand for Relief portion of the CFPB Complaint, and refer to the CFPB Complaint for its allegations and other contents. Deny that the relief sought in the CFPB Complaint is warranted and deny any remaining allegations in this paragraph.

17. The CFPB then issued a circular reiterating that "dark patterns" and "negative options" are likely to mislead consumers. The circular specifically identified Active, making it a poster child for these unlawful practices.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the document cited in footnote 4 of the Complaint for its contents.

18. GPN has implicitly conceded that its prior definitive statement concerning compliance was false and misleading by adding a caveat in its most recent Form 10-K, which asserted that GPN is "in compliance *in all material respects* with applicable existing legal and regulatory requirements"—a statement that is, even with the added verbiage, at odds with the CFPB's allegations.

11

**ANSWER:**

Deny the allegations in this paragraph, except refer to Global Payments' February 17, 2023 Form 10-K for its contents.

19.    Soon thereafter, on May 1, 2023, GPN's long-time CEO, Defendant Jeffrey Sloan, who oversaw the acquisition of Active, announced he was leaving effective one month later without any plan for the next phase of his career.

**ANSWER:**

Admit that Mr. Sloan served as Global Payments' CEO from approximately 2013 through the time of his resignation from that position effective June 1, 2023 and that during his tenure as CEO the Company acquired Active. Admit that Global Payments filed an SEC Form 8-K on May 1, 2023, attaching among the exhibits thereto a press release dated May 1, 2023 and a letter agreement between Mr. Sloan and the Company addressing, among other things, Mr. Sloan's resignation. Deny the remaining allegations in this paragraph, except refer to the May 1, 2023 Form 8-K and its exhibits for their contents.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**ANSWER:**

Admit that Plaintiffs purport to assert claims under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**ANSWER:**

The allegations in this paragraph state legal conclusions that Defendants are not required to admit or deny.  To the extent that a response is required, Defendants admit that the court has jurisdiction over this action.

22.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

**ANSWER:**

The allegations in this paragraph state legal conclusions that Defendants are not required to admit or deny.  To the extent that a response is required, Defendants admit that the venue is proper in this Judicial District and deny the remaining allegations in this paragraph.

23.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate

13

commerce, including interstate telephone communications, and the facilities of a national securities exchange.

**ANSWER:**

Admit that, during the Class Period, Active and Global Payments used the means and instrumentalities of interstate commerce, including interstate telephone communications, and that Global Payments used the facilities of a national securities exchange. Deny the remaining allegations in this paragraph.

## III.   PARTIES

### A.    Plaintiffs

24.    Co-Lead Plaintiff Mike Shafer, as set forth in the Certification filed at Docket No. 16-4, incorporated by reference herein, acquired GPN common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:**

Denied, except lack knowledge or information sufficient to form a belief as to the truth of information set forth in Mr. Shafer's Certification filed at Docket No. 16-4.

25.    Co-Lead Plaintiff David Keating, as set forth in the Certification filed at Docket No. 16-4, incorporated by reference herein, acquired GPN common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:**

Denied, except lack knowledge or information sufficient to form a belief as to the truth of information set forth in Mr. Keating's Certification filed at Docket No. 16-4.

26.     Co-Lead Plaintiff William Jeffrey Igoe, as set forth in the Certification filed at Docket No. 15-5, incorporated by reference herein, acquired GPN common at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**ANSWER:**

Denied, except lack knowledge or information sufficient to form a belief as to the truth of information set forth in Mr. Igoe's Certification filed at Docket No. 15-5.

## B.     Defendants

27.     Defendant GPN is a Georgia corporation with its principal place of business at 3550 Lenox Road, Atlanta, Georgia. GPN is the publicly traded parent company of Active.  GPN common stock trades on the NYSE under the ticker symbol "GPN."

**ANSWER:**

Admit that Global Payments is a Georgia corporation with its principal executive office at 3550 Lenox Road, Atlanta, Georgia. Admit the remaining allegations in this paragraph.

28.     Defendant Jeff Sloan is the former Chief Executive Officer ("CEO") of GPN and was GPN's designated Principal Executive Officer during the Class Period. Defendant Sloan joined GPN as its President in 2010, served in that role until 2014,

15

and became CEO, as well as a Director, in 2013. Sloan left GPN and its Board effective June 1, 2023, when he was replaced by Defendant Bready.

**ANSWER:**

Admit the allegations in the first two sentences of this paragraph. Admit that Mr. Sloan resigned from his positions as Global Payments' CEO and a member of its board of directors effective June 1, 2023, on which date Mr. Bready succeeded Mr. Sloan as Global Payments' CEO and was elected to the Company's board of directors. Deny the remaining allegations in this paragraph.

29.    Defendant Cameron Bready is the current CEO of GPN. Defendant Bready served as GPN's President and Chief Operating Officer ("COO") from 2020 to 2022. From 2014 to 2019, Defendant Bready served GPN's Chief Financial Officer ("CFO"). Beginning in June 2014, Defendant Bready served as an Executive Vice President. In February 2017, Defendant Bready was made a Senior Executive Vice President.

**ANSWER:**

Admit that Mr. Bready is the current Chief Executive Officer of Global Payments and also currently serves as a Director of Global Payments. Admit that Mr. Bready served as Global Payments' President and Chief Operating Officer from September 2019 until June 1, 2023. Admit that Mr. Bready served as Global Payments' Senior Executive Vice President and Chief Financial Officer from March 2017 to September 2019 and served as the Company's Executive Vice President and Chief Financial Officer from June 2014 to February 2017. Deny the remaining allegations in this paragraph.

16

30.     Defendant Paul Todd was GPN's CFO from September 2019 to June 30, 2022, and was its designated Principal Financial Officer during the Class Period.

**ANSWER:**

Admit that Mr. Todd was Global Payments' CFO from September 2019 to June 30, 2022, and was its designated Principal Financial Officer during that time period.  Deny any remaining allegations in this paragraph.

31.     Defendant Josh Whipple is the Senior Executive Vice President and CFO of GPN, and its designated Principal Financial Officer. Prior to the appointments of these roles effective July 1, 2022, Defendant Whipple served as GPN's Chief Strategy and Enterprise Risk Officer from 2015 to 2022.

**ANSWER:**

Admitted.

32.     Defendant Active Network, LLC ("Active") is a wholly owned subsidiary of GPN. GPN acquired Active in 2017. Active's headquarters are in Dallas, Texas.

**ANSWER:**

Admitted.

33.     Defendant Andrea Facini was Active's President from April 2019 until August 2022. Prior to that, Defendant Facini worked at Active from October 2011 to January 2018, first as Senior Vice President, Global Product & Innovation and then as Chief Product Officer ("CPO").

**ANSWER:**

Admitted.

34.     Defendants Sloan, Bready, Todd, and Whipple are referred herein as the "Individual GPN Defendants." The Individual GPN Defendants, because of their

positions with GPN, possessed the power and authority to control the contents of GPN's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual GPN Defendants were provided with copies of GPN's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

**ANSWER:**

Admit that the Complaint purports to refer to Messrs. Sloan, Bready, Todd, and Whipple as the "Individual GPN Defendants." Deny the remaining allegations in this paragraph, except refer to Global Payments' Class Period SEC filings, press releases, earnings conference call transcripts, and presentations to investors and analysts for their contents.

35.    Defendant Facini, because of his position with Active, possessed the power and authority to control the contents of information Active provided to GPN (which Active and Facini intended to be included in and reflected by GPN's SEC filings and other public statements), as well as Active's web sites, press releases, and other public statements. Because of his position and access to material non-public information available to him but not to the public, Defendant Facini knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

**ANSWER:**

Deny the allegations in this paragraph, except refer to Active's press releases, public statements and material posted on Active's web sites during Mr. Facini's tenure with Active for their contents.

### C.    Relevant Non-Parties

36.    FE-1[3] was an Active employee from July 2019 to July 2022, located at Active's Dallas, Texas headquarters. FE-1 had roles in social media and marketing during their tenure at Active. As a social media buyer, FE-1's job responsibilities included planning, managing, and executing paid social media campaigns. As a Marketing Specialist, B2B, FE-1's job responsibilities included developing, implementing, and managing targeted web and email re-targeting strategies and managing effective paid media campaigns on social channels including Facebook and Instagram. In that position, FE-1 reported to Active's Head of Marketing Gloria Walker, who reported to Defendant Facini.

**ANSWER:**

Admit that Gloria Walker served as Active's Head of Marketing and reported to Mr. Facini during their respective tenures with Active.  Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

37.    FE-2 worked at Active from July 2018 to March 2022, based out of Active's Dallas headquarters, as a marketing specialist and, then, a senior marketing specialist.  FE-2 monitored Active's social media platforms on Instagram and

---

[3] To preserve their anonymity and protect them from retaliation, each former employee of Active or GPN quoted herein is referenced numerically as "FE-_" and non-gendered pronouns are used.

Facebook and was responsible for responding to complaints from customers on social media.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

38.     FE-3 worked at Active from April 2014 to June 2018. FE-3 was based in Active's Dallas headquarters. FE-3 initially provided technical support for certain hunting and fishing licensing products for approximately two years before transferring to Active's registration department, where FE-3 dealt with Active Advantage complaints.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

39.     FE-4 worked at Active from July 2014 to January 2021, based in Dallas, as an account executive, then account manager, and then senior account manager. FE-4 oversaw accounts for children's camps (e.g., summer camps, day camps, and after-school programs), and reported to Director of Account Management Pam Aden.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

40.     FE-5 was the Associate Director of Technical Support at Active from May 2015 to April 2017, based in Dallas.  FE-5 supervised a team that answered calls concerning Active Advantage memberships, including membership cancellations, chargebacks, and refunds.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

41.    FE-6 was employed by Active as a Product Marketing Manager from December 2018 to December 2019 and was based in Dallas. FE-6 reported to Senior Manager of Product Marketing Tom Crist and then to Head of Marketing Gloria Walker (who, according to FE-1 reported to Defendant Facini). Crist reported to then-Vice President of Marketing Cristine Kao, who reported to then-President Facini. FE-6 oversaw product marketing activities for three products: Swim Manager, Meet Mobile, and Active's team sports program.

**ANSWER:**

Admit that Active Senior Manager of Product Marketing Tom Crist reported to Active's former Vice President of Marketing Cristine Kao and that Ms. Kao reported to Mr. Facini during their respective tenures with Active.  Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

42.    FE-7 was employed by Active from September 2014 to August 2017 and was based in Dallas. At the time they left, FE-7 was the Supervisor of Technical Support and was a frontline manager for an end-to-end software program called Active Net. Active Net helped manage reservations, collect payments, and do payroll and reporting, and enabled enrollment for Active Advantage. As a result of their position and responsibilities, FE-7 had insight into the mechanism for Active Advantage enrollment and the refund policies and practices in the technical support department.

21

**ANSWER:**

Admit the allegations in the third sentence of this paragraph. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

43.     FE-8 was a Client Application Specialist at Active from February 2015 to July 2017, based in Dallas. Per FE-8, headquarters had an open office plan, and FE-8 worked on the same floor as a team of 50 to 100 people responsible for handling calls from consumers complaining about Active Advantage.

**ANSWER:**

Admit that Active employed personnel whose responsibilities included responding to calls from customers, event registrants, and others on various subjects, including the Advantage program. Admit that Active's Dallas offices had certain open areas as well as closed offices and other closed spaces. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

44.     FE-9 worked for GPN from September 2019 to March 2023, and was based in Atlanta. FE-9 was GPN's President of Vertical Markets Software Solutions from September 2019 to January 2022 and then Chief Strategy Officer until leaving GPN in March 2023.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

45.    FE-10 worked for Active from 2014 to February 2020, based in Dallas, first as a Client Application Specialist, then as a Technical Account Manager, and then, from January 2019 to February 2020, as a Supervisor, Technical Support. FE-10 oversaw a team of ten to twenty customer service agents based in the Philippines who handled complaints calls from customers.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

46.    FE-11 was a Technical Analyst at Active from 2014 to August 2018, based in Dallas. FE-11 worked in an open space office on the same floor with Active employees who received escalation calls from consumers demanding refunds of Active Advantage fees.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

47.    FE-12 worked at Active from 2014 to March 2019 and was based in Dallas. FE-12 was first a Digital Account Manager, then a Senior Digital Account Manager, and then a Manager, Digital Marketing Consultants beginning in fall 2017. FE-12 attended quarterly business review meetings where attendees discussed customer complaints about being signed up and charged for Active Advantage membership without their consent.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

48.    FE-13 was a Professional Services Consultant employed by Active from 2014 to August 2018, based in Dallas. FE-13 worked with racing clients and then with larger camp clients of Active.

23

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of

the allegations in this paragraph.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background of Active and Active Advantage

49.    Active went public in May 2011 under the name Active Network, Inc., billing itself as "the leading provider of organization-based cloud computing applications serving a wide range of customer groups including business events, community activities, outdoors and sports." In its IPO, Active touted its "proprietary technology platform," claiming it "transforms the way organizers manage their activities and events by automating online registrations and streamlining other critical management functions, while also driving consumer participation to their events."

**ANSWER:**

Admit that The Active Network, Inc. completed an initial public offering of

its common stock in May 2011 and that the allegations in this paragraph quote certain

excerpts of language that appeared in the prospectus issued in connection with that

initial public offering. Deny the remaining allegations in this paragraph, except refer

to the referenced prospectus for its contents.

50.    Then, as now, Active offered online event registration and payment services, primarily for camps and athletic events, such as running races. For many organizers of such events, rather than building and maintaining their own online registration and payment infrastructure, it is preferable to retain a vendor such as Active to provide these services so that participants can register and pay for events online. When consumers are completing online enrollment for an event for which the event organizer has contracted with Active, the consumers are directed to webpages built by Active. Active collects the consumers' registration information

24

and consumer payments data (e.g., credit or debit card number) so that Active can transmit the consumer payments data through the payments systems. Active is compensated by collecting a portion of the remittances that it transmits to the event organizers.

**ANSWER:**

Admit that the allegations in the third, fourth, and fifth sentences of this paragraph fairly summarize the matters addressed therein. Admit that, since May 2011, Active has offered online event registration and payment services, including for camps and athletic events, such as running races. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph. Deny the remaining allegations in this paragraph.

51. In September 2013, Active was taken private by Vista Equity Partners ("Vista"), a private equity firm. The aggregate consideration paid by Vista was approximately $924 million (without giving effect to related transaction fees and expenses).

**ANSWER:**

Admitted.

**B. Active Advantage Invites Regulatory Scrutiny and Litigation.**

52. At least as early as July 21, 2011, Active offered subscription membership in a "discount membership club" known as "Active Advantage." In return for an annual fee, Active Advantage members can redeem discounts for processing fees, beer and wine tastings, sports apparel, flowers, travel, lodging, and race registrations.

**ANSWER:**

Admitted.

53.     As noted above, Active uses two deceptive tactics to lure consumers into Active Advantage memberships: (1) "dark patterns" and (2) "negative options." According to the CFPB, "[d]igital dark patterns are design features used to deceive, steer, or manipulate users into behavior that is profitable for a company, but often harmful to users or contrary to their intent."[4]  According to the FTC, a "common dark pattern involves tricking someone into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges."[5]  A "frequent example of a dark pattern resulting in unauthorized charges is when a company deceptively offers a free trial period, but then, unbeknownst to the consumer, the trial is followed by a recurring subscription charge if the consumer fails to cancel."  The FTC has long made clear that dark patterns violate consumer protection laws.  "Seeing a rise in these types of dark patterns, the FTC hosted a workshop in 2007 to analyze the marketing of goods and services through offers with negative option features, then issued a staff report in 2009 that set forth principles to guide sellers offering negative options online."

**ANSWER:**

Deny the allegations in the first sentence of this paragraph. Admit that the text set forth in quotation marks in the second sentence of this paragraph appears in the document cited at footnote 4 of the Complaint.  Admit that the text set forth in quotation marks in the third, fourth, and sixth sentences of this paragraph appears in the document cited at footnote 5 of the Complaint.  Lack knowledge or information

---

[4] CFPB, Consumer Financial Protection Circular 2023-01, *Unlawful negative option marketing practices*, Jan. 19, 2023, available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_unlawful-negative-option-marketing-practices-circular_2023-01.pdf.
[5] FTC Staff Report, *Bringing Dark Patterns to Light*, Sept. 2022, available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

26

sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

54.    Per the CFPB, a "negative option" is "a term or condition under which a seller may interpret a consumer's silence, failure to take an affirmative action to reject a product or service, or failure to cancel an agreement as acceptance or continued acceptance of the offer."

**ANSWER:**

Admit that the text set forth in quotation marks in this paragraph appears in the document cited at footnote 4 of the Complaint. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

55.    As the CFPB stated, "[d]ark patterns can be particularly harmful when paired with negative option programs, causing consumers to be misled into purchasing subscriptions and other services with recurring charges and making it difficult for consumers to cancel and avoid such charges." That is exactly what Active did. In its online registration and payment workflow for events and camps, Active includes a misleadingly designed page intended to trick consumers into agreeing to a free trial Active Advantage membership (which, of course, automatically converted to a paid subscription). More specifically, Active inserts a webpage that includes a button, typically labeled "Accept," that, when selected, enrolls the consumers in Active Advantage. Many consumers click this highlighted button because they mistakenly believe this action is required to accept charges to their credit or debit cards for the event or camp, or to agree to terms and conditions or liability waivers relating to the event or camp. Instead, consumers are actually enrolling in a trial membership in the Active Advantage discount club, which automatically converts to a paid subscription with an annual fee of $89.95, unless consumers opt out by canceling their membership within 30 days.

27

**ANSWER:**

Admit that the text set forth in quotation marks in the first sentence of this paragraph appears in the document cited at footnote 4 of the Complaint. Admit that, during the Class Period, Active users who clicked on the button to "Accept" enrollment into the Active Advantage program during event registration were enrolled in the trial memberships which could be cancelled within 30 days without charge and converted into a paid subscription with an annual fee of $89.95 if not cancelled. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth sentence of this paragraph. Deny the remaining allegations in this paragraph.

56. Though some of this agency guidance was published relatively recently, it has long been clear that dark patterns and negative options are deceptive. For instance, Congress enacted the Restore Online Shoppers' Confidence Act ("ROSCA") in 2010. ROSCA prohibits charging for goods and services sold over the internet using a negative option feature unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's account; and (3) provides simple mechanisms for a consumer to stop recurring charges. The FTC's first action alleging ROSCA violations was filed in 2016. Active did not "clearly and conspicuously" to consumers that they were agreeing to join Active, nor that their free trial would convert to a paid membership, nor that such membership would be automatically renewed (and an annual fee charged) each year.

28

**ANSWER:**

Admit that the documents cited in footnotes 4 and 5 of the Complaint are dated January 19, 2023 and September 2022, respectively. Admit that Congress enacted the Restore Online Shoppers' Confidence Act ("ROSCA") in 2010. State that the allegations in the third sentence of this paragraph state legal conclusions that Defendants are not required to admit or deny. To the extent that a response is required, Defendants deny those allegations, except refer to the complete text of ROSCA and all legal authorities applying or interpreting ROSCA for their contents. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of this paragraph. Deny the remaining allegations in this paragraph.

57.    Furthermore, ROSCA requires online negative option sellers to provide a simple mechanism for consumers to cancel. According to the FTC:

> To meet this standard, negative option sellers should provide cancellation mechanisms that are at least as easy to use as the method the consumer used to buy the product or sign up for the service. This means that consumers should be able to cancel their subscription through the same medium (such as a website or mobile application) that the consumer used to sign up for the negative option plan in the first place. It also means that negative option sellers should not subject consumers to new offers or similar attempts to save the account that impose unreasonable delays on consumers' cancellation efforts.[6]

---

[6] *Bringing Dark Patterns to Light*.

**ANSWER:**

Admit that the block quoted text set forth in this paragraph appears in the document titled "*Bringing Dark Patterns to Light*" that is cited in footnote 5 of the Complaint. State that the allegations in the first sentence of this paragraph state legal conclusions that Defendants are not required to admit or deny. To the extent that a response is required, Defendants deny those allegations, except refer to the complete text of ROSCA and all legal authorities applying or interpreting ROSCA for their contents. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

58.   None of this was new to Active, or to GPN. Years before the Class Period, on September 6, 2013, the office of the Attorney General of the State of Iowa, citing Iowa's Consumer Fraud Act and Buying Club Memberships Law ("BCL"), entered into an assurance of voluntary compliance with Active, under which Active agreed to pay $237,167 in refunds to Iowa residents who were unknowingly charged for Active Advantage memberships. According to the Attorney General's office, over 9,500 Iowa residents had each paid a $59.95 annual fee at least once (approximately half of whom had already demanded and received refunds from Active). In addition to providing refunds, Active paid $15,000 to the state. Active further agreed to "either (1) cease enrolling consumers residing in the State of Iowa in Active Advantage as of the effective date of this Assurance, or (2) comply with the BCL." Implicitly conceding that it would *not* comply with the BCL, Active instead chose to stop enrolling Iowans in Active Advantage.

**ANSWER:**

Admit that The Active Network, Inc. entered into an Assurance of Voluntary Compliance with the State of Iowa dated September 6, 2013. Deny the remaining

allegations in this paragraph, except refer to the Assurance of Voluntary Compliance

for its terms.

59.    The following year, on November 24, 2014, the Attorney General of Vermont announced a settlement with Active pursuant to which Active agreed to refund (by the end of 2014) all amounts unknowingly paid by Vermont residents for Active Advantage, in addition to a payment of $25,000 to the state. Active further agreed to clearly distinguish registrations for discount membership programs from the registration for events. Instead of creasing its deceptive practices, however, Active stopped offering Active Advantage in Vermont.

**ANSWER:**

Admit that in or around November 2014, Active entered into a settlement

agreement with Attorney General of Vermont and thereafter elected to cease offering

the Advantage program in Vermont.    Deny the remaining allegations in this

paragraph, except refer to the settlement agreement for its terms.

60.    On June 15, 2016, the District Attorneys of San Diego, Alameda, and Sonoma counties, in California, announced the settlement of a consumer protection action against Active. Active agreed to fund a restitution program to reimburse about 100,000 California consumers who, between 2010 and 2013, paid for Active Advantage but did not use the service to get any discount or benefit (excluding any discount they may have received automatically upon enrollment) and did not already receive a refund. In addition to the restitution program, Active agreed to pay $2.7 million in civil penalties and $150,000 to reimburse the costs of investigation.

**ANSWER:**

Admit that in or around June 2016, Active agreed to a settlement with the

District Attorneys of San Diego, Alameda, and Sonoma counties, in California.

31

Deny the remaining allegations in this paragraph, except refer to the settlement agreement for its terms.

61.    In addition to government actions, civil actions were filed in state and federal courts in California. On February 24, 2014, a consumer class action complaint was filed alleging that the plaintiff, and thousands of other proposed class members, was unknowingly enrolled in Active Advantage as a result of registering for an event through Active. The complaint asserted claims for violations of California's Consumer Legal Remedies Act, its Business and Professions Code, and for common law fraud and deceit. Active settled the claims in January 2017, agreeing to provide full refunds to California residents who were charged for Active Advantage membership without their consent.

**ANSWER:**

Admit that civil lawsuits asserting claims relating to the Active Advantage program have been filed in state and federal courts in California.  Admit that one such putative class action was filed on February 24, 2014 in the Superior Court of the County of San Diego and that Active settled that litigation in or around January 2017.  Deny the remaining allegations, except refer to the filings in the action for their contents and to the settlement papers for the settlement terms.

62.    Moreover, Active Advantage was raised by hundreds in complaints made by consumers to the BBB, Yelp, and ComplaintsBoard, among other venues. Active generally responds to all complaints made to the BBB, which the BBB forwards to Active and solicits a response. According to the BBB, it generally forwards complaints to businesses within two business days of receipt, asking the business to respond in fourteen calendar days; if a response is not received, the BBB sends a follow-up letter to the business.

32

**ANSWER:**

Admit that complaints about Active Advantage have been submitted to forums

such as the BBB, Yelp, and ComplaintsBoard and that Active responds to many of

the complaints that it receives, including complaints which the BBB has forwarded

to Active and requested a response.  Lack knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in this paragraph.

63.    In December 2016, it was reported that the Better Business Bureau had received 410 complaints from consumers in 48 states about Active.[7]  One consumer, who was charged $69.96 for Active Advantage after registering for a ten kilometer race via Active, told a reporter: "You scratch your head and try and remember, what did I sign up for? What is this?" According to the report, "[i]n most cases, the company responded to complaints by issuing refunds. 'We do apologize for the inconvenience you might have experienced to resolve this issue,' read[] a standard response posted on most BBB complaints. Furthermore, even at that time, Active had a page on its website titled "Refund ACTIVE Advantage Membership," and when consumers called Active's customer service department, one of the first automated responses explains, "If you are calling about a charge on your credit card," referring to the surprise Active Advantage membership fees.

**ANSWER:**

Admit that Active has submitted responses to complaints made to the BBB

concerning the Advantage program, and refer to those responses for their contents.

Admit that Active has provided directions for persons seeking refunds of Active

---

[7] KGW-TV, "The unexpected cost of running races," Dec. 12, 2016, available at https://www.kgw.com/article/news/investigations/the-unexpected-cost-of-running-races/283-368639772.  Many of these pre-Class Period complaints made to, and published by, the BBB are no longer available online.

Advantage membership charges, both via Active's website and telephonic customer service hotline. Deny the remaining allegations in the last two sentences of this paragraph, except refer to Active's website for its contents. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, except refer to the article cited in footnote 7 of the Complaint for its contents.

64.    While garnering revenues for Active in the short term, the practice posed a business risk because consumers end up blaming the event organizers—which are Active's customers—for the issue. "It reflects poorly on our business," said one the president of one organization that contracted with Active for a ten kilometer race. After the race, the organization's staff received several phone calls from participants upset about unwanted charges from Active. "We are trying to put on the best events we can and try and make the experience great for all of the participants and it doesn't look good when they get charges that they are not expecting on their card," said the organization president. "If we could get out now, we would[,] but we have to stick with our contract for another year," he added. "Once it is over, we are done."

**ANSWER:**

Admit that event organizers are among Active's customers. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

C.    **In September 2017, GPN Acquires Active.**

65.    On August 3, 2017, GPN announced that it agreed to acquire the communities and sports divisions of Active from Vista, while Active's outdoors division would be retained by Vista. The purchase price was $1.2 billion, consisting of $600 million in cash as well as GPN shares valued at $600 million.

34

**ANSWER:**

Admitted.

66.    Defendant Sloan told analysts that "ACTIVE is a global leader in delivering cloud-based, mission critical, enterprise software, including payment technology solutions, to small-to-medium sized businesses, targeting at events in the communities and health and fitness verticals."

**ANSWER:**

Admit that Mr. Sloan made the statement appearing in quotes in this paragraph during Global Payments' Q2 2017 earnings call on August 3, 2017 and refer to the transcript of that call for its contents.

67.    GPN explained to investors that the Active acquisition aligned with GPN's "technology-enabled, software-driven strategy" and involved operations in two vertical markets (communities, and health and fitness) with "opportunities to meaningfully increase payment throughput."

**ANSWER:**

Admit that Mr. Sloan said the words appearing in quotes in this paragraph during Global Payments' Q2 2017 earnings call on August 3, 2017 and refer to the transcript of that call for its contents.

68.    Defendant Sloan told analysts that:

> ACTIVE has high rates of recurring revenue and operates in a fragmented and underpenetrated market with attractive growth fundamentals. It also has no channel conflict with existing Global Payments businesses and partners, and has a complementary global footprint. We expect to realize revenue and expense synergies over time, as we seek to leverage our extensive distribution assets and further scale the business globally.

35

**ANSWER:**

Admit that Mr. Sloan made the block-quoted statement appearing in this paragraph during Global Payments' Q2 2017 earnings call on August 3, 2017 and refer to the transcript of that call for its contents.

69. Defendant Bready disclosed that GPN expected Active's 2017 revenues (using GPN's net revenue convention) to approach $200 million (though little of that would be recognized by GPN because the acquisition did not close until the third quarter). David Mangum, GPN's then-President and Chief Operating Officer, told analysts that Active's revenue was nearly entirely from US customers.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the transcript of Global Payments' Q2 2017 earnings call on August 3, 2017 for its contents.

70. The acquisition was completed on September 1, 2017. GPN then integrated Active into its internal controls over financial reporting. GPN touted the revenue boost it expected from Active, with Defendant Bready telling analysts on November 8, 2017 that:

> As a result of our strong performance for the third quarter, as well as the closing of the ACTIVE Network transaction, we are again updating our 2017 guidance. We now expect net revenue to range from $3.505 billion to $3.53 billion, reflecting growth of 23% to 24% over 2016. This includes an expected contribution from ACTIVE Network of approximately $40 million to $45 million for the fourth quarter.

**ANSWER:**

Admit that Global Payments' acquisition of Active was completed on September 1, 2017. Admit that Global Payments integrated Active into its North

America segment following the completion of the acquisition. Admit that, as part of these integration activities, Global Payments applied its controls and procedures to Active, and refer to Global Payments' public SEC filings for discussion of Global Payments' integration of Active. Admit that Mr. Bready made the block-quoted statement appearing in this paragraph during Global Payments' Q3 2017 earnings call on November 8, 2017 and refer to the transcript of that call for its contents. Deny the remaining allegations in this paragraph.

71.    Defendant Bready added:

If you look at their [Active's] business overall, it's seasonally strongest in Q1 and Q2, Q2 being a seasonally strongest quarter. Q3 and Q4 tend to be wider from a revenue point of view.

So if you take that $40 million to $45 million target that we have for ACTIVE for Q4. I expect that business for all of calendar 2017 to produce $180 million to $185 million based on that expectation which is in line with our earlier commentary on Q2 where we indicated that the business would approach $200 million of revenue for calendar 2017, to be a little more specific around that right now we see it in the $180 million to $185 million range.

**ANSWER:**

Admit that Mr. Bready made the block-quoted statement appearing in this paragraph during Global Payments' Q3 2017 earnings call on November 8, 2017 and refer to the transcript of that call for its contents.

72.    GPN disclosed that:

37

> The acquisition, integration, and conversion of businesses (such as the acquisition of ACTIVE Network) involve a number of risks. Core risks are in the area of valuation (negotiating a fair price for the business based on inherently limited diligence) and integration and conversion (managing the complex process of integrating the acquired company's people, services, technology and other assets to realize the projected value of the acquired company and the synergies projected to be realized in connection with the acquisition). In addition, international acquisitions often involve additional or increased risks including, for example: managing geographically separated organizations, systems, and facilities; integrating personnel with diverse business backgrounds and organizational cultures; ***complying with foreign regulatory requirements***; fluctuations in currency exchange rates; enforcement of intellectual property rights in some foreign countries; difficulty entering new foreign markets due to, among other things, customer acceptance and business knowledge of those new markets; and general economic and political conditions.

**ANSWER:**

Admit that the block-quoted text appearing in this paragraph also appeared in Global Payments' SEC Form 10-K filed on February 23, 2018 and refer to that document for its contents.

73. Despite the reference to "foreign regulatory requirements" in connection with international acquisitions, GPN made no mention of the regulatory compliance challenges it would almost certainly face as a result of the Active acquisition.

**ANSWER:**

Denied.

74. Following a September 2019 merger, GPN realigned its reportable segments, dividing its operations into three segments: Merchant Solutions, Issuer

38

Solutions and Business and Consumer Solutions. Since then, Active's financials have been included as part of the Merchant Solutions segment.

**ANSWER:**

Admitted.

### D.    Active Continues To Mislead Consumers.

75.    After resolving the litigation it had faced prior to its acquisition by GPN, Active continued to deceive consumers into signing up for Active Advantage. Active's marketing tests to determine which wording was most effective in deceiving consumers continued until at least 2019, according to the CFPB.  Furthermore, Active increased the annual fee for Active Advantage—without providing the advance notice required by federal law—to $89.95 on or about January 4, 2019.

**ANSWER:**

Admit that Active increased the annual fee for Active Advantage to $89.95 on

or about January 4, 2019.  Deny the remaining allegations in this paragraph.

76.    Customer complaints continued apace, including the following examples:



Mallory H
★☆☆☆☆                                                   06/27/2020

I have the same issue as everyone listed below. I registered my son for a summer camp and 30 days later I am automatically charged $89.95. I looked through my junk mail and found an email with the reciept and took my hours to figure out what this company is. It's such a shame they are prying on people registering for camps and events and saying they can "opt in or out" to automatic charges for a service they do not want or even know what it is. It's is TERRIBLE business practice. I have asked the place that used you as their registration platform to not support your company due to this ridiculous scam they running. I tried to call their customer service line and had a response that they are closed due to COVID, I sent an email but haven't recieved anything other than a stock response. I better receive a refund for a service that I did not have any knowledge of signing up for!! Please beware of using this web platform and look to register another way if a business is using Active Advantage for their registration needs.

\* \* \*

 **Jordan V**
⭐☆☆☆☆                                                          03/30/2021

I was charged for a one year membership after a "trial" I never signed up for. If you make a reservation through \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*, apparently they auto sign you up for this!



**ACTIVE Network, LLC Response**                               04/09/2021

Hi \*\*\*\*\*\*\*

Thank you for reaching out regarding ACTIVEAdvantage. We want to assure you that the membership is an opt in offer and the offer for a trial would while registering. A case has been created for you and an agent will follow up with more information regarding the membership offer. Case reference is: XXXXXXXX. Please let us know if you have any further questions, you can reach back out to us at \*\*\*\*\*\*\*@active.com.

Thank you,
ACTIVE Consumer Support
www.ACTIVEnetwork.com

\* \* \*

40



GN

05/11/2021

This company automatically created an account for me when I reserved a DEC camp ground. No where on the ReserveAmerica shopping cart was there an option to opt in or out of this "trial" membership. 30 days later, Chase blocked a charge as being fraudulent from Active Advantage. No where did I explicitly consent to be a part of this "network" or "benefits program". It's telling that Chase blocked this company's transaction. To make things even worse, the business does not have any phone number listed and the only way to "opt out" of the membership before being billed is to email them. These are horrible, anti user practices meant to trap unsuspecting people into a monthly subscription knowing full well they won't use any of the so called "services" of this business.



**ACTIVE Network, LLC Response**

05/28/2021

ACTIVE Advantage is a multi-step opt-in offered available when making a campground reservation with ReserveAmerica. Due to COVID-19, we have shifted to an email based Consumer Support team. If you have any further questions regarding what ACTIVE Advantage is and what the membership includes, feel free to email ACTIVENetwork Consumer Support at: ***************@active.com or *******@active.com

Thank you,
ACTIVE Consumer Support
www.ACTIVEnetwork.com

* * *

41



**DP**
★☆☆☆☆

07/01/2021

I just received an email today I was charged $89.95 for an auto renewal of a membership I apparently was deceptively "opted-in" dating back to 2014. I logged in and just learned today this company has been charging me an annual renewal. I submitted a membership cancelation and refund request just minutes ago. I fully expect to be refunded in short order. I am posting this as I certainly would never knowingly sign up for auto renewal of this membership, and to be best of my knowledge my only time I EVER access this service was when I signed up for a race in 2014.



**ACTIVE Network, LLC Response**

07/15/2021

We apologize for the inconvenience. We want to assure you that the membership is an opt-in, multiple step process to sign up for the membership trial. However, it is not our intention for you to have an unwanted membership. We can confirm that your membership was cancelled on 7/4/2021 with a refund for the 2021 membership. If you have not already seen the credit, please let us know by reaching out to *******@active.com so we can assist in locating it.

Thank you,
ACTIVE Consumer Support

\* \* \*



**L W**
★☆☆☆☆

12/31/2021

ACTIVE Network, LLC has an intentionally misleading "membership sign up" process where a user may be signing up for a specific event and the final screen, filled with tiny print, hoodwinks users into an $89.95 payment a year later. Basically you've signed up for one thing, then another screen gives you the option of signing up for this membership, but is very unclear, and the most obvious button at the bottom of the screen says something like "Continue" or "Complete" and therefore seems like part of the event you're interested in in the first place. But unless you read the details and click "No Thanks" (the less prominent, gray button next to the bright and bold "Continue"/"Complete") then you've agreed to their terms. This is a scam and should be illegal because it is so misleading and done in such bad faith.

42

**ANSWER:**

Admit that Active received or otherwise became aware of complaints regarding Active and Advantage and the process for enrolling in same and that Active responded to many of the complaints of which it received notice. Lack knowledge or information sufficient to form a belief as to as to whether the un-sourced alleged examples set forth in this paragraph are genuine. Deny the remaining allegations in this paragraph.

77. Unsurprisingly, credit card chargeback rates continued to far exceed normal levels: while the major credit card network rules deem chargeback rates of 1% to 1.5% to be concerning, Active's own analysis of the chargeback rate for Active Advantage showed chargeback rates of either six or seven percent for the final three months of 2019, and an Active senior finance manager noted that the chargeback rate for Active Advantage exceeded six percent in 2018.

**ANSWER:**

Admit that consumers made chargeback requests relating to purchases made through Active, including with respect to credit card charges issued in connection with enrollment in the Advantage program. Admit that Active tracked and maintained certain information relating to rates at which chargebacks were requested, and refer to Active's records of such information for their contents. Lack knowledge or information sufficient to form a belief as to as to the truth of the remaining allegations in this paragraph.

78.    Former employees confirmed that Active's deceptive practices continued unabated, as follows:

a.    FE-1:

i.    "I also created and posted to active social media channels organically and answered any questions anybody had whether it was in our posts or through direct messages" on Facebook and Instagram, FE-1 said. "Or I would send them to the right person within the company who could answer their questions."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-1 or other unnamed persons. Deny the remaining allegations in this paragraph, except refer to the referenced Active social media channels, including Active's Facebook and Instagram posts, for their contents.

ii.    Through monitoring of Active's Facebook and Instagram accounts, FE-1 became aware of customer complaints about being enrolled in Active Advantage without their consent in early 2021, FE-1 said. FE-1 got about five to ten per month, but did not deal with consumers who disputed the charge on their credit cards or complained on Yelp or to the Better Business Bureau.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-1 or other unnamed persons. Deny the remaining allegations

in this sub-paragraph, except refer to Active's Facebook and Instagram accounts for their contents.

> iii.    These complaints were "definitely an issue," FE-1 said. "It was just a known issue that people would sign up and then ask for a refund. I was on the marketing team so I saw a lot of complaints online about it and had to handle those complaints. Anyone I saw on our social commenting with a complaint or sending us a direct message I would send to the team responsible for refunding them. Or I would guide where they could go to get a refund." FE-1 directed consumers to Active's website, which itself directed them to request refunds via an email address (ActiveAdvantage@active.com) or a toll-free telephone number (1-866-561-0647).

**ANSWER:**

Admit that Active's website listed an email address and toll-free phone number that could be used to request refunds. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-1 or other unnamed persons. Deny the remaining allegations in this sub-paragraph, except refer to Active's website and posts to Active's social media accounts for their contents.

> iv.    However, the departments responsible for refunds were "quite understaffed," FE-1 said. "People would get mad that their refund wasn't happening fast enough. I don't know where the phone number went but the email would go to the support team who dealt with refunds who were

based in China. People would get mad that their refund wasn't happening fast enough."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote from and/or describe statements, observations, beliefs, or actions of FE-1 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> v. Active had quarterly town hall meetings attended by all employees, including FE-1. Derek Story, Active's Vice President, Commerce and Partnerships, oversaw Active Advantage; according to FE-1, it was Story's primary focus. During the quarterly town hall meetings, Story summarized the performance of Active Advantage during the preceding quarter, addressing the number of refunds given and memberships cancelled, as well as goals for growing Active Advantage during the next quarters. Following these meetings, a quarterly business report was distributed to all employees. During FE-1's time at Active, these reports contained a slide concerning Active Advantage, including the number of members, refunds, and cancellations. FE-1 believes that these quarterly business reports were provided to GPN leadership.

**ANSWER:**

Defendants Active and Facini admit that: (i) Active held quarterly town hall meetings during the Class Period, which typically were attended by many Active employees; (ii) Derek Story served as Active's Senior Director, Commerce and Partnerships during the Class Period and, during portions of the Class Period, had

certain responsibilities for oversight of Active Advantage; and (iii) Mr. Story reported on aspects of the Advantage program at certain town hall meetings during the Class Period and refer to materials presented at those meetings for their contents. The other Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations. Admit that during the Class Period certain Global Payments executives received periodic reports concerning Active's business, but state that both during the Class Period and now, Active represented a small portion of Global Payments' overall business and that Global Payments' executives did not receive regular detailed reporting on the Advantage Program. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-1. Deny the remaining allegations in this sub-paragraph.

> vi.   In addition to the quarterly town hall meetings, Active had weekly business review meetings. FE-1 attended these meetings from time to time when their superior could not attend. During these weekly meetings, Active's leadership received summaries of Active's programs, including Active Advantage, and the number of members, cancellations, and refunds was addressed.

**ANSWER:**

Defendants Active and Facini admit the allegations in the first and last sentences of this subparagraph. The other Defendants lack knowledge or

information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

      b.    FE-2:

          i.    Active's customer support staff regularly received complaints from consumers. "The support people were either getting calls from customers complaining about the charge or people would chat in the support chatbot [on Active's website] and bitch about it."

**ANSWER:**

Defendants Active and Facini admit that Active's customer support staff received complaints from consumers both telephonically and through a "chat" feature available on Active's website. The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-2 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

          ii.    FE-2 raised the customer complaints with Senior Technical Support Manager Mike Peery, who claimed the problem had been fixed after Active settled a class action lawsuit and a lawsuit filed by the district attorneys of Alameda and Sonoma counties in June 2016. However, consumers continued to complain to and about Active.

**ANSWER:**

Admit that Mike Peery was a Senior Technical Support Manage at Active during part of the Class Period. Admit that Active received consumer complaints after the January 2017 settlement of the lawsuit referenced in this paragraph. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-2, other unnamed persons, and/or Mr. Peery. Deny the remaining allegations in this sub-paragraph.

      c.    FE-3:

          i.    FE-3's department would get calls every day from members who had been charged for an autorenewal membership they didn't know they had. Employees received bonuses if they were able to convince complaining consumers not to cancel Active Advantage memberships. Despite this incentive, FE-3's department did issue refunds and cancel membership accounts with respect to approximately 40% of the complaints received by the department. FE-3's department did not handle complaints made to other departments (such as a dedicated complaints team) or to third parties.

**ANSWER:**

Defendant Active admits that: (i) Active's registration department handled requests to cancel Active Advantage memberships and/or refund membership charges and granted those requests in many cases; and (ii) certain of Active's

employees received incentive payments for "saved" Advantage memberships.  The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.  Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-3 or other unnamed persons.  Deny the remaining allegations in this sub-paragraph.

> ii.     The sales department tracked whether or not members redeemed their offers in the Advantage program.

**ANSWER:**

Defendants Active and Facini admit that Active tracked certain information relating to Advantage members' usage of benefits offered to Advantage members, but deny that the sales department did so.  The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.  Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

> iii.    Active tracked customer complaints, cancellations, and credit card chargebacks relating to Active Advantage, and more serious consumer complaints were reported to management via "escalation forms."

**ANSWER:**

Defendants Active and Facini admit that Active tracked certain information relating to customer complaints, cancellations, and credit card chargebacks relating to Active Advantage and escalated certain such information to members of Active's management.  The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-3. Deny the remaining allegations in this sub-paragraph.

        d.    FE-4:

            i.    FE-4 received complaints from consumers who were unknowingly enrolled in and charged for Active Advantage, and would direct them to the same email address and telephone number recalled by FE-4.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-4 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

            ii.    In addition, Active received complaints from its event organizer clients about the offer, often because those clients had received consumer complaints or negative

51

online reviews as a result of consumers unknowingly being enrolled in Active Advantage. "A lot of times they'd be pretty upset," according to FE-4. "It could just be such a thing where it's just a ticking time bomb – they may get a bad Yelp review out of the blue and had Active Advantage on their account for five years." FE-4 was "sure" that Active lost clients because of Active Advantage.

**ANSWER:**

Defendants Active and Facini admit that Active received complaints relating to Active Advantage from some event organizer clients.  The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.  Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-4 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

      iii.    FE-4 worked with the largest clients near the end of their employment with Active, many of whom "negotiated their contract and had the offer removed." However, Active sometimes refused to remove it when requested by smaller clients. "It was definitely a sore point," FE-4 said. "As time went on, after Global Payments purchased the company, we'd remove the offer if the customer requested it." FE-4 recalls that Active lost some customers as a result of consumers being deceived by the Active Advantage inserted offer.

52

**ANSWER:**

Defendants Active and Facini admit that Active sometimes agreed to omit an offer of membership in Active Advantage from event registration processes Active managed for customers upon customer request. The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

> iv. FE-4 was told by management that it was a "cash cow" for Active. "I'd ask management, 'Why don't we just take the offer away from camp customers? 'I was told it was a big moneymaker for the company and for a long time it was something we really didn't have any insight into and we didn't have the ability to make any modifications to it and then they got sued a couple of times and it all changed and we were able to take the offer off easily."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-4 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> v. "It was kind of an open thing where everybody knew what it was; everyone knew that it duped people that didn't pay attention," FE-4 said, "but it was kind of this part of this thing, part of the cost of doing business. Everybody knew what it was. Everybody understood the nature of the

53

complaints that came with it." During one of the quarterly town hall meetings, which were all-hands meetings, a senior account manager asked a question about Active Advantage: "why are we offering this if we're losing clients over it?" The question "made everyone cringe."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-4 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

vi.    It was "well known" it would cause accidental signups "for a long time," FE-4 said, "and I would say there was a period where they didn't care and there was a period where they did care, particularly after Global Payments took over." When GPN acquired Active, there was an effort to avoid misleading consumers and a greater willingness to remove the inserted offer from registration workflows when Active's clients requested it, FE-4 said.

**ANSWER:**

Admit that Active undertook efforts to avoid misleading consumers. Defendants Active and Facini admit that Active sometimes omitted the Active Advantage membership offer from the participant registration process upon customer request.  The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.  Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph

54

purporting to quote and/or describe statements, observations, beliefs, or actions of FE-4 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> e.   FE-5:
>
> i.   Most Active Advantage members were auto-enrolled when they signed up for an event, rather than using the direct sign-up option on the Active Advantage website.

**ANSWER**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-5. Deny the remaining allegations in this sub-paragraph.

> ii.   Micah Kropp, who was Senior Manager of Product Marketing and Strategy from 2013 to 2017 and Senior Director of Global Partnerships and Digital Strategy from 2017 to 2020, would have tracked revenues and customer retention.

**ANSWER**

Admit that Micah Kropp served as Active's Senior Manager of Product Marketing and Strategy from March 2013 to January 2017 and Senior Director of Global Partnerships and Digital Strategy from February 2017 to December 2020. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

> iii. Kropp, FE-5 believes, would have been able to see how many people clicked through Active Advantage web portal and how many people redeemed the offers available to them as members. Membership cancelations would have been tracked by Kropp in order to assess the performance of the product. FE-5 believes that Kropp would have tracked the cancellations, chargebacks, and complaints as part of the key performance indicators for Active Advantage.

**ANSWER:**

Admit that Mr. Kropp would have had access to key performance indicators tracked for Active Advantage, including information concerning members' redemption of certain offers and benefits and requests for membership cancellations and chargebacks. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

> iv. Calls to technical support were recorded, so Active and GPN had a complete record of the complaints.

**ANSWER:**

Defendant Active admits that, during portions of the Class Period, external phone calls made to Active's technical support group were recorded for quality assurance purposes.  The other Defendants lack knowledge or information sufficient

to form a belief as to the truth of these allegations.  Deny the remaining allegations in this sub-paragraph.

> v. Refunding consumers was "regular" and "a really common thing" that was happening "every day." FE-5 conceived of the idea to reward technical support representatives for convincing consumers to keep Active Advantage memberships.

**ANSWER:**

Admit that Active granted certain refund requests.  Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

> vi. Active responded to all of the complaints on the Better Business Bureau website.

**ANSWER:**

Admit that Active responded to many complaints made on the Better Business Bureau website relating to Active and/or its services. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-5. Deny the remaining allegations in this sub-paragraph.

> f. FE-6:

> i. Active Advantage was notorious within the company. "We all knew in marketing that it was kind of sneaky how they

got people into it and the program," FE-6 said. "It wasn't a secret. It was talked about in the office."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-6 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

     ii.    "There were a lot of complaints about Active Advantage," FE-6 said. "I know people were very angry about it. There were a lot of customers who were upset they got tricked into buying this."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-6 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

    g.    FE-7:

     i.    Director of Technical Support Jeff Tang reviewed Better Business Bureau complaints about Active Advantage.

**ANSWER:**

Defendants Active and Facini admit that Jeff Tang was a Director of Technical Support at Active and that, during his tenure, he reviewed certain reports pertaining

58

to the Advantage program that were filed with the Better Business Bureau. The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

> ii.    Active tracked cancelations, credit card chargebacks, and complaints about Active Advantage through Salesforce, and tracked how many Active Advantage members redeemed the offers available to them as members. Salesforce was widely accessible at Active.

**ANSWER:**

Defendants Active and Facini admit that Active tracked certain information relating to cancelations, credit card chargebacks, and complaints about Advantage. Defendants Active and Facini admit that during the Class Period, Active used Salesforce software, including for purposes relating to requests to cancel Advantage memberships, but deny that the Salesforce software was "widely accessible" within Active. The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

        iii.    Customer refund requests were the company's "most hot-button topic."

**ANSWER:**

Denied.

        iv.    "We had a team dedicated to that function, to helping with Active Advantage memberships," FE-7 reported. "Of the team that helped with that, refunding and canceling memberships were probably the most common reasons people would reach out to us."

**ANSWER:**

Admit that certain Active employees had responsibility for assisting Active Advantage members. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-7. Deny the remaining allegations in this sub-paragraph.

        v.    The technical support numbers were "pretty lopsided" with more people trying to cancel obtain get a refund instead of seeking help completing a transaction.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

60

h.   FE-8:

i.   "The team [that] customers would call into; their whole job was just to convince people to stay with the program. They were like a retention team. If you look at Consumer Reports and other places about this membership, it's all scam, scam, scam."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-8, Consumer Reports, or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

ii.   It was "common knowledge" at Active that people were tricked into signing up for Active Advantage memberships. "It had that scammy kind of feel to it," FE-8 said.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-8 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

iii.   "There were 50 to 100 people and all they did was answer these calls," FE-8 said. "Seventy-five to 90 percent of the phone calls were about people trying to cancel the automatically charged subscription fee for signing up for races. They were like the reverse sales team – trying to sell

61

something to somebody that's already been charged. It was bogus."

**ANSWER:**

Admit that Active employed staff responsible for responding to calls from customers and Active Advantage members. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-8 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> iv.   FE-8 heard that Active Advantage constituted a "large, large portion of the actual business," FE-8 said. "It was a big part of their valuation."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-8 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> i.   FE-9:
>
> i.   Prior to the COVID-19 pandemic, Active was responsible for about $200 million of revenue. During the height of the pandemic, it was around $100 million.

62

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-9. Deny the remaining allegations in this sub-paragraph, except refer to Active financial records for information about Active's revenues.

    ii.    As President of Vertical Markets Software Solutions, FE-9 had weekly one-on-one meetings with the presidents of each of the 12 software businesses they oversaw, including Active. Thus, FE-9 had weekly meetings with Defendant Facini concerning Active.

**ANSWER:**

Admit that Global Payments' President of Vertical Markets Software Solutions typically held weekly one-on-one meetings with the presidents of each of the 12 software businesses they oversaw, which included Mr. Facini, during his tenure as President of Active. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

    iii.    FE-9 also had monthly business reviews with the leadership teams of each of the 12 software businesses in their purview. For Active, the leadership team included the president of the company (Defendant Facini, and prior to that Evan Davies), as well as Randy Skemp, who was head of sales, and Active's CFO (Jennifer Mitchell and then Mark Murphy). Defendant Bready and Vice President/General Manager of Sports Toby Green also attended these monthly meetings. "The monthlies were more focused on business performance, forecast

63

adjustments, risks of the business, things of that nature," FE- 9 said.

**ANSWER:**

Admit that the individuals named in the second sentence of this sub-paragraph were members of Active's leadership team during their respective tenures at Active. Admit that the individuals named in the second and third sentences of this sub-paragraph attended certain Active business review meetings, some of which included discussion of Active performance, forecasts, and/or business risks. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-9. Deny the remaining allegations in this sub-paragraph.

    iv.    GPN also had quarterly meetings, presided over by Defendant Sloan, and attended by ten to fifteen members of the GPN leadership team, including Defendants Bready, Todd, and Whipple. Each subsidiary business made a presentation. For Active the presenter was Evan Davies until he was replaced by Defendant Facini.

**ANSWER:**

Admit that Messrs. Sloan, Bready, Todd, and Whipple, and certain other Global Payments executives participated in periodic meetings (often held quarterly) during their respective tenures and that executives of certain Global Payments subsidiaries, including Messrs. Davies or Facini on behalf of Active, sometimes

presented information at such meetings, but state that both during the Class Period and now, Active represented a small portion of Global Payments' overall business and that discussions concerning Active and the Advantage program were not a major focus of such meetings. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-9. Deny the remaining allegations in this sub-paragraph.

> v. The subsidiary businesses, including Active, reported monthly and quarterly on their performance.

**ANSWER:**

Admit that Global Payments' subsidiaries, including Active, provided monthly and quarterly reporting on certain performance data to Global Payments. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to describe statements, observations, beliefs, or actions of FE-9 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> j. FE-10:
>
> i. "It was a pretty busy department," FE-10 said. "We usually had calls waiting." FE-10 recalled that "we had a lot of complaints about Active Advantage. It was a genuine

65

thing. With 100 percent certainty I can say we got complaints every day about it."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

    k.    FE-11:

        i.    "I heard horror stories," FE-11 said. "I heard a lot of the escalations that would come through with people saying, "I didn't sign up for this.""

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

        ii.    Or, ""We've got another one that said they didn't sign up for it.' It was stuff that I had heard from other reps on the floor."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

        iii.    "It didn't sound legitimate because a lot of the software they did was signing up for marathons and triathlons and things of that nature and when they signed up for them, they were automatically enrolled in this Active Advantage and there were some angry people."

66

**ANSWER:**

Deny that event registrants "were automatically enrolled in" Active Advantage. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

        iv.    FE-11 recalled a representative who working on camping accounts shared some "'Oh my gosh' moments" of clients calling to complain signed up for a camp and were unknowingly enrolled in Active Advantage. "The whole thing kind of stunk."

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

        l.    FE-12:[8]

        i.    According to FE-12, other attendees of these meetings included: Chief Information Officer, Global Operations and General Manager of e-Commerce, Greg Ingino (who ran the meetings); Micah Kropp, the Director, Global Partnerships & Digital Strategy, who was in charge of building the Active Advantage program; Gary Schwake, the Vice President of Consumer Engagement and Partnerships; and Cristine Kao, VP of Marketing. In addition, Defendant Facini was present for part of the last quarterly business review meeting FE-12 attended before FE-12 left the company in March 2019.

---

[8] This sub-paragraph is listed on page 40 of the Complaint as paragraph "1.i." Defendants assume this is a typographical error but use the same numbering in this Answer for consistency.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

> ii. During these meetings, Kropp reported about how many subscriptions they got this quarter and the resulting net revenue. In addition, "there was always mention of people complaining, wanting to cancel but we're not letting them cancel and automatic renewals," FE-12 said. "People were upset about automatic renewals."

**ANSWER:**

Defendants Active and Facini admit that Mr. Kropp reported on matters relating to the Advantage program, sometimes including with respect to Advantage subscriptions and related revenues, at certain Active town hall meetings. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-12 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> iii. According to FE-12, leadership didn't seem to care about the complaints. Rather, they were focused on how to get more people to sign up to the membership, FE-12 said. "Their attitude was I know people are complaining but they should read the fine print or they should uncheck the box," FE-12 said.

68

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-12 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

> iv.    Active salespeople also told FE-12 that their customers (i.e., the organizers of the races, events, camps, and so forth) "hated" the Active Advantage button in their registration workflow and wanted it off because they received complaints as well.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

> v.    FE-12 said that this "unethical" practice continued because it yielded "millions" for Active. "I would say it was really easy, guaranteed money for them because it was a guaranteed automatic signup from the customer," FE-12 said.

69

**ANSWER:**

Deny that the process for enrollment in Active Advantage was "unethical," "guaranteed," or "automatic." Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this sub-paragraph.

**ANSWER:**

79.  FE-13:

    i.   Active included provisions in contracts with clients specifically permitting Active to include Active Advantage offers in the payment and registration workflow for client events. Active included these provisions by default and removed it only if the client specifically requested it. If Active agreed not to include Active Advantage offers in the workflow for a specific client or client event, then Active's technical support team was tasked with the technical aspects of removing the inserted offer.

**ANSWER:**

Defendants Active and Facini admit that: (i) Active's contracts with customers typically included provisions permitting Active to offer enrollment in the Advantage program as part of the participant registration and payment processes those customers contracted with Active to manage; (ii) such provisions were sometimes removed from contracts at clients' request; and (iii) Active technical personnel assisted with technical aspects of removing the offer from the registration and payment processes in such instances. The other Defendants lack knowledge or

70

information sufficient to form a belief as to the truth of these allegations. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-13. Deny the remaining allegations in this sub-paragraph.

ii.    Usually, only larger clients requested that Active remove contractual provisions permitting Active to include Active Advantage offers in registration and payment workflows. At times this occurred prior to contract execution. At other times, clients later complained about the inserted offer and Active agreed to remove it.

**ANSWER:**

Defendants Active and Facini admit that: (i) certain Active customers requested removal of contractual provisions permitting Active to include Active Advantage offers in the participant registration and payment processes they contracted with Active to manage; and (ii) in some instances, customers requested the removal of those provisions and Active agreed to do so prior to executing that contract and, in other instances, the request was made and agreed after the contract had been executed.  The other Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations.

iii.   FE-13 was responsible for larger accounts; if the contract involved less than $250,000 of revenue, FE-13 likely

71

would not have been aware of the client's concerns regarding Active Advantage.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph.

iv. Complaints from customers about being signed up for the Active Advantage membership without their knowledge or consent were "ongoing" during FE-13's tenure with Active. "This was not something where one or two of us knew about it. We all knew about it."

**ANSWER:**

Admit that Active received complaints about the Advantage program, including complaints claiming that members had unknowingly enrolled. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-13 or other unnamed persons. Deny the remaining allegations in this sub-paragraph.

80. Thus, Active continued to employ illegal and deceptive practices to trick consumers into signing up for Active Advantage, bolstering Active's—and GPN's—revenues, while creating a risk of regulatory action that would depress those same revenues.

**ANSWER:**

Denied.

**E.    Defendants Misrepresent the Basis of Active's Performance and Compliance.**

81.    Despite Active's unlawful practices, Defendants touted Active's performance during the Class Period as hinging on bookings for events and competitions, omitting any mention of the millions brought in by tricking consumers into joining Active Advantage.

**ANSWER:**

Denied.

82.    Defendants went far beyond that, however. In its annual reports on Form 10-K for 2020 and 2021, GPN definitively assured investors that "[w]e are currently in compliance with existing legal and regulatory requirements[.]"  This was blatantly false, as investors began to learn when the CFPB filed its complaint.

**ANSWER:**

Admit that Global Payments' annual reports on Form 10-K for years 2020 and

2021 both include the statement:  "We are currently in compliance with existing legal

and regulatory requirements."  Deny the remaining allegations in this paragraph,

except refer to Global Payments' 2020 and 2021 annual reports on Form 10-K for

their contents.

83.    After the filing of the CFPB Complaint, GPN backed away [*sic*] its false assurances.  GPN's annual report on Form 10-K for 2022, filed on February 17, 2023, stated: "We are currently in compliance ***in all material respects*** with applicable existing legal and regulatory requirements and do not expect that maintaining compliance with these regulations will have a material adverse effect

on our capital expenditures, earnings or competitive and financial positions." GPN has implicitly conceded that its prior assertions of compliance were false.

**ANSWER:**

Admit that Global Payments' annual report on Form 10-K for 2022, filed on February 17, 2023, included the statement: "We are currently in compliance in all material respects with applicable existing legal and regulatory requirements and do not expect that maintaining compliance with these regulations will have a material adverse effect on our capital expenditures, earnings or competitive and financial positions." Deny the remaining allegations in this paragraph, except refer to Global Payments' 2022 annual report on Form 10-K for its contents.

### F.    The CFPB Files Its Complaint.

84.    On October 18, 2022, the CFPB filed the CFPB Complaint in Federal court, revealing that Active had continued its unlawful practices. The CFPB alleged that Active violated the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B), because it (1) "has represented, directly or indirectly, expressly or by implication, that consumers who, during and in connection with their online event registration and payment transactions, provide information on the enrollment page for Active Advantage and click on the highlighted 'Accept' call to action button were registering only for their event," and (2) "interfered, at the time of the transaction, with consumers' ability to understand that by providing information on the enrollment page and clicking on the highlighted 'Accept' call to action button, the consumers would be enrolled in the fee-based discount club, Active Advantage, with automatic withdrawal of a recurring annual membership fee."

**ANSWER:**

Admit that the CFPB filed the CFPB Complaint on October 18, 2022.  Deny the remaining allegations in this paragraph, except to refer to the CFPB Complaint for its allegations.

85.     In addition to revealing that Active continued to employ dark patterns and negative options to trick consumers into recurring Active Advantage memberships, the CFPB Complaint alleged that Active violated section 907(a) of the (EFTA), 15 U.S.C. § 1693e(a), and section 1005.10(d) of Regulation E, 12 C.F.R. § 1005.10(d), by increasing the Active Advantage membership fee without sending consumers "written notice of the amount and date of the transfer at least 10 days before" levying the increased fee. Violations of Regulation E are subject to penalties for $1,000 *per violation*, not to exceed 1% of the defendant's assets.

**ANSWER:**

The allegations in this paragraph state legal conclusions that Defendants are not required to admit or deny.  To the extent a response is required, deny the allegations in this paragraph, except refer to the text of the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq*., and Regulation E, 12 C.F.R. § 1005, for their contents. Deny the remaining allegations in this paragraph, except to refer to the CFPB Complaint for its allegations.

86.     In response to this news, the price of GPN stock declined 1.17% from its $115.00 opening price that day, and declined approximately another 0.88%, the following day.

**ANSWER:**

Deny the allegations in this paragraph, except refer to historical data regarding prices at which shares of Global Payments' common stock traded at various times on October 18, 2022 and October 19, 2022.

### G.   Defendant Sloan Abruptly Leaves GPN.

87.   On May 1, 2023, with no prior public warning, GPN announced that its longtime CEO, Defendant Sloan, would leave GPN effective one month later (June 1, 2023). Defendant Sloan had occupied the CEO role since 2013 and oversaw and publicly justified the acquisition of Active.

**ANSWER:**

Admit that Mr. Sloan served as Global Payments' CEO from approximately 2013 through the time of his resignation from that position effective June 1, 2023, and that during his tenure as CEO he made public statements concerning the acquisition of Active which speak for themselves. Admit that Global Payments filed an SEC Form 8-K on May 1, 2023, attaching among the exhibits thereto a press release dated May 1, 2023 and a letter agreement between Mr. Sloan and the Company addressing, among other things, Mr. Sloan's resignation. Deny the remaining allegations in this paragraph, except refer to the May 1, 2023 Form 8-K and its exhibits for their contents.

88.   Defendant Sloan had no position lined up for the next phase of his career. According to his LinkedIn, he is currently "self-employed." Defendant Bready, Active's COO, was pressed into service to take Sloan's place as CEO.

76

**ANSWER:**

Admit that Mr. Sloan's LinkedIn page (https://www.linkedin.com/in/jeff-sloan-996a05163/) states that he is currently "Self-employed" as a "Board Member, Private Equity and Venture Capital Investor." Admit that Mr. Bready succeeded Mr. Sloan as Global Payments' CEO and was elected to the Company's board of directors following Mr. Sloan's resignation. Deny the remaining allegations in this paragraph.

89. Coming shortly after the CFPB Complaint and GPN's tacit admission that its prior assurances of regulatory compliance were false, Sloan's surprise departure is likely connected to GPN's misleading of investors concerning Active's deceptive business practices. After all, Sloan had overseen the acquisition of Active and its integration into GPN's financial reporting. Analysts called the news of his departure surprising and confusing. In response to the announcement, GPN's share price fell approximately 8.62%.

**ANSWER:**

Deny the allegations in this paragraph, except refer to analyst commentary relating to Mr. Sloan's departure from Global Payments for its contents and refer to historical data regarding prices at which shares of Global Payments' common stock traded at various times on and around May 1, 2023.

**H.    Defendants Had An Affirmative Duty under Items 303 and 105 of Regulation S-K To Disclose The Omitted Facts.**

90. Item 303 of Regulation S-K, 17 C.F.R. §229.303(a), requires domestic issuers to disclose any "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Item 303, 17 C.F.R. §229.303(b)(2)(i), specifically requires domestic issuers to:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

**ANSWER:**

The allegations in this paragraph state legal conclusions that Defendants are not required to admit or deny. To the extent a response is required, deny the allegations in this paragraph, except refer to Item 303 of Regulation S-K, 17 C.F.R. §229.303(a), and 17 C.F.R. §229.303(b)(2)(i) for their contents.

91.    The SEC's May 18, 1989 interpretive release (No. 33-6835) provides a two-step test to determine whether disclosure under Item 303 is required:  Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:  (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.  (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

**ANSWER:**

The allegations in this paragraph state legal conclusions that Defendants are not required to admit or deny. To the extent a response is required, deny the allegations in this paragraph, except refer to SEC Release No. 33-6835 for its contents.

92.    In violation of Item 303, Defendants omitted the material factor of Active's use of deceptive trade practices to trick consumers into signing up for

Active Advantage constituted a known trend, commitment, event or uncertainty because it was reasonably likely to lead to regulatory scrutiny, investigations, and penalties, and because, as a result of such, Active's practices—and the resulting revenues—were unsustainable.

**ANSWER:**

Denied.

93.    Furthermore, Item 105 of SEC Regulation S-K required disclosure of "material factors" that made an investment in GPN "speculative or risky." The SEC has confirmed that Item 105's definition of "material" is consistent with the Supreme Court's longstanding definition: that is, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Omissions in violation of Item 105 are actionable under the Exchange Act.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph. The remaining allegations in this paragraph state legal conclusions that Defendants are not required to admit or deny. To the extent a response is required, deny the allegations in this paragraph, except refer to Item 105 of SEC Regulation S-K and to the complete text of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 449 (1976) for their contents.

94.    In violation of Item 105, Defendants omitted the material factor of Active's use of deceptive trade practices to trick consumers into signing up for Active Advantage, which made an investment in GPN speculative or risky.

**ANSWER:**

Denied.

## V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

95.    Rule 10b-5(b) provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" Defendants violated that provision as detailed herein.

**ANSWER:**

The allegations in the first sentence of this paragraph state legal conclusions that Defendants are not required to admit or deny. To the extent a response is required, deny the allegations in the first sentence of this paragraph, except refer to Rule 10b-5 for its contents. Deny the remaining allegations in this paragraph.

### A.    Defendants' False And Misleading Statements And Omissions in GPN's Periodic Reports Filed with The SEC

96.    On February 19, 2021, GPN filed its Annual Report on Form 10-K for the year ending December 31, 2020 (the "2020 Form 10-K"). Each of Defendants Sloan and Todd certified that he had reviewed the 2020 Form 10-K and that it did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading.  The 2020 Form 10-K stated that:

> Various aspects of our business are subject to regulation and supervision under federal, state and local laws in the United States, and foreign laws, regulations and rules, as well as local escheat laws and privacy and information security regulations. In addition, we are subject to rules promulgated by the various payment networks, including American Express, Discover, Interac, Mastercard and Visa. Set forth below is a brief summary of some of the significant laws and regulations that apply to us. These descriptions are not exhaustive, and these laws, regulations and rules frequently change and are increasing in number.

*We are currently in compliance with existing legal and regulatory requirements* and do not expect that maintaining compliance with these regulations will have a material adverse effect on our capital expenditures, earnings or competitive and financial positions. See "Item 1A - Risk Factors" for additional discussion of the potential risks associated with future changes in laws or regulations.

**ANSWER:**

Admit that Global Payments filed its Annual Report on Form 10-K for the year ending December 31, 2020 on February 19, 2021. Admit that Messrs. Sloan and Todd executed certifications pursuant to Rule 13a-14(a) of the Securities Exchange Act as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 that were attached as Exhibits to this Annual Report. Deny the remaining allegations in this paragraph, except refer to the cited Form 10-K (including all Exhibits thereto) for its contents.

97. The statement that GPN was "currently in compliance with existing legal and regulatory requirements" (which was not present in GPN's earlier periodic reports and thus was purposefully added by Defendants during the Class Period) was materially false and misleading because Active was violating federal and state consumer protection laws, including the CFPA and the EFTA, by continuing to employ deceptive trade practices to trick consumers into signing up for Active Advantage.

**ANSWER:**

Denied.

98. The 2020 Form 10-K also stated that:

All persons offering or providing financial services or products to consumers, directly or indirectly, can be subject to prohibitions against unfair, deceptive, or abusive acts or practices under the Dodd-Frank Act. More generally, all persons engaged in commerce, including, but not limited to, us and our merchant and financial institution customers, are also subject to Section 5 of the Federal Trade Commission ("FTC") Act prohibiting unfair or deceptive acts or practices ("UDAP"). In addition, there are other laws, rules and or regulations, including the Telemarketing Sales Act, that may directly affect us or the activities of our merchant customers and in some cases may subject us to investigations, fees, fines and disgorgement of funds in the event we are deemed to have aided and abetted or otherwise provided the means and instrumentalities to facilitate the illegal activities of the merchant through our payment processing services. Various federal and state regulatory enforcement agencies, including the FTC, the CFPB and the states' attorneys general have the authority to take action against nonbanks that engage in UDAP or violate other laws, rules or regulations and, ***to the extent we are in violation of these laws, rules or regulations or processing payments for a merchant that may be in violation of these laws, rules or regulations, we may be subject to enforcement actions and as a result may incur losses and liabilities***.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the cited Form 10-K for its contents.

99. Defendants' statement that GPN may be subject to enforcement actions "to the extent [it was] in violation of these laws, rules or regulations or processing payments for a merchant that may be in violation of these laws, rules or regulations" was materially misleading because Defendants did not disclose that Active continued to violate federal and state consumer protection laws, including the CFPA and the EFTA, by continuing to employ deceptive trade practices to trick consumers into signing up for Active Advantage.

82

**ANSWER:**

Denied.

100.   On February 18, 2022, GPN filed its Annual Report on Form 10-K for the year ending December 31, 2021 (the "2021 Form 10-K"). Each of Defendants Sloan and Todd certified that he had reviewed the 2021 Form 10-K and that it did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements therein not misleading.  The 2021 Form 10-K stated that:

> Various aspects of our business are subject to regulation and supervision under federal, state and local laws in the United States, and foreign laws, regulations and rules, as well as local escheat laws and privacy and information security regulations. In addition, we are subject to rules promulgated by the various payment networks, including American Express, Discover, Interac, Mastercard and Visa. Set forth below is a brief summary of some of the significant laws and regulations that apply to us. These descriptions are not exhaustive, and these laws, regulations and rules frequently change and are increasing in number.
>
> ***We are currently in compliance with existing legal and regulatory requirements*** and do not expect that maintaining compliance with these regulations will have a material adverse effect on our capital expenditures, earnings or competitive and financial positions.

**ANSWER:**

Admit that GPN filed its Annual Report on Form 10-K for the year ending December 31, 2021 on February 18, 2022. Admit that Messrs. Sloan and Todd executed certifications pursuant to Rule 13a-14(a) of the Securities Exchange Act as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 that were

83

attached as Exhibits to this Annual Report. Deny the remaining allegations in this paragraph, except refer to the cited Form 10-K (including all Exhibits thereto) for its contents.

101.    The statement that GPN was "currently in compliance with existing legal and regulatory requirements" was materially false and misleading because Active was violating federal and state consumer protection laws, including the CFPA and the EFTA, by continuing to employ deceptive trade practices to trick consumers into signing up for Active Advantage.

**ANSWER:**

Denied.

102.    The 2021 Form 10-K also stated that:

> Because we directly or indirectly offer or provide financial services or products to consumers, we are subject to prohibitions against unfair, deceptive, or abusive acts or practices under the Dodd-Frank Act. More generally, all persons engaged in commerce, including, but not limited to, us and our merchant and financial institution customers, are subject to Section 5 of the Federal Trade Commission ("FTC") Act prohibiting unfair or deceptive acts or practices ("UDAP"). We also have businesses that are subject to credit reporting and debt collection laws and regulations in the U.S. Various federal and state regulatory enforcement agencies, including the FTC, the CFPB and the states' attorneys general, have the authority to take action against nonbanks that engage in UDAP or violate other laws, rules or regulations and, *to the extent we are in violation of these laws, rules or regulations or processing payments for a merchant that may be in violation of these laws, rules or regulations, we may be subject to enforcement actions and as a result may incur losses and liabilities.*

**ANSWER:**

Deny the allegations in this paragraph, except refer to the cited Form 10-K for its contents.

103.  Defendants' statement that GPN may be subject to enforcement actions "to the extent [it was] in violation of these laws, rules or regulations or processing payments for a merchant that may be in violation of these laws, rules or regulations" was materially misleading because Defendants did not disclose that Active continued to violate federal and state consumer protection laws, including the CFPA and the EFTA, by continuing to employ deceptive trade practices to trick consumers into signing up for Active Advantage.

**ANSWER:**

Denied.

104.  In addition, Defendants violated Item 303 and Item 105 of Regulation S-K by omitting to disclose, in GPN's 2020 Form 10-K and 2021 Form 10-K, that Active continued to employ deceptive trade practices to trick consumers into signing up for Active Advantage.

**ANSWER:**

Denied.

**B.     Defendants' False And Misleading Statements And Omissions in Calls with Analysts**

105.  On October 31, 2019, GPN held a Q3 2019 Earnings Call. During the call, Defendant Bready discussed growth components of the Company and stated, in pertinent part:

> The second thing I would say in our own software businesses, we continue to see strong bookings growth across AdvancedMD and *ACTIVE* as well.

**ANSWER:**

Admit that during Global Payments' quarterly earnings conference call on October 31, 2019, Mr. Bready made substantially the statement that is block-quoted in this paragraph. Deny the remaining allegations in this paragraph, except refer to the transcript of the October 31, 2019 earnings conference call for its contents.

106.   On May 13, 2020, Defendant Bready discussed the impact of the COVID-19 pandemic on GPN's businesses, stating:

> Our gaming business, our [A]ctive events business, a lot of events have been postponed or rescheduled. ***So, that will have a bit of a revenue impact on that business***.

**ANSWER:**

Admit that, on May 13, 2020, Mr. Bready made substantially the statements that are block-quoted in this paragraph during a conference presentation. Deny the remaining allegations in this paragraph, except refer to the transcript of May 13, 2020 conference presentation transcript for its contents.

107.   On June 9, 2021, Defendant Bready discussed the performance of GPN's Vertical Markets businesses, including Active, stating:

> It's a really good question because in a lot of ways, we view those businesses, gaming and ACTIVE in particular, is a bit of a canary in the coal mine around how the recovery is pacing. I'll talk about education separately. Let me start with ACTIVE and gaming. We've seen really good trends in ACTIVE and gaming and even gaming returned to growth in the first quarter, which was an encouraging sign. iGaming continues to grow at a pretty rapid pace. We're well-positioned there and we're continuing to see sort of the in-person, in-casino volumes increase kind of month

86

after month. So gaming, I think, is on a pretty good trajectory as we sit here in June and looks to be trending in line or better than our expectations kind of for the full year, assuming, of course, things remain on track from a recovery standpoint. ***From an ACTIVE basis, what we've seen is really good booking trends, largely for events in the back half of the year. So we are seeing good volumes of bookings in the ACTIVE business, particularly around camps for the summer and then events, more traditional sporting events and endurance events in the back half of the year. So, assuming those events happen, I think ACTIVE is poised to have a pretty good 2021 and a very strong back half of 2021 as people want to get back out and begin reengaging in those activities again***.

**ANSWER:**

Admit that, on June 9, 2021, Mr. Bready made substantially the statements that are block-quoted in this paragraph during a conference presentation. Deny the remaining allegations in this paragraph, except refer to the transcript of the June 9, 2021 conference presentation for its contents.

108. On November 17, 2021, in response to a question about the effect of the COVID-19 pandemic, Defendant Bready stated:

The second area where we've seen the same kind of impacts are in some of our vertical markets businesses. And I think we've talked pretty openly about those. Our K-12 education business has struggled to recover, largely because of school lunches being free. ***ACTIVE networks has been slower to recover as people have been slower, obviously to re-engage in some of the events that ACTIVE caters to***.

87

**ANSWER:**

Admit that, on November 17, 2021, Mr. Bready made substantially the statements that are block-quoted in this paragraph during a conference presentation. Deny the allegations in this paragraph, except refer to the transcript of the November 17, 2021 conference presentation for its contents.

109.   On December 7, 2021, an analyst asked Defendant Sloan for "an update specifically on a number of your verticals, K-12, ACTIVE Network, and gaming." In response, Defendant Sloan stated:

> Well, it's a great question, so let me just start off by saying those are three very good businesses. The impact has squarely been from the pandemic and not from something else. So really, they've been most acutely impacted by the pandemic and haven't recovered as sharply as some of our other businesses, which I'll talk about in a second. Having said that, the fourth quarter that we're in now, Rayna, the fourth quarter of 2021, we expect the portfolio to pivot to growth compared to 2019, so hopefully a lot of that, Rayna, therefore is behind it, will no longer be a drag on our performance relative to 2020, and we'll be growing relative to 2019. To give you a sense of size, those three businesses, K-through-12 schools where we have 40,000 public schools primarily in the United States using our services; our gaming business which is a mix of online and offline, but mostly offline; and **our ACTIVE endurance business collectively contribute about 10% of merchant revenue and, as I mentioned, they're all healthy but for the obvious macro around the pandemic. The very good news beyond the fact they turned in the fourth quarter that we're now in is that ACTIVE and gaming has showed really good bookings trends and really good performance most recently**.

88

**ANSWER:**

Admit that on December 7, 2021, Mr. Sloan made substantially the statements that are block-quoted above during a conference presentation. Deny the remaining allegations in this paragraph, except refer to the transcript of the December 7, 2021 conference presentation for its contents.

110.    On May 2, 2022, Defendant Sloan, in response to a question about recent growth on the Merchant Solutions segment, stated:

> ***So actually our performance has accelerated in a number of the businesses that Cameron can describe within vertical markets in terms of reopenings, Darrin, that had been more recent laggards; examples include ACTIVE and K-12 have also returned to growth.*** So we feel really good about kind of where we are there, and as we said in our prepared remarks, we think that's really going to be a tailwind for our business this year and thereafter.

**ANSWER:**

Admit that during Global Payments' quarterly earnings conference call on May 2, 2022, Mr. Sloan made substantially the statements that are block-quoted in this paragraph. Deny the remaining allegations in this paragraph, except refer to the transcript of the May 2, 2022 earnings conference call for its contents.

111.    On May 16, 2022, Defendant Sloan touted Active's growth:

> So, to date, I would say the consumer remains very healthy. We really have not seen a volume or other performance impact of any significance coming out of the consumer. If you break down further into our business segments to get to heart of your question, in our Merchant business, new sales and bookings

> trends remain very consistent. We saw 20% bookings growth in the first quarter of 2022 relative to 2021. We saw 35% bookings growth in our vertical markets business with really record bookings in our TouchNet university business and in our active business and in our AdvancedMD healthcare business.

**ANSWER:**

Admit that on May 16, 2022, Mr. Sloan made substantially the statements that are block-quoted above during a conference presentation. Deny the remaining allegations in this paragraph, except refer to the transcript of the May 16, 2022 conference presentation for its contents.

112. On May 23, 2022, Defendant Bready, in response to a question about recovery of GPN's Vertical Markets businesses in light of the continuing COVID-19 pandemic (given that GPN had previously said the Vertical Markets businesses, including Active, were significantly negatively affected by COVID-19), told analysts that:

> The second vertical that was more heavily impacted is our [A]ctive business. ***Active largely focuses on sporting events and fitness events as well as registration for fun runs and those types of activities. Obviously, during the pandemic, that business was heavily impacted by those events being canceled and not coming back to some degree quite as of yet. As we get again further into 2022, we expect that business to continue to recover back towards 2019 levels.***

**ANSWER:**

Admit that on May 23, 2022, Mr. Bready made substantially the statements that are block-quoted above during a conference presentation. Deny the remaining

allegations in this paragraph, except refer to the transcript of the May 23, 2022

conference presentation for its contents.

113.    On August 31, 2022, Defendant Sloan touted Active's growth without disclosing the reliance on deceptive trade practices:

> But the other piece, the good news is that our vertical markets businesses that were more impacted in 2020, including our ACTIVE and K-12 businesses are back to contributing to growth as a tailwind, and that portfolio is turned into the tailwind that we said it would, really, all along. So, overall, just to go back to where you started, I think we're in a really good place from an operating point of view. And, again, our trends, volumes and the like, are tracking in line with our expectations.

**ANSWER:**

Admit that on August 31, 2022, Mr. Sloan made substantially the statements

that are block-quoted above during a conference presentation. Deny the remaining

allegations in this paragraph, except refer to the transcript of the August 31, 2022

conference presentation for its contents.

114.    Defendant Bready added, again without alerting investors to the deceptive trade practices:

> And our ACTIVE business just produced its seventh consecutive quarter of bookings growth, which is another tailwind for our businesses.

**ANSWER:**

Admit that on August 31, 2022, Mr. Sloan made substantially the statements

that are block-quoted above during a conference presentation.  Deny the remaining

91

allegations in this paragraph, except refer to the transcript of the August 31, 2022 conference presentation transcript for its contents.

115.   The statements in the paragraphs 105-114 above about Active's performance, including those touting Active's growth and attributing such growth to bookings were materially misleading because they omitted and failed to disclose that Active's revenues were derived in substantial part from illegal and deceptive trade practices to trick consumers into signing up for Active Advantage.

**ANSWER:**

Denied.

### C.   Defendants' False and Misleading Statements and Omissions on Active's Websites

116.   During the Class Period, several materially false and misleading statements and omissions were made on Active's websites (including https://www.activenetwork.com/).   These statements and omissions portrayed Active's registration and payment processing software as easy to use, fostering consumer loyalty, and driving consumer engagement.

**ANSWER:**

Admit that https://www.activenetwork.com/ was a page of Active's website during the Class Period.   Deny the remaining allegations in this paragraph, except refer to all historical versions of the pages on Active's website in use during the Class Period for their contents.

117.   During the Class Period, including on December 28, 2019, Active's website homepage (https://www.activenetwork.com/home) described Active's registration and payment processing software as follows:

> ACTIVE makes registrations, payment processing, program management and more, easy! Our wide range of solutions are

created specifically to meet your needs and drive up participation
-- meaning you save time and resources.

**ANSWER:**

Admit that https://www.activenetwork.com/home was a page of Active's

website during the Class Period and that, at times during the Class Period, the text

that is block-quoted in this paragraph appeared on that page.  Deny the remaining

allegations in this paragraph, except refer to all historical versions of the pages on

Active's website in use during the Class Period for their contents.

118.  This was false and misleading because Active's registration and
payment processing services were not "created specifically to meet your needs and
drive up participation." Rather, they were also designed to trick consumers into
signing up for Active Advantage, benefiting Active and costing (rather than
"sav[ing]") the "time and resources" of Active's customers and of consumers.

**ANSWER:**

Denied.

119.  During the Class Period, including on April 20, 2020, an Active website
(https://www.activeendurance.com/home) stated that "ACTIVE's race registration
and technology help elevate the participant experience so that your event stands out
from the crowd."

**ANSWER:**

Admit that https://www.activeendurance.com/home was a page of Active's

website during the Class Period and that, at times during the Class Period, the text

that appears in quotation marks in this paragraph appeared on that page.  Deny the

93

remaining allegations in this paragraph, except refer to all historical versions of the

pages on Active's website in use during the Class Period for their contents.

120.   This was false and misleading because Active's "race registration and technology," rather than "elevat[ing]" the participant experience, were specifically designed to trick consumers into signing up for Active Advantage, undermining the "participant experience."

**ANSWER:**

Denied.

121.   During the Class Period, including on February 26, 2021, an Active website (https://www.activeendurance.com/home) stated that Active's event technology, including its registration and payment software services, permit event organizers to "[b]oost [their] brand and [their] business by maintaining a ***seamless experience for your customers***, from registration to race day."

**ANSWER:**

Admit that https://www.activeendurance.com/home was a page of Active's

website during the Class Period.  Deny the remaining allegations in this paragraph,

except refer to all historical versions of the pages on Active's website in use during

the Class Period for their contents.

122. This was false and misleading because Active's registration and payment software services, rather than "maintaining a *seamless experience for your customers*, from registration to race day," were specifically designed to trick consumers into signing up for Active Advantage, creating a negative experience for event organizers and their customers.

**ANSWER:**

Denied.

123. On May 21, 2021, a blog post (https://www.activenetwork.com/blog/have-the-best-advantage-with-active-advantage) on Active's website described the Active Advantage sign-up process as follows:

# Signing Up is a Breeze

With all these great deals, you're probably wondering, "How do I sign up for ACTIVE Advantage?" All it takes is four simple steps.

- Within the "Review Cart & Check Out Page", under 'Order Details', Click "Learn More" to view the offer

- Once the 'Learn More' information has appeared, click "Add to Cart" to accept the offer

- Once the offer is accepted, a free trial line-item will be added and the processing fee will be waived

- Confirm your order and click "Accept"

**ANSWER:**

Admitted.

124. This was false and misleading because signing up for Active Advantage, rather than "a breeze," was the result of illegal and deceptive business practices for millions of consumers. Moreover, Defendants omitted to state that signing up for Active Advantage requires agreeing to pay an annual fee.

**ANSWER:**

Denied.

125. On July 16, 2021, a blog post (https://www.activenetwork.com/blog/chargebacks) on Active's website addressed the issue of credit card chargebacks, stating:

> When it comes to chargebacks, think of it the same way. Instead of you having to personally deal with the issue, our team at ACTIVE handles it for you. In fact, as your partner, ACTIVE Network challenges *every* chargeback received. When a chargeback is initiated, ACTIVE steps in and has been successful in disputing between 50-80% of the chargebacks received. After winning the case, the chargeback is closed in ACTIVE's favor and funds are returned.

**ANSWER:**

Admit that on July 16, 2021, a blog post including substantially the text that is block-quoted in this paragraph appeared at the https://www.activenetwork.com/blog/chargebacks page of Active's website. Deny the remaining allegations in this paragraph, except refer to all historical versions of the pages on Active's website in use during the Class Period for their contents.

126. This statement was false and misleading by touting Active's purported success at disputing credit card chargebacks while omitting to state that a large number of chargebacks arose from Active's illegal and deceptive trade practices to trick consumers into signing up for Active Advantage, and that Active acceded to

96

such chargebacks rather than disputing them (and did not successfully dispute 50-80% of such chargebacks).

**ANSWER:**

Denied.

## VI.    LOSS CAUSATION

127.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased GPN common stock at artificially inflated prices and were damaged thereby. The price of GPN common stock declined when the concealed risks materialized and/or when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**ANSWER:**

Denied.

128.  Specifically, artificial inflation in the price of GPN common stock was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions, as detailed above, was partially revealed to the public on October 18, 2022 and May 1, 2023.

**ANSWER:**

Denied.

129.  On October 18, 2022, during the trading day, the market learned of the CFPB Complaint and the allegations therein. In response to this news, the price of GPN stock declined to $113.67, a decline of $1.33, or 1.17%, from its $115.00 opening price that day, and declined another $1.00, or approximately 0.88%, the following day, closing at $112.67 per share on October 19, 2022.

**ANSWER:**

Deny the allegations in this paragraph, except refer to historical data regarding prices at which shares of Global Payments' common stock traded at various times on October 18, 2022 and October 19, 2022.

130.   On February 17, 2023, before the market opened, GPN filed its 2022 Form 10-K. By contrast to GPN's prior unhedged assertions that it was "in compliance with existing legal and regulatory requirements," the 2022 Form 10-K stated that GPN was "in compliance *in all material respects* with applicable existing legal and regulatory requirements." In response to this news, the price of GPN stock declined $1.04, or 0.89%, from a closing price of $117.35 on February 16, 2023, to close at $116.31 on February 17, 2023.

**ANSWER:**

Admit the allegations in the first sentence of this paragraph and admit that Global Payments' Form 10-K filed on February 17, 2023 included a statement that "We are currently in compliance in all material respects with applicable existing legal and regulatory requirements and do not expect that maintaining compliance with these regulations will have a material adverse effect on our capital expenditures, earnings or competitive and financial positions." Deny the remaining allegations in this paragraph, except refer to historical data regarding prices at which shares of Global Payments' common stock traded at various times on February 16 and 17, 2023.

131.   On May 1, 2023, before the market opened, GPN surprised the market by announcing that Defendant Sloan would leave GPN effective June 1, 2023, to be

replaced as President and CEO by Defendant Bready. Analysts described the news as surprising and confusing. In response to this news, the concealed regulatory risks relating to Active's deceptive business practices materialized, and GPN's share price fell $9.71 per share, or approximately 8.62%, from a closing price of $112.71 on April 28, 2023 (the previous trading day) to close at $103.00 per share on May 1, 2023.

**ANSWER:**

Admit that Global Payments filed a Form 8-K with the SEC on May 1, 2023, prior to market opening, announcing that it had entered into a letter agreement with Mr. Sloan dated May 1, 2023 pursuant to which to which the parties acknowledged that Mr. Sloan would be leaving the Company and its Board of Directors effective June 1, 2023.  Deny the remaining allegations in this paragraph, except refer to historical data regarding prices at which shares of Global Payments' common stock traded at various times on April 28, 2023 and May 1, 2023.

## VII.  ADDITIONAL SCIENTER ALLEGATIONS

### A.  GPN's Due Diligence Prior to Acquiring Active

132.  Before agreeing to acquire Active, GPN conducted due diligence about Active, including receiving non-public information about Active's revenues, which certainly included information showing the amount of revenue attributable to Active Advantage. Thus, GPN's executive leadership at the time (which included all of the Individual GPN Defendants) was aware that Active Advantage was material to Active's financial performance. In addition, the amounts that Active agreed to pay in connection with settling the lawsuits and investigations filed by consumers and government attorneys would have been reflected in the internal financial information received and reviewed by GPN's executive leadership. Furthermore, GPN would have received information showing a significant number of employees responsible for handling customer complaints.

**ANSWER:**

Admit that Global Payments conducted due diligence on Active before acquiring Active, which included receipt of certain non-public financial information relating to Active, including information about Active's historical revenues, and information relating to Active's resolution of certain lawsuits and investigations. Admit that the individuals Plaintiffs refer to as the "Individual GPN Defendants" were executives of Global Payments or certain subsidiaries of Global Payments at the time of Global Payments' acquisition of Active. Deny the remaining allegations in this paragraph.

133. Moreover, at the time that GPN acquired Active, there was a great deal of public information concerning Active's deceptive trade practices, including public dockets of legal actions, press releases by government attorneys, and consumer complaints on Active's social media channels as well as on third-party websites such as the Better Business Bureau, Yelp, and ComplaintsBoard. Thus, GPN's executive leadership was aware of Active's unlawful practices with respect to Active Advantage.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the referenced information sources for their contents.

**B.    Active Continued To Receive and Respond to A Flood of Consumer Complaints During the Class Period.**

134. After GPN acquired Active, the flood of consumer complaints—made both directly to Active and about Active on third-party websites—continued. The Better Business Bureau webpage for Active, which states that Active is "NOT BBB ACCREDITED," reveals that the Better Business Bureau has 890 complaints about

Active in the last 3 years and has closed 382 complaints about Active in just the last 12 months (meaning that the BBB processed those complaints, forwarded them to Active, and gave Active time to respond and the consumers time to state whether Active's response was satisfactory). The vast majority of these complaints—which Active employees responded to—concern surprise charges for Active Advantage memberships.

**ANSWER:**

Admit that complaints about Active have been made directly to Active and also to the Better Business Bureau and that Active has responded to many such complaints. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

135. Even a cursory online search for "Active Network" yields references to Active's deceptive practices. Indeed, the first page of Google search results includes an Active webpage entitled "Unknown Credit Card Charge," as shown here:



**ANSWER:**

Admit that a Google search of the phrase "active network" will identify search results including those depicted in this paragraph. Lack knowledge or information sufficient to form a belief as to the truth of the allegation that such results will always be included in the first page of results. Deny the remaining allegations in this paragraph.

136. That page links to three other pages concerning refunds for Active Advantage memberships:

## Unknown Credit Card Charge

Participant Management  Print    Share

The ACTIVE Network is a software provider that processes activity registrations and online payments for organizations in multiple markets, such as endurance (running, swimming, cycling), team sports (baseball, basketball, football, soccer), camping (reservations), communities (park and recreation centers), business conferences, and school-affiliated groups.

If a participant contacts an organization asking about a transaction showing a merchant descriptor such as **ACT\*** or **ACTIVE-Network** preceding the organization name prefix, then the participant registered and paid for an activity online or through an organization's point-of-sale (POS) system (such as at the organization office).

For additional details on various ACTIVE Network charges, please refer to the following articles found within the ACTIVE.com Support Help Center ⮺.

- $89.95 Charge on Bank Statement
- $49.99 Active Advantage Charge on Bank Statement
- £24.99 Active Advantage Charge on Bank Statement
- ACT Charge on Bank Statement
- ACTIVE Refund

To submit a request for Credit Card charge search, please send an email to support team at support@active.com by providing the followings:

1. Transaction Date
2. Transaction Amount
3. Last 4-digits of Credit Card
4. Credit Card holder's full name
5. Credit Card Charge Descriptor

**<u>ANSWER</u>:**

Admit that the Unknown Credit Card Charge link depicted in paragraph 135 links to a page of Active's website containing information that is similar in many respects to that depicted in this paragraph.  Deny the remaining allegations in this paragraph.

137.   While investors were not aware of the volume of complaints received by Active or of the revenues derived from Active Advantage, GPN's executive management (i.e., the Individual GPN Defendants), as well as Defendant Facini, had access to this information.

**ANSWER:**

Denied.

C.    **The CFPB Conducted an Investigation of GPN and Active Prior to Filing a Complaint.**

138.    Prior to filing the CFPB Complaint, the CFPB conducted an investigation of Active that included obtaining internal Active documents and communications and securing testimony from Active leadership. GPN was necessarily aware of this given that Active is its wholly owned subsidiary and in light of the close oversight of Active conducted by GPN's legal and communications departments, which FE-1 recalled had to approve *all* Active press releases. Indeed, they exercised such close oversight that FE-1 believes they did not approve any press releases submitted by their department.

**ANSWER:**

Admit the allegations in the first sentence of this paragraph. Admit that Active is a wholly owned subsidiary of Global Payments and that certain members of Global Payments' legal department and certain other employees of Global Payments were aware of the CFPB's investigation. Admit that personnel in Global Payments' legal and communications departments reviewed and approved certain press releases prior to their issuance by Active. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this sub-paragraph purporting to quote and/or describe statements, observations, beliefs, or actions of FE-1 or other unnamed persons. Deny the remaining allegations in this paragraph.

139.    The detailed allegations set forth in the CFPB Complaint make clear that the CFPB's investigation began well before the filing of the CFPB Complaint. For instance, the CFPB Complaint states: "[i]n an internal email, a senior manager

of ACTIVE described the Active Advantage discount club as providing 'pure profit.' An ACTIVE vice president testified that 'pure profit' means 'the cost of goods sold was next to zero.'"

**ANSWER:**

Deny the allegations in this paragraph, except refer to the CFPB Complaint

for its allegations and refer to the referenced email and testimony for their contents.

140.   The CFPB Complaint also includes detailed allegations about: Active's marketing tests for Active Advantage conducted between 2016 and 2019 (i.e., before and after GPN acquired Active); Active's analysis of chargeback rates for Active Advantage during 2018 and 2019; and Active's analysis concluding that about 72% of the consumers who were enrolled in Active Advantage through the inserted offer and who requested to cancel their membership in 2019 were "unaware" of their membership.

**ANSWER:**

Deny the allegations in this paragraph, except refer to the CFPB Complaint

for its allegations.

141.   Given these detailed allegations and the fact that the CFPB secured testimony from Active employees prior to filing the lawsuit, it is virtually certain that the investigation began—and that Active and GPN were aware of the investigation—for a significant portion of the Class Period, including on February 18, 2022 when GPN filed the 2021 Form 10-K falsely stating that GPN was "currently in compliance with existing legal and regulatory requirements." GPN walked back this assertion in the 2022 Form 10-K.

**ANSWER:**

Admit that certain employees of Active and Global Payments were aware of

the CFPB's investigation involving Active throughout the Class Period.  Deny the

105

remaining allegations in this paragraph, except refer to Global Payments' Form 10-Ks filed on February 18, 2022 and February 17, 2023 for their contents.

### D.    GPN and its Executives Were Responsible for the Decision to Acquire Active and Thus for Its Contribution to GPN.

142.    Individual GPN Defendants Sloan, Bready, and Whipple—and Sloan in particular, as CEO—were executives of GPN at the time it acquired Active. These Defendants were responsible for GPN's decision to acquire Active, which they touted to investors at the time. As a result, these Defendants were responsible for Active's success as a subsidiary of GPN, and therefore were motivated to conceal Active's use of deceptive practices to trick consumers into Active Advantage memberships.

**ANSWER:**

Admit that Mr. Sloan was CEO of Global Payments at the time of the Active acquisition. Admit that Mr. Bready was Executive Vice President and Chief Financial Officer of Global Payments at the time of the Active acquisition. Admit that Mr. Whipple was Global Payments' Chief Strategy and Enterprise Risk Officer at the time of the Active acquisition. Deny the remaining allegations in this paragraph.

### E.    Corporate Scienter of GPN

143.    GPN is liable for the acts of the Individual GPN Defendants, Active, Facini, and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency, including, for example, statements made in SEC filings signed by Individual GPN Defendants, because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency. Active is wholly owned, controlled, and overseen by GPN, as is Active's leadership including (during his tenure) Defendant Facini.

**ANSWER:**

Admit that Active is a wholly owned subsidiary of Global Payments. Deny

the remaining allegations in this paragraph.

144.   The scienter of the Individual GPN Defendants, Active, and other employees and agents of GPN is similarly imputed to GPN under the corporate scienter doctrine, respondeat superior, and agency principles.

**ANSWER:**

Denied.

## VIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

145.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities other than Defendants who or which purchased or otherwise acquired GPN common stock during the period October 31, 2019 and October 18, 2022, both dates inclusive, and who were damaged thereby, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:**

Admit that Plaintiffs purport to bring this action as a putative class action on

behalf of the "class" described. Deny that Plaintiffs or the other putative class

members they purport to represent are entitled to relief and deny that class treatment

of the claims is appropriate. Deny the remaining allegations in this paragraph.

146.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GPN common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs

107

believe that there are at least hundreds or thousands of members in the proposed Class.

**ANSWER:**

Admit that throughout the Class Period, Global Payments' common stock was traded on the NYSE. Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

147.   Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein. Plaintiffs have retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs. Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

**ANSWER:**

Deny the allegations in the second sentence of this paragraph.   Lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

148.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

**ANSWER:**

Lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph. Deny the remaining allegations in this paragraph.

149.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)    whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and the proper measure of such damages.

**ANSWER:**

The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

150.    Individualized issues of reliance will not predominate over common issues. The presumption of reliance applies because at all relevant times, the market for GPN common stock was an efficient market.

**ANSWER:**

The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

## IX.    NO SAFE HARBOR

151.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged herein to be misleading were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**ANSWER:**

The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Defendants deny those allegations.

152.    Alternatively, to the extent that the statutory safe harbor does apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized and/or approved by an executive officer of GPN who knew that those statements were false when made.

110

**ANSWER:**

Denied.

## X.    CAUSES OF ACTION

### FIRST CLAIM
**Violations of Section 10(b) of The Exchange Act And**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

153.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.  This claim is brought against all Defendants.

**ANSWER:**

Defendants repeat and reincorporate their responses set forth above as if fully set forth herein. Admit that Plaintiffs purport to assert the "First Claim" against all Defendants. Deny that the "First Claim" has any merit.

154.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**

Denied.

155.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of GPN common stock in an effort to maintain artificially high market prices for GPN common stock in violation of Section 10(b) of the Exchange Act and Rule

111

10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

**ANSWER:**

Admit that Plaintiffs purport to sue Defendants under Section 10(b) of the Exchange Act and Rule 10b-5. Deny the remaining allegations in this paragraph.

156. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about GPN's financial well-being and prospects, as specified herein.

**ANSWER:**

Denied.

157. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of GPN's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about GPN and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of GPN common stock during the Class Period.

**ANSWER:**

Denied.

158. Each of the Individual GPN Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual GPN Defendants were high-level executives and/or directors at GPN during the Class Period and members of GPN's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer

and/or director of GPN, was privy to and participated in the creation, development and reporting of GPN's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of GPN's management team, internal reports and other data and information about GPN's and Active's finances, operations, legal proceedings, and compliance matters at all relevant times; and (iv) each of these defendants was aware of GPN's and Active's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

**ANSWER:**

Denied.

159.   Defendant Facini's primary liability and controlling person liability arises from the following facts: (i) Defendant Facini was the President of Active; (ii) Defendant Facini, by virtue of his responsibilities and activities as President of Active, was privy to and participated in the creation, development and reporting of Active's internal budgets, plans, projections and/or reports, and of GPN's internal budgets, plans, projections and/or reports with respect to Active; (iii) Defendant Facini enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, GPN's management team and other members of Active's management team, internal reports and other data and information about GPN's and Active's finances, operations, legal proceedings, and compliance matters at all relevant times; and (iv) Defendant Facini was aware of GPN's and Active's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

**ANSWER:**

Denied.

## SECOND CLAIM
### Violations of Section 20(a) of The Exchange Act
### Against GPN, The Individual GPN Defendants, and Facini

160.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein. This claim is brought against Defendants GPN, Jeff Sloan, Cameron Bready, Paul Todd, Josh Whipple, and Andrea Facini.

113

**ANSWER:**

Defendants repeat and reincorporate their responses set forth above as if fully set forth herein. Admit that Plaintiffs purport to assert the "Second Claim" against Defendants GPN, Jeff Sloan, Cameron Bready, Paul Todd, Josh Whipple, and Andrea Facini. Deny that the "Second Claim" has any merit.

161.    The Individual GPN Defendants acted as controlling persons of GPN and Active within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of the Individual GPN Defendants' high-level positions, participation in and/or awareness of GPN's and Active's operations and/or intimate knowledge of the statements filed by GPN with the SEC and disseminated to the investing public, the Individual GPN Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of GPN and Active, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual GPN Defendants were provided with or had unlimited access to copies of GPN's and Active's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:**

Denied.

162.    In particular, the Individual GPN Defendants had direct and supervisory involvement in the day-to-day operations of GPN and Active and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

**ANSWER:**

Admit that Messrs. Sloan, Bready, Whipple, and Todd had supervisory involvement in certain of GPN's day-to-day operations during their respective tenures at Global Payments. Deny the remaining allegations in this Paragraph.

163.   Defendant Facini acted as a controlling person of GPN within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of Defendant Facini's high-level position, participation in and/or awareness of GPN's and Active's operations and/or intimate knowledge of the statements filed by GPN with the SEC and disseminated to the investing public, Defendant Facini had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of GPN and Active, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendant Facini was provided with or had unlimited access to copies of Active's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:**

Denied.

164.   In particular, Defendant Facini had direct and supervisory involvement in the day-to-day operations of GPN and Active and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

**ANSWER:**

Admit that Mr. Facini had supervisory involvement in certain of Active's day-to-day operations during his tenure at Active. Deny the remaining allegations in this Paragraph.

165.   GPN was a controlling person of Active within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of GPN's ownership of Active, GPN was able to and did exercise oversight of Active, and had awareness of Active's operations and/or intimate knowledge of Active's false and misleading statements alleged herein. GPN had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Active, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. GPN was provided with or had unlimited access to copies of Active's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:**

Denied.

166.   As set forth above, the Individual GPN Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person of GPN, and because of their culpable participation in the misleading statements/omissions and/or the fraudulent scheme alleged herein, the Individual GPN Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**ANSWER:**

Denied.

167.   As a direct and proximate result of the Individual GPN Defendants' wrongful conduct alleged herein, Plaintiffs and other members of the Class suffered damages in connection with their purchases of GPN's securities during the Class Period.

**ANSWER:**

Denied.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

(b)   Awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## ANSWER:

Deny that Plaintiffs are entitled to any of the relief requested in the Prayer for Relief and deny the remaining allegations in these and any other portions of the Complaint to the extent not expressly admitted herein.

117

## XII.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

## ANSWER:

Defendants join Plaintiffs' demand for a trial by jury.

## DEFENSES

Without assuming the burden of proof or persuasion where it otherwise rests with Plaintiffs, Defendants plead the following defenses:

## FIRST DEFENSE

Without admitting that Plaintiffs suffered damages, or that Defendants are liable for any such damages, Defendants assert that any liability is limited by 15 U.S.C. § 78u-4(e) & (f) and under principles of equitable allocation, recoupment, set-off, proportionate liability, comparative fault, and failure to mitigate.

## SECOND DEFENSE

Plaintiffs' claim under Section 20(a) of the Exchange Act fails because the Individual Defendants acted with good faith and did not directly or indirectly induce

118

any act or acts constituting a direct or primary violation of the Securities Exchange Act of 1934 or the rules or regulations thereunder.

## THIRD DEFENSE

Every act or omission alleged in the Complaint was done or omitted in good faith conformity with the rules and regulations of the Securities and Exchange Commission, and therefore, pursuant to Section 23(a) of the Securities Exchange Act of 1934, there is no liability for any act or omission so alleged.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs assumed risks about which they complain in this action.

## FIFTH DEFENSE

Plaintiffs' claims are barred to the extent they are untimely under the applicable statute of limitations and/or doctrine of laches.

## SIXTH DEFENSE

Defendants are not liable for alleged misstatements and omissions protected by the safe harbor provision of Section 10(b) of the Exchange Act and the rules promulgated thereunder and/or the "bespeaks caution" doctrine.

## SEVENTH DEFENSE

Defendants are not liable under the "truth-on-the-market" doctrine because the truth concerning any alleged misstatement or omission of material fact by Defendants was at all relevant times publicly available to the market through credible sources.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

Defendants reserve the right to raise any additional defenses, cross-claims, and third-party claims not asserted herein of which they may become aware through discovery or other investigation, as may be appropriate at a later time.

WHEREFORE, Defendants having fully answered Plaintiffs' Amended Class Action Complain, pray:

    (a)    that the Amended Class Action Complaint be dismissed with prejudice;

    (b)    that judgment be entered in Defendants' favor;

    (c)    that all costs of this action be taxed against Plaintiffs; and

    (d)    for such other and further relief as the Court deems proper.

Dated: May 13, 2024

/s/ Michael R. Smith
Michael R. Smith
Georgia Bar No. 661689
Benjamin Lee
Georgia Bar No. 443082
Peter Starr
Georgia Bar No. 648453
Matthew Rosenthal
Georgia Bar No. 871852
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Tel:  (404) 572-4600
Fax:  (404) 572-5100
mrsmith@kslaw.com
blee@kslaw.com
pstarr@kslaw.com
mrosenthal@kslaw.com

*Attorneys for Defendants Global Payments*
*Inc., Active Network LLC, Jeff Sloan,*
*Cameron Bready, Paul Todd,*
*Josh Whipple, and Andrea Facini*

## **RULE 7.1(D) CERTIFICATION**

The undersigned counsel certifies that this document has been prepared with

one of the font and point selections approved by the Court in Local Rule 5.1(C).

/s/ *Michael R. Smith*
Michael R. Smith
Georgia Bar No. 661689

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day a copy of the foregoing was filed and served using the Court's CM/ECF system which will send notification of such filing to ECF registered participants.

DATED this 13th day of May 2024.

/s/ Michael R. Smith
Michael R. Smith
Georgia Bar No. 661689

*Counsel for Defendants*